IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHARLES JACKSON,                          )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )      Civil Action No.  07-111
                                          )      Judge Nora Barry Fischer
THE CITY OF PITTSBURGH, a PA              )
Municipal Corporation, ET AL.,            )
                                          )
            Defendants.                   )
                                          )

## MEMORANDUM OPINION

### I.      Introduction

        This is a civil rights case arising under  42 U.S.C. § 1983  in which Plaintiff, Charles Jackson

("Plaintiff"), claims that Defendants, the City of Pittsburgh ("City") and five of its police officers,

Timothy Kreger ("Kreger"), Eric Holmes ("Holmes"), Mark Goob ("Goob"), James Joyce ("Joyce"),

and Gregory Woodhall ("Woodhall," collectively "Defendant Officers"),[1] violated his constitutional

rights under the Fourth, Eighth, and Fourteenth Amendments, and committed torts under

Pennsylvania law. Plaintiff's claims stem from an incident that occurred on November 2, 2001, in

which Defendant Officers pulled him over for a traffic stop. Plaintiff alleges that during the stop he

was assaulted by Kreger, his vehicle was unlawfully searched, he was unlawfully arrested, and

denied necessary medical treatment prior to being incarcerated at the Allegheny County Jail ("ACJ").

The matter is currently before the Court on Defendants' Joint Motion for Summary Judgment.

(Docket No. 80). Upon consideration of Defendants' Motion and Brief in Support (Docket Nos. 80

and 82), Plaintiff's Response (Docket No. 85), Defendants' Reply (Docket No. 89), Plaintiff's Sur-

---

[1]

        Plaintiff also originally sued Terry Collings, another City police officer, and the County of Allegheny. These
two Defendants were dismissed by the Court on February 20, 2008, as they were not named in Plaintiff's Second
Amended Complaint. (*See* Docket No. 42).

Reply (Docket No. 92), and for the reasons set forth herein, the Court will GRANT, in part, and DENY, in part, the Motion.

## II.     Factual Background

Unless otherwise specified, the facts of record are uncontested. Viewed in the light most favorable to Plaintiff, they are as follows.

### A.     *The Traffic Stop*

On November 2, 2001, between 9:10 and 9:30 p.m., Plaintiff, then a 36 year old resident of Pittsburgh, was driving in the area of Hamilton Avenue and Frankstown Road in the Homewood area of Pittsburgh. (Docket No. 87 at ¶ 1, 3, 4; Docket No. 81 at ¶ 1, 3, 4). That evening, Defendant Officers Kreger, Goob, Joyce and Woodhall,[2] all narcotics officers with the City of Pittsburgh police department, were traveling together in an unmarked car on a narcotics detail. (Docket No. 56 at ¶12; Docket No. 86 at ¶1; Docket No. 93-4 at ¶1). They were all in plainclothes. (Docket No. 81 ¶ 2; Docket No. 87 at ¶ 2). Plaintiff claims that he was driving on North Braddock Avenue and attempted to make a left turn onto Frankstown Road on his way to meet his parents for bowling. (Docket No. 81 at ¶¶ 3, 5). However, Defendant Officers maintain that they observed Plaintiff traveling on Hamilton Avenue in a 1988 black Nissan and made a right turn onto North Braddock Avenue without signaling, and that his vehicle emitted a loud noise, suggesting a malfunctioning muffler. (Docket No. 81 at ¶¶ 3, 6). In response to same, Defendant Officers testified that they initiated a traffic stop near the intersection of Mead Street and North Braddock Avenue, while Plaintiff asserts

---

[2]     In their Answer to the Fourth Amended Complaint, Defendants contend that while Defendant Holmes is employed by the Pittsburgh City Police Bureau, he was not present or involved in the events that took place on November 2, 2001. (Docket No. 58 at ¶¶7, 12). Indeed, nowhere in Plaintiff's Fourth Amended Complaint does he refer to any alleged conduct by Defendant Holmes. (Docket No. 56). Nor does Plaintiff make any reference to him in his filings opposing summary judgment. (Docket Nos. 85, 87, 92, and 93-4). Accordingly, Defendant, Eric Holmes, is dismissed from this action. *See Donnelly v. Johns-Manville Sales Corp.*, 677 F.2d 339, 341 (3d Cir. 1982).

he was stopped near a business called "Beer World," which is no longer in operation. (Docket No. 81 at ¶ 7; Docket No. 87 at ¶ 7).

According to Defendants, after pulling Plaintiff over, Defendant Goob approached his driver's window, requesting Plaintiff's driver's license, to which Plaintiff responded that he did not have one. (Docket No. 81 at ¶¶ 8-9).  The parties dispute that Plaintiff's Pennsylvania license was suspended. Defendant Officers testified that they performed a background check at the scene and verified that Plaintiff's Pennsylvania driver's license had been suspended.(Docket No. 81 at ¶9-10). In contrast, Plaintiff contends that all four officers "ambushed [him] with guns drawn and flashlights glaring" and that the officers told him he was being pulled over because he was "a known drug dealer." (Docket No. 87 at ¶¶ 6-8). Plaintiff further contends that his vehicle was not producing a loud noise from the muffler, (Docket No. 87 at ¶6), and that he did have a valid Pennsylvania driver's license. (Docket No. 87 at ¶ 9). Plaintiff also stated that the officers failed to check and see that he also had a valid Ohio driver's license.[3] (Docket No. 81 at ¶ 11; Docket No. 87 at ¶ 9; Docket No. 93-4 at ¶¶ 8-9).

   B.     *Search of Plaintiff's Car*

After verifying that Plaintiff's suspended Pennsylvania license, Defendant Officers informed Plaintiff that he would not able to continue to drive his vehicle. (Docket No. 81 at ¶ 12; Docket No. 87 at ¶ 12). Defendant Officers contend that where the vehicle was stopped created an impediment and hazard to traffic, while Plaintiff claims that his car "offer[ed] no such impediment." (*Id.* at ¶ 13). Plaintiff denies the officers' contention that they asked him to get out of the car, rather, he claims they pulled open his door and "demanded that Plaintiff get out of the vehicle." (*Id.* at ¶ 14).  Upon

---

[3]

   Plaintiff at one point admits that his Pennsylvania driver's license was expired at the time of the stop, although he had a valid Ohio license. (Docket No. 93-4 at ¶ 9).

doing so, Plaintiff testified that Defendant Officers immediately frisked him. (*Id.*).  The officers then informed Plaintiff that his vehicle would have to be towed because it created a hazardous impediment to traffic. (*Id.* at ¶ 15).

In anticipation of the arrival of the tow truck, Defendant Kreger conducted an inventory search of the vehicle. (Docket No. 81 at ¶ 16). Plaintiff attests that Defendant Kreger searched his vehicle three or four times without cause, and that these searches were made immediately upon Plaintiff's exit from the car.[4] (Docket No. 87 at ¶ 16; Docket No. 93-4 at ¶ 5).  During these searches, Defendants allegedly tore a hole in one of the seats and pulled a speaker out of a wall of the car. (Docket No. 93-4 at ¶ 4).  Plaintiff contends that the towing of his vehicle was in violation of City of Pittsburgh Bureau of Police Regulation Order 41-4 or 5.1.3,[5] because Plaintiff was not allowed to contact someone to retrieve the vehicle on his behalf prior to its tow. (Docket No. 85 at 2; Docket No. 93-4 at ¶¶ 11-12).  Further, Plaintiff testified that Defendant Officers had no justification for towing Plaintiff's car because it was not an impediment to traffic, as the car had not been stopped near a stop signal, was on the right side of the road, and was only passed by a couple of cars throughout the duration of the stop. (Docket No. 87 at ¶13).

In contrast, Defendant Officers contend that Plaintiff's vehicle was not damaged by their search, and that Plaintiff signed a Towing Notice provided by the officers prior to the tow. (Docket No. 81 at ¶ 18). The Towing Notice indicates that Plaintiff's vehicle was, in every category, marked

---

[4]

In his Fourth Amended Complaint Plaintiff claims his vehicle was searched three separate times by Defendant officers. (Docket No. 56 at ¶14).  In later pleadings, Plaintiff contends that the number of times his car was searched was, in fact, four. (Docket No. 93-4 at ¶5; Docket No. 87 at ¶16).

[5]

Plaintiff claims that Defendant Officers' towing of his vehicle violated Order 41-4 of the City of Pittsburgh Bureau of Police Regulations. (Docket No. 85 at 2).  Plaintiff later asserts in the same pleading and subsequent responsive pleadings that the tow was actually a violation of 5.1.3. of the City of Pittsburgh Bureau of Police Regulations, discussed *infra*, without discussing the earlier mentioned Order 41-4. (Docket No. 85 at 6).

"damaged" at the time the vehicle was towed. (*Id.*). They further claim that Plaintiff's car was already in "deplorable condition" before the traffic stop. (Docket No. 95 at ¶ 4). Defendants also note that in his statements to the Office of Municipal Investigations ("OMI"), Plaintiff only stated that the officers enlarged a preexisting tear in one of the seats while they acknowledge that a stereo had been torn out. (*Id.*).

      C.    *Arrest of Plaintiff*

Through the course of the traffic stop, Defendant Officers maintain that Plaintiff became increasingly agitated and used profane language upon learning that his vehicle would be searched and towed. (Docket No. 81 at ¶ 17; Docket No. 87 at ¶ 17). The officers advised Plaintiff to "settle down" and to "chill out," but Plaintiff denies that this occurred. (Docket No. 81 at ¶ 19; Docket No. 87 at ¶ 19). Defendant Officers testified that Plaintiff approached Kreger from behind as Kreger was conducing the inventory search, at which point Kreger turned to face Plaintiff, pushing him away. (Docket No. 81 at ¶¶ 20-21). Goob then physically restrained Plaintiff from behind, taking him to the ground using an "armbar" technique.(*Id.* at ¶¶ 22-23). It is uncontested that Joyce and Woodhall were not involved. (*Id.*). Kreger then handcuffed Plaintiff while he laid face down on the ground and continued to resist arrest. (*Id.* at ¶¶ 25-26). Defendant Officers admit that Plaintiff received an injury below his right eye as a result of this encounter, however, the severity of the injury is contested. (*Id.* at ¶ 27; Docket No. 87 at ¶ 24). In light of Plaintiff's behavior during his arrest, Defendants claim that the force used was reasonably necessary to effectuate the arrest. (Docket No. 58 at ¶¶16-17; Docket No. 59 at ¶17).  Defendants also assert that they had probable cause to conduct the arrest and to search Plaintiff incident to the arrest. (Docket No. 58 at ¶17; Docket No. 59 at ¶17).

Plaintiff's version of these facts differs drastically. Plaintiff denies initiating any contact with Kreger and asserts that Kreger physically assaulted him after another officer searched his pockets

and found $350.00, once again accusing him of being a drug dealer. (Docket No. 87 at ¶¶ 21, 22). Plaintiff asserts "that whatever type of hold was used by Goob was used while Plaintiff was staggering from Kreger's punch to this throat." (*Id.*). Plaintiff alleges that Defendant Kreger struck or punched him in the throat, face, and eyes numerous times in the process of arresting him and while he laid still on the ground. (Docket No. 87 at ¶24; Docket No. 93-4 at ¶¶15-17). It is undisputed that the other officers standing at the scene were not involved in this altercation; to this end, Plaintiff claims that they were "close enough to help," but did nothing. (Docket No. 81 at ¶ 23; Docket No. 87 at  ¶¶ 23, 25).

       D.     *Events Subsequent to Plaintiff's Arrest*

Plaintiff testified that despite his obvious injuries suffered as a result of purported mistreatment by Defendant Kreger, he was refused medical treatment prior to being admitted to the Allegheny County Jail. (Docket No. 81 at ¶¶ 28-29).  He contends that he experienced blackouts, and difficulty with swallowing and breathing. (Docket No. 93-4 at ¶¶18-19).  However, Defendants claim Plaintiff was not denied any medical treatment. (Docket No. 59 at ¶27). To this end, Defendants attest that no one brought to the county jail with visible injuries or complaints of physical injuries is admitted without clearance from a hospital. (Docket No. 59 at ¶23). Moreover, Defendant Officers testified that they offered Plaintiff medical assistance at the scene and that he denied said request. (Docket No. 89 at 2; Docket No. 95 at ¶ 20).

After his arrest, Plaintiff was transported to the Allegheny County Jail and charged with

disorderly conduct,[6] resisting arrest,[7] failing to activate his turn signal,[8] and driving without a license.[9] (Docket No. 81 at ¶¶ 30, 31; Docket No. 87 at ¶ 30, 31). Plaintiff asserts that he was incarcerated for one to three days[10] prior to his Preliminary Hearing. (Docket No. 56 at ¶¶27-28; Docket No. 85 at 2). At Plaintiff's Preliminary Hearing, the court dismissed all charges except the failure to use a turn signal. (Docket No. 56 at ¶29; Docket No. 93-4 at ¶24). Plaintiff pled guilty and paid the fine for the charge of failing to use a turn signal, because he "just wanted to get it out of the way." (Docket No. 93-4 at ¶ 25).

Upon his discharge from the jail, on November 3, 2001, Plaintiff went to the Western Pennsylvania Hospital Emergency Department, where he complained of blurred vision, pain and numbness of the cheek, and difficulty swallowing. (Docket No. 81 at ¶ 32; Docket No. 87 at ¶ 32). The attending physician diagnosed a large "facial abrasion," and noted that it was cleaned thoroughly. (Docket No. 81 at ¶¶34-35; Docket No. 83-1 at 14). The physician also noted that

---

[6]

Under 18 Pa. C.S. § 5503, "[a] person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, if (1) he engages in fighting or threatening, or in violent or tumultuous behavior; (2) makes unreasonable noise; (3) uses obscene language, or makes an obscene gesture; or (4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor." 18 Pa.C.S. § 5503.

[7]

A person commits a misdemeanor of the second degree of resisting arrest or other law enforcement "if, with the intent of preventing a public servant from effecting a lawful arrest or discharging any other duty, the person creates a substantial risk of bodily injury to the public servant or anyone else, or employs means justifying or requiring substantial force to overcome the resistance." 18 Pa.C.S. § 5104.

[8]

Under 75 Pa.C.S. § 3334(a) of the Pennsylvania Motor Vehicle Code, "no person shall turn a vehicle . . . without giving an appropriate signal."

[9]

Under 75 Pa.C.S. § 1501, drivers in Pennsylvania are required to be licensed at all times.

[10]

In his Fourth Amended Complaint, Plaintiff claimed he was held in the ACJ for three days prior to his preliminary hearing. (Docket No. 56 at ¶ 28).

7

Plaintiff's physical exam indicated cheek and neck pain and numbness, as well as shortness of breath and blurred vision. (Docket No. 87 at ¶ 33; Docket No. 95 at ¶ 18; Docket No. 83-1 at 14). He then prescribed Plaintiff antibiotic ointment before releasing Plaintiff from the hospital. (*Id.*). On November 7, 2001, Plaintiff's family doctor, Dr. Kenneth Ung, noted some neck and facial bruising, as well as some tenderness and trouble turning his head. (Docket No. 87 at ¶33; Docket No. 87-23). Dr. Ung also noted that Plaintiff had some bruises and contusions over both cheeks and a neck bruise around the windpipe, with mild trouble swallowing. (Docket No. 87-23).

Plaintiff claims Defendant Officers' actions were racially motivated. (Docket No. 87 at ¶ 40). For this proposition, Plaintiff cites the inconsistent reasoning given by one of the Defendants for stopping his car, i.e. that Plaintiff was pulled over for allegedly running a stop sign. (Docket No. 87 at ¶ 5). However, following a formal complaint by Plaintiff, the OMI did not find that the Defendants conducted themselves inappropriately during the encounter with Plaintiff. (Docket No. 81 at ¶¶ 38-39).

With regards to Plaintiff's claims that the City is liable under section 1983 for Defendant Officers' actions, Defendants assert that the City maintains and imposes adequate and reasonable customs, policies, and practices, including, *inter alia*, training practices, procedures, customs, disciplinary procedures, and reviews. (Docket No. 58 at ¶48; Docket No. 81 at ¶¶42-43).

## III.   Procedural History

Plaintiff, originally proceeding *pro se*, initiated this case in the Court of Common Pleas of Allegheny County on October 31, 2003 by filing of a praecipe for a writ of summons. (Docket No.

1-4). The following parties were originally named as Defendants: County of Allegheny,[11] the City of Pittsburgh, and City of Pittsburgh police officers Terry Collings, Mark Goob, Eric Holmes, James Joyce and Timothy Kreger, in their individual and official capacities. (*Id.*). The City of Pittsburgh ruled Plaintiff to file a complaint on March 17, 2004 (Docket No. 1-9), and on January 11, 2007, the City filed a praecipe to enter judgment non pros. (Docket No. 1-13). Plaintiff filed his complaint on January 19, 2007, seeking damages in the amount of $10 million for various civil rights violations and tort claims. (Docket No. 1-14). Defendants removed the case to this Court on January 30, 2007. (Docket No. 1).

After resolving various motions by Defendants, the Court held a case management conference with counsel for Defendants and the Plaintiff on August 31, 2007, during which the Court set down case management deadlines. (Docket No. 20). On November 21, 2007, attorney Sylvia Denys entered her appearance on behalf of the Plaintiff. (Docket No. 30). Upon being granted leave to amend to file a fourth amended complaint, Plaintiff filed his Fourth Amended Complaint on June 24, 2008, (Docket Nos. 54 and 56, respectively), naming the City and the five Defendant Officers in their individual capacities. (Docket No. 56). In his Fourth Amended Complaint, Plaintiff seeks damages for violations of his Fourth Amendment rights (Counts I and II),  his rights under the Eighth Amendment (Count III), under 42 U.S.C. §§1985, and 1986 (Counts IV and V), and under Pennsylvania law (Count VI). (Docket No. 56). He demands relief in the form of compensatory damages for his injuries, punitive damages, injunctive relief, medical expenses, and payment of costs and attorney's fees (Docket No. 56).

---

[11] Upon a motion to dismiss by the County of Allegheny, which was granted by this Court on January 9, 2008 (Docket Nos. 32 and 39), said Defendant was dismissed with prejudice.

Fact discovery closed on July 21, 2009, after which Plaintiff filed an excessive force expert report by James Baranowski, a former Pennsylvania State Trooper, collision reconstruction specialist, and investigator.[12] (*See* Docket Nos. 71, 72, 73, and 76). Defendants filed their Joint Motion for Summary Judgment on August 21, 2009, along with their Concise Statement of Material Facts, Brief in Support, and Appendix. (Docket Nos. 80, 81, 82, and 83). After being granted an extension of time, on October 15, 2009, Plaintiff filed his Response, his Concise Statement of Material Facts, and a Reply to Defendants' Statement of Material Facts. (Docket Nos. 85, 86, and 87). Defendants filed their Reply on October 29, 2009, as well as a Counter Statement of Facts and reply Appendix. (Docket Nos. 89, 90, and 91). Plaintiff filed his Sur-Reply on November 5, 2009. (Docket No. 92).[13]

## IV.    Standard of Review

Summary judgment may only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

---

[12]

After Plaintiff filed his expert report on July 2, 2009, the Court convened a telephone status conference with counsel for the parties to advise counsel that Plaintiff's expert, Mr. Baranowski, had previously appeared before the Court as a plaintiff in a civil rights case, *see Baranowski v. Waters, et al.*, at Civ. A. Nos. 05-1379 and 08-544; the Court permitted counsel leave to review the issue with the parties. (Docket No. 77). Thereafter, counsel for the parties advised the Court that they had no objection to this Court proceeding with this matter. (Text Entry Order, 7/17/2009).

[13]

On November 17, 2009, Plaintiff filed a Motion to Amend/Correct (Docket No. 93) his Concise Statement of Material Facts (Docket No. 86) to correct citations to the supporting record, attaching thereto as an exhibit his corrected Concise Statement of Material Facts. (Docket No. 93-4). Defendants filed a response on November 18, 2009, opposing this motion, citing prejudice to Defendants caused by Plaintiff's counsel's lack of diligence. (Docket No. 94).  On November 30, 2009, Defendants filed a Response (Docket No. 95) to Plaintiff's corrected statement of facts attached as an exhibit to Plaintiff's motion. (Docket No. 93-4). In his Reply filed on that same day, Plaintiff argued that his corrections were minimal, and moreover, Defendants could not be prejudiced as they had already responded to his corrected statement. (Docket No. 96). On December 1, 2009, the Court granted Plaintiff's Motion to Amend/Correct his Concise Statement of Material Facts, finding that Defendants failed to demonstrate prejudice and that the motion was mooted given Defendant's response to Plaintiff's corrected statement. (Docket No. 97). Accordingly, Plaintiff's corrected Concise Statement of Material Facts (Docket No. 93-4) was accepted as filed on November 17, 2009. (*Id.*).

of law." FED.R.CIV.P. 56(c). Pursuant to Rule 56, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A motion for summary judgment will only be denied when there is a genuine issue of material fact, i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). The mere existence of some disputed facts is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-248 (1986).

In determining whether the dispute is genuine, the court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility. The court is only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy*, 413 F.3d at 363; *Simpson v. Kay Jewelers*, 142 F.3d 639, 643 n.3 (3d Cir.1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir.1994)). In evaluating the evidence, the court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in his favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir.2007). As to materiality, the relevant substantive law identifies which facts are material. *Anderson*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

V.     **Discussion**

The Civil Rights Act of 1871, 42 U.S.C. § 1983 ("§ 1983"), provides, in pertinent part,

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be

11

subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Section 1983, thereby, creates a cause of action for violations of the United States Constitution and federal laws but does not itself grant any substantive rights; in order to establish a claim under the statute, a plaintiff "'must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law.'" *Kneipp by Cusack v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996) (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141  (3d Cir. 1993)). Defendants have moved for summary judgment on all of Plaintiff's section 1983 claims, arguing that Plaintiff has failed to create genuine issues of material facts entitling his case to go to a jury.  The Court will address Defendants' motion as it relates to each of Plaintiff's claims, in turn.

A.      **Fourth Amendment**

In Counts I and III of his Fourth Amended Complaint, Plaintiff challenges the legality of Defendant Officers' actions in searching his vehicle, arresting and incarcerating him, and subjecting him to excessive force. (Docket No. 56 at 4, 6).  The Fourth Amendment "guarantees citizens the right 'to be secure in their persons . . . against unreasonable searches and seizures' of the person." *Graham v. Connor*, 490 U.S. 386, 394 (1989).  Here, Defendants do not dispute that Defendant Officers were acting under color of state law when they seized and searched Plaintiff within the meaning of the Fourth Amendment during their encounter with him. (*See generally*, Docket No. 82). The parties also do not dispute the legality of the initial traffic stop; however, as discussed earlier, what occurred after the stop is at issue.

1.      *Search After the Traffic Stop*

12

In Count I of Plaintiff's Fourth Amended Complaint, Plaintiff alleges that the inventory search of his car by Defendants prior to towing the vehicle was a violation of his rights under the Fourth Amendment because there was no justification for impoundment of his car, and because the inventory search was improperly conducted. (Docket No. 56 at 3-4). Defendants have moved for summary judgment on the legality of the Defendant Officers' inventory search arguing that once the officers determined that Plaintiff's vehicle was a hazardous impediment to traffic, and because Plaintiff could not drive the car due to his suspended license, they were entitled to conduct an inventory search. (Docket No. 82 at 8). Defendants further argue that even assuming Plaintiff's claims of property damage are true, the damage is so minimal that it does not rise to the level of a constitutional violation. (*Id.*). Plaintiff responds that because the officers refused to let him call someone to drive his car to his home, in violation of the City's Bureau of Police Regulation 5.1.3, their inventory search was invalid. (Docket No. 85 at 6-7).

After a lawful traffic stop, the Fourth Amendment protects against warrantless searches absent "specifically established and well-delineated exceptions." *Holeman*, 425 F.3d at 191 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). One such exception is an inventory search conducted for purposes other than an investigation. *Id.* The United States Supreme Court has held that inventory searches pursuant to standardized police procedures are reasonable and require no warrant or probable cause. *Id.* at 372. When a vehicle is in lawful police custody, it may be searched by the government for the purposes of cataloging and safeguarding the vehicle's contents. *Id.* at 373. However, as noted in *Whren v. U.S.*, 517 U.S. 811 (1996), an inventory search should not be made in bad faith or for general investigatory purposes, absent the probable cause necessary to otherwise conduct a vehicle search. *See also Florida v. Wells*, 495 U.S. 1, 4 (1990); *Colorado v. Bertine*, 479

U.S. 367, 372 (1987).

The standard procedure for conducting the inventory search should limit the government actor's discretion by providing *when* the inventory search may be conducted and *what* may be considered within the scope of the inventory search. *U.S. v. Salmon*, 944 F. 2d 1106, 1120 (3d Cir. 1991). Additionally, impounding a vehicle is not improper as long as it is not done in order to investigate criminal activity. *U.S. v. Smith*, 522 F. 3d 305, 311 (3d Cir. 2008), (citing *Bertine,* 479 U.S. at 375-76). The government's power to remove vehicles from public thoroughfares is "beyond challenge." *Opperman*, 428 U.S. at 369. The Court of Appeals for the Third Circuit has held that a decision to impound a vehicle, even when contrary to a standard procedure, is not a *per se* violation of the Fourth Amendment, and removing vehicles that impede traffic is reasonable. *Smith*, 522 F. 3d at 312-13 (citing *United States v. Coccia*, 446 F. 3d 233, 238 (1st Cir. 2006)).

Here, that relevant procedure is contained in Defendant City's "Towing and Tow Pound Procedures," last revised June 1, 2000, which provides that "vehicles shall not be towed nor holds placed on them unless there is a clear legal reason to do so." (Docket No. 83-3 at 5). It further provides that vehicles of arrested persons "shall NOT be towed unless" they present a traffic hazard and cannot be driven away. (Docket No. 83-3 at 6). As noted, the parties dispute whether Plaintiff's vehicle created a hazard to traffic. This factual dispute, which bears on the question of whether the tow was necessary, cannot be determined at the summary judgment stage. *Bennett v. Murphy*, 274 F.3d 133, 135 (3d Cir. 2002) (factual disputes bearing on credibility can be made only by a jury at trial). In regards to Plaintiff's claim that he requested to call someone to drive the car away, the Court notes that under the towing policy, an "arrested person may give his permission to another person to move his vehicle." (Docket No. 83-3 at 5). If Plaintiff did indeed request to have another individual come to retrieve his car, then a jury could find that the tow, and attendant inventory

search, were unnecessary and illegal. Accordingly, Defendants' motion for summary judgment with regards to the legality of the inventory search is denied.

2.    *Wrongful Arrest*

Defendants next move for summary judgment on Plaintiff's claim that he was arrested without probable cause and wrongfully incarcerated, on the basis that they had probable cause to arrest Plaintiff. (Docket No. 82 at 5). Defendants specifically argue that the totality of the circumstances warranted an arrest of Plaintiff for disorderly conduct and resisting arrest as the officers had an objective reason to believe that Plaintiff was a danger or a threat to their safety. (*Id.* at 7). On this point, Defendants contend that Kreger and Goob thought Plaintiff approached Kreger in an aggressive manner, therefore, probable cause existed to arrest him, even if they were mistaken in their belief. (*Id.*).

Plaintiff maintains that when viewing the record evidence in the light most favorable to him, the officers had no authority to arrest him for disorderly conduct or resisting arrest. (Docket No. 85 at 6). In light of the fact that Plaintiff was unarmed in the midst of four armed officers, Plaintiff argues that a reasonable person could not believe that he posed a threat to the officers' safety. (*Id.*). Plaintiff cites to the fact that Defendants Goob and Woodhall both testified that they had not observed Plaintiff attempting to hit or flail his arms towards Kreger. (*Id.*). Based on these facts, Plaintiff argues that he has a valid claim for false arrest based on the charges of disorderly conduct and resisting arrest. (*Id.*).

"An arrest may violate the standards of the Fourth Amendment...if made without probable cause to believe that a crime has been committed." *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994). Probable cause exists "when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an

offense has been or is being committed." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir. 1995). Probable cause is a wholly objective, "reasonable officer" standard, and the officer's subjective motivation is irrelevant. *Whren*, 517 U.S. at 813. A warrantless arrest in a public place comports with the Fourth Amendment so long as there was probable cause to arrest for *some* crime; the probable cause need not be for the crime articulated by the arresting officer, or even for a "closely related" crime. *Devenpeck v. Alford*, 543 146, 153-54 (2004).

In general, the question of probable cause in a section 1983 damage suit is a question of fact for the jury, unless there is only one reasonable determination possible. *Montgomery v. De Simone*, 159 F.3d 120, 124 (3d Cir. 1998); *Ingram v. Lupas*, 2009 U.S. App. LEXIS 25788, at *7 (3d Cir. Nov. 24, 2009)(not-precedential). Therefore, "a district court may conclude that probable cause did exist as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding, and may enter summary judgment accordingly." *Estate of Smith v. Marasco*, 318 F.3d 497, 514 (3d Cir. 2003)(internal quotation and citation omitted).

The question to be decided here is whether a reasonable jury, on the evidence adduced and drawing all inferences in Plaintiff's favor, could reasonably find that Defendant Officers did not have probable cause to arrest Plaintiff. *Patzig v. O'Neill*, 577 F.2d 841, 847 (3d Cir. 1978). This Court finds that the evidence pointing to a lack of probable cause is sufficient to allow the issue to go to a jury.

According to Plaintiff, he did not attempt to approach Kreger nor was he using profane language or being aggressive. (Docket No. 87 at ¶¶ 17, 19). Plaintiff also denies initiating contact with Kreger or any of the other officers; rather, he contends that he remained silent while the officers searched him. (*Id.* at ¶ 21). As noted, Defendants maintain that Plaintiff approached Kreger from behind in an aggressive manner, thereby prompting Goob's use of the "armbar" hold to subdue

Plaintiff. (Docket No. 81 at ¶ 20, 22). They further contend that Plaintiff continued to resist arrest, and thus, they were justified in handcuffing Plaintiff while he laid face down on the ground. (*Id.* at ¶ 25). Construing these disputed facts in the light most favorable to Plaintiff, the Court concludes that the evidence is sufficient to support Plaintiff's claim for wrongful arrest. *Estate of Smith*, 318 F.3d at 514. In particular, a reasonable jury could find that, based on Plaintiff's testimony, the evidence would not have provided Defendant Officers with probable cause to arrest Plaintiff, because Plaintiff had not committed, was not in the process of committing, and was not about to commit the offenses of disorderly conduct or resisting arrest. *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979), *accord Maryland v. Pringle*, 540 U.S. 366, 370-71 (2003). For these reasons, Defendants' motion for summary judgment on Plaintiff's Fourth Amendment wrongful arrest claim is denied.

### 3.   *Excessive Force*

In Count I, Plaintiff also asserts that the force used by Defendants in effecting his arrest was beyond constitutionally permissible limits. (Docket No. 56 at 4). Defendants argue for dismissal of this claim on the basis that Defendant Officers reasonably believed that Plaintiff was a danger. (Docket No. 82 at 12). Because Kreger objectively thought that Plaintiff was approaching him in a threatening way, the actions of the officers in taking Plaintiff to the ground and handcuffing him were reasonable under the circumstances. (*Id.*). In addition, Defendants contend that Plaintiff's medical records do not support his "story" that he was seriously injured by being brutally kicked and punched. (*Id.*).

Akin to the standard for probable cause, the standard for a Fourth Amendment excessive force claim is one of objective reasonableness, which assesses the circumstances "from the perspective of a reasonable officer on the scene." *Carswell v. Borough of Homestead*, 381 F.3d 235, 240 (3d Cir. 2004)(quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)); *Gilles v. Davis*, 427 F.3d

197, 207 (3d Cir. 2005). The reasonableness of a particular use of force depends on the circumstances of each case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997).

As previously discussed, the parties' version of what occurred leading up to Plaintiff's arrest is widely contested. Plaintiff has testified that he did not attempt to approach Kreger or initiate any sort of contact with the officers. (Docket No. 87 at ¶¶ 17, 19).  And,  Defendant Goob testified that he did not observe Plaintiff swinging or throwing his hands at Kreger, nor did he observe any attempt to hit Kreger. (Docket No. 95 at ¶ 15). While Defendant Officers testified that they observed Plaintiff being "aggressive," (Docket No. 81 at ¶¶ 19-21; Docket No. 95 at ¶ 15), Defendant Woodhall testified that he "couldn't tell if [Plaintiff] grabbed [Kreger] or pushed him or what, and that's when Detective Good [sic] grabbed him by the arms." (Docket No. 95 at ¶ 15). Based on this record, the Court finds that the material facts and circumstances pertinent to the question of the objective reasonableness of the officers' use of force are disputed. This issue turns on the credibility of Plaintiff and Defendant Officers, and because credibility determinations can be made only by a jury at trial, Defendants are not entitled to summary judgment on Plaintiff's excessive force claim. *Bennett v. Murphy*, 274 F.3d 133, 135 (3d Cir. 2002).

To the extent that Defendants argue that Plaintiff's excessive force claim fails because his injuries were *de minimis* in nature, their argument has no merit. The Court of Appeals for the Third Circuit has explained that the absence of physical injury does not necessarily signify that the force was not excessive; rather, it is simply one of the circumstances to be considered under the objective reasonableness standard set forth in *Graham*, *supra*. *See also Sharrar*, 128 F.3d at 821-22 (the fact

that the physical force applied was of such an extent to lead to injury is indeed a relevant factor to be considered as part of the totality of the circumstances). Accordingly, Defendants' motion for summary judgment on Plaintiff's Fourth Amendment excessive force claim is denied.

### B.   Eighth Amendment Claim

Plaintiff's Eighth Amendment claim is based on the allegation that while he was in Defendants' custody, they refused his request to take him to the hospital to receive medical treatment for his injuries. (Docket No. 56 at 5). Defendants argue that, while it is true that Plaintiff was not taken to the hospital prior to being incarcerated, it is also true that Plaintiff only had a small injury to his right cheek. (Docket No. 82 at 10). In fact, the doctor who examined Plaintiff less than 24 hours after the incident found no signs of a serious injury. (*Id.*; *see also* Docket No. 83-24). Thus, Defendants contend, Plaintiff's Eighth Amendment claim fails because he cannot prove deliberate indifference to a serious medical need. (Docket No. 82 at 10). Moreover, they argue this claim fails because Plaintiff refused medical treatment at the scene offered by Defendant Officers and Plaintiff did not ask to be taken to the hospital until he was in the "paddy wagon" with different officers, who have not been named as parties to this suit. (Docket No. 89 at 2).

In response, Plaintiff contends that his injuries were severe in that he was unable to breathe and swallow, and that he was "fading in and out." (Docket No. 85 at 7). Despite these impairments, he argues, his requests to go to the hospital were denied prior to his incarceration at the Allegheny County Jail. (*Id.* at 8).  Notwithstanding the same, Plaintiff acknowledges that he did not request medical treatment until he was being transported to ACJ, but, he contends that because he could not obtain treatment until he was discharged from ACJ, there is sufficient record evidence establishing that Defendant Officers violated his Eighth Amendment rights. (Docket No. 92 at 4).

The Eighth Amendment prohibition against cruel and unusual punishment applies only to

individuals who have already been convicted of a crime. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)(holding that the Eighth Amendment applies only after the state "has secured a formal adjudication of guilt in accordance with the due process of law."). Because Plaintiff was a pretrial detainee, and not a convicted prisoner at the time of the alleged incident, his claim under the Eighth Amendment is analyzed under the Due Process Clause of the Fourteenth Amendment. *Hubbard v. Taylor*, 399 F.3d 150, 164-66 (3d Cir. 2005)(quotation omitted). In this context, the Due Process Clause "does require the responsible...governmental agency to provide medical care" to pretrial detainees, *City of Revere*, 463 U.S. at 244, because the failure to do so amounts to punishment without an adjudication of guilt. *Hubbard*, 399 F.3d at 166.

In analyzing the denial of medical care to a pretrial detainee, the inquiry is whether the denial was "imposed for the purpose of punishment or whether it [was] but an incident of some other legitimate governmental purpose." *Bell v. Wolfish*, 441 U.S. 520, 538 (1979). That inquiry involves an indirect application of the Eighth Amendment deliberate indifference standard. *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 580-81 (3d Cir. 2003)(quoting *City of Revere*, 463 U.S. at 44). In the context of evaluating a pre-trial detainee's claim for inadequate medical care, a district court must analyze whether there was deliberate indifference on the part of the defendants and whether the detainee's medical needs were serious. *Monmouth County Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference requires more than inadequate medical attention or incomplete medical treatment. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). A plaintiff must show that the defendant acted with reckless disregard by acting or failing to act in response to a substantial risk of serious harm. *Id.* Therefore, a plaintiff must establish that the defendant knew of a substantial risk of serious harm and failed to act despite that knowledge. *Id.* at 842.

Here, viewing the evidence in Plaintiff's favor, the Court finds that this showing has not been made. There is no evidence that Plaintiff required immediate treatment, or that Defendant Officers drew that inference; indeed, there is evidence to the contrary. Plaintiff was conversant, able to move around, and aware of his surroundings, as evidenced by the fact that he was conscious and requested to go to the hospital while being transported to the jail. (Docket No. 93-4 at ¶ 20). Moreover, while Plaintiff states that he requested medical care for his injuries (Docket No. 93-4 at ¶ 3), he does not deny the fact that he did not make that request until he was being transported by officers different from those who were present at the scene. (Docket No. 95 at ¶ 20). In addition, Plaintiff does not deny the fact that Defendant Officers offered him medical care and that he refused that offer. (*Id.*). These facts preclude any showing that Defendant Officers acted with a "sufficiently culpable state of mind," *Farmer*, 511 U.S. at 834, for purposes of an Eighth Amendment claim. As a result, the Court cannot conclude that there is a jury question regarding whether the Defendant Officers were deliberately indifferent to Plaintiff's medical needs, and summary judgment is granted as to this claim.

### C.   Sections 1985(3) and 1986 Claims

In Counts IV and V, Plaintiff alleges that Defendant Officers conspired together in neglecting or refusing to intervene when Kreger was allegedly assaulting Plaintiff. (Docket No. 56 at 7).Thus, Plaintiff claims that Defendant Officers violated his rights under 42 U.S.C. §§ 1985(3) and 1986. (*Id.*). Defendants have moved for summary judgment on these claims on the grounds that Plaintiff has not created a question of fact as to whether Defendant Officers' actions were racially motivated or that Plaintiff is a member of a suspect class. (Docket No. 82 at 13).  Defendants further argue that Plaintiff's section 1986 claim fails because it is time-barred. (*Id.*). Plaintiff argues in response that because he was not free to leave the scene and the other officers did not intervene when Kreger was

purportedly unlawfully assaulting him, he is entitled to relief under sections 1985(3) and 1986. (Docket No. 85 at 9).

Section 1985(3) permits an action to be brought by one injured by a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3); *see also Griffin v. Breckenridge*, 403 U.S. 88 (1971). To establish a claim under 42 U.S.C. § 1985(3), a plaintiff must demonstrate the following: (1) a conspiracy; (2) for the purpose of depriving any person of the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to a person or his property. *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828-29 (1983)(citing *Griffin*, 403 U.S. at 102-03); *see also Fraber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006). In *Griffin*, the Supreme Court held section 1985(3) requires "the intent to deprive of *equal* protection;" thus, a claimant must show "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirator's action." *Griffin*, 403 U.S. at 102.

Here, Plaintiff has not produced any evidence creating a jury question as to the Defendant Officers' intent to deprive him of equal protection, beyond his mere allegation that Defendant Officers conspired because of racial animus. Indeed, the record evidence shows that Plaintiff told OMI investigators that the officers did not make any sort of racist remarks to him on November 2, 2001. (Docket No. 83-1 at 48). Consequently, the Court finds that Plaintiff's section 1985(3) claim in Count IV fails as Plaintiff has not established a conspiracy against him, and Defendants' motion for summary judgment as to this claim is granted. *See also Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997)(setting forth the requirements for a cause of action under section 1985(3)).

Having found that Plaintiff's section 1985(3) claim fails, the Court finds that his claim under

section 1986 likewise fails.[14] *See Brawer v. Horowitz*, 535 F.2d 830, 841 (3d Cir. 1976); *Rogin v. Bensalem Twp.*, 616 F.2d 680, 696 (3d Cir. 1980)("[b]ecause transgressions of § 1986 by definition depend on a preexisting violation of § 1985, if the claimant does not set forth a cause of action under the latter, its claim under the former necessarily must also fail). Moreover, as correctly noted by Defendants, Plaintiff failed to bring his section 1986 claim within the one year statute of limitations. 42 U.S.C. §1986 ("no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued."); *Burnett v. Grattan*, 468 U.S. 42 (1984). The incident in question occurred on November 2, 2001, however, Plaintiff did not file his praecipe for writ of summons in the Allegheny County Court of Common Pleas until October 31, 2003, (*see* Docket No. 1-4), almost two years later. Accordingly, Defendants' motion for summary judgment on Plaintiff's section 1986 claims is granted, and said claim is dismissed.

### D.    Pennsylvania State Law Claims

In Count VI of his Fourth Amended Complaint (Docket No. 56 at 9), Plaintiff sets forth pendent state claims for assault, aggravated assault, false arrest, and malicious prosecution. (*Id.*). Defendants argue that summary judgment should be granted as to these claims because the force

---

[14]

Section 1986 provides:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed; and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $ 5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued.

*Brawer v. Horowitz*, 535 F.2d 830, 841 (3d Cir. 1976).

used by the officers was objectively reasonable under the circumstances and, therefore, Defendants are immune from liability under the Pennsylvania Political Subdivision Tort Claims Act ("PSTCA"), 42 Pa. C.S. §§ 8541, *et seq.* (Docket No. 82 at 13). In particular, Defendants argue that there are no exceptions to immunity applicable to causes of action based upon police inaction or misconduct, regardless of whether those actions involved negligent or intentional conduct. (*Id.* at 14).  Plaintiff did not respond to Defendants' argument for dismissal of his state law claims. (*See* Docket No. 85 and 92).

Pursuant to W.D. Pa. Local Rule 56(C), "Opposition Requirements" for a motion for summary judgment, a party opposing a motion for summary judgment must address the applicable law and explain why there are genuine issues of material fact to be tried on a claim and/or why the moving party is not entitled to judgment as a matter of law. W.D. Pa. L.R. 56(C)(2).  Because Plaintiff has failed to comply with this rule with regards to his Pennsylvania state law claims for assault, aggravated assault, false arrest, and malicious prosecution in Count VI of his Fourth Amendment Complaint (Docket No. 56 at 9), summary judgment is granted as to these claims and said claims are dismissed.

### E.    Municipal Liability

Defendants move for summary judgment on all federal claims against the City on the basis that Plaintiff has failed to establish a policy or custom which would evince deliberate indifference on the part of the City as to the Defendant Officers' actions. (Docket No. 82 at 18; Docket No. 89 at 3). To this end, Defendants contend that the only place where Plaintiff makes any accusation of deliberate indifference is in his discovery response, in which he states that the City's deliberate indifference is proven by two prior lawsuits against the City, one in 1996 and one in 1997. (Docket No. 82 at 18). However, Plaintiff fails to recognize that since 1997, the City's towing, search and

24

seizure, use of force, and "Continuum of Control" policies have changed. (*Id.*; Docket No. 83-3 at 1-21).  In regards to Kreger's prior OMI history, the City argues that because only one complaint relating to an incident of excessive force against Kreger was sustained, this cannot constitute deliberate indifference. (Docket No. 82 at 3; Docket No. 89 at 3). Moreover, the City notes that Kreger is no longer employed with the City of Pittsburgh police department. (*Id.*; Docket No. 89 at 4). Therefore, Defendants argue that Plaintiff has not produced any evidence establishing the City's liability. (Docket No. 82 at 19)

Plaintiff argues in response that the City has a long standing problem with police brutality, evidenced by the Consent Decree between the City and the United States dated April 16, 1997, which imposed federal oversight on the Pittsburgh Police.[15] (Docket No. 85 at 10; Docket No. 91-1 at 15-19).  Plaintiff further cites to Kreger's OMI history, which consists of 5 prior complaints of excessive force, as well as a prior lawsuit against Kreger, *Neidig v. City of Pittsburgh*, Civ. A. No. 02-07, in which the plaintiff prevailed on a malicious arrest claim.[16] (Docket No. 85 at 11). This record of a pattern or practice of use of excessive force by the Pittsburgh Police, Plaintiff argues, exhibits deliberate indifference on the part of the City. (*Id.*). Plaintiff further notes that the City did not terminate Kreger, rather, he resigned. (Docket No. 92 at 2). Plaintiff maintains that the City is liable for the conduct of Defendant Officers in this case because it failed to adequately train Kreger, as evidenced by his OMI history and after a problem concerning his use of force became apparent. (*Id.* at 2-3).

---

[15]

This Consent Decree was filed in the case of *United States v. City of Pittsburgh, et al.*, at Civil Action No. 97-354, which was comprised of more than 60 cases against the City of Pittsburgh for violations of citizens' civil rights. (Civ. A. No. 97-354; Docket Nos. 21 and 22).

[16]

The *Neidig* case was closed on September 30, 2002, after it became part of the global settlement in Civil Action No. 96-560, which was consolidated with the case at Civil Action No. 97-354, discussed in note 17, *supra*. (Civ. A. No. 02-07).

In order for a government entity to be liable under §1983, it is not enough that the plaintiff merely "identify conduct properly attributable to the municipality." *Bd. of County Commissioners of Bryan Cty, Okla. v. Brown*, 520 U.S. 397, 404 (1997). Rather,

> [A] local government may not be sued under §1983 for any injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury that the government as an entity is responsible under §1983.

*Monell v. Dept. of Social Serv.'s of City of N.Y.*, 436 U.S. 658, 694 (1978); *see also McGreevy v. Stroup*, 413 F.3d 359 (3d Cir. 2005). Indeed, a plaintiff is required to show that "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404 (emphasis in original). The Court of Appeals for the Third Circuit has held that a municipality will be liable for the conduct of its employees in one of three ways:

> First, the municipality will be liable if its employee acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity, *Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989); second, liability will attach when the individual has policy making authority rendering his or her behavior an act of official government policy, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986); third, the municipality will be liable if an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

*McGreevy*, 413 F.3d at 376. Additionally, a plaintiff is required to show a direct causal link between the actions of the municipality and the alleged deprivation of constitutional rights. *Id*.

Pertinent here, a municipality's failure to properly train its officers can create an actionable violation of a party's constitutional rights under section 1983. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Deficient training may create section 1983 liability when the municipality either had knowledge of the offending incident or knowledge of a prior pattern of similar actions, and there were "circumstances under which the supervisor's inaction could be found to have communicated

a message of approval to the offending subordinate." *Boneberger v. Plymouth Twp.*, 132 F.3d 20, 25 (3d Cir. 1997)(citing *Freedman v. City of Allentown*, 853 F.2d 1111, 1117 (3d Cir. 1988)). The Court of Appeals for the Third Circuit has held that evidence of "such policies," including "a code of silence among officers" and the failure to take disciplinary action against offending officers in response to citizen complaints, is sufficient for a *Monell* claim to survive summary judgment. *Bailey v. County of York*, 768 F.2d 503, 507 (3d Cir. 1985)(citing *Brandon v. Holt*, 469 U.S. 464 (1985)). To this end, an official policy or custom may be inferred from "informal acts or omission of supervisory municipal officials." *Turpin v. Mailet*, 619 F.2d 196, 200 (2d Cir.), *cert. denied*, 449 U.S. 1016 (1980). "The issue of authorization, approval, or encouragement is generally one of fact, not law." *Turpin*, 619 F.2d at 201; *see also Owen v. City of Independence*, 445 U.S. 622, 633-34 and n.13, 655 n.39 (1980).

Here, it is uncontested that the City was aware of Kreger's prior OMI complaints regarding his conduct toward the public; however, there is no evidence that the City attempted to rectify his conduct prior to his leaving the City's employ in 2002. *But see Brandon*, 469 U.S. 464 (city held liable under section 1983 notwithstanding that the director of police had no actual knowledge of the officer's disciplinary record because he should have known that the officer's dangerous propensities created a threat to the rights and safety of citizens). Specifically, there is no evidence that Kreger was disciplined or re-trained by the City. While it is true that the City has certain policies in place that control the amount of force a police officer may use in certain contexts, and that those polices have been revised since the *Neidig* case and the 1997 Consent Decree to which Plaintiff referred (*see* Docket No. 83-3 at 1-21), a reasonable jury could find that the absence of any action by Kreger's supervisors in response to the numerous excessive force complaints against him conveyed a message of approval to him. *Turpin*, 619 F.2d at 201; *see also Beck v. City of Pittsburgh*, 89 F.3d 966, 971-76

(3d Cir. 1996)(evidence of a series of prior written civilian complaints of a similar nature concerning a police officer's use of force and the city's lack of responsive action was sufficient evidence from which a jury could have inferred that the city knew, and acquiesced in, the tacit use of excessive force by its police officers). Kreger's history, as well as the City's prior history of excessive force complaints, should have put the City on notice of the need to re-train or discipline Kreger. *See Bryan County*, 520 U.S. at 407; *but see Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997)(holding that the trial court did not err in granting summary judgment to county on *Monell* claim where plaintiff presented no evidence that similar conduct occurred in the past).

Based on the foregoing, the Court finds that Plaintiff has presented a jury question as to whether the City was deliberately indifferent to the need to train its police officers and that this failure was the actual cause of Plaintiff's injuries. *Simmons v. City of Phildelphia*, 947 F.2d 1042, 1076 (3d Cir. 1991). Therefore, Defendants' motion for summary judgment as to the City's liability under section 1983 is denied. However, to the extent that Plaintiff is seeking punitive damages against the City (*see* Docket No. 56), the Court notes that recovery of punitive damages from a governmental entity is prohibited. *See Newport v. Fact Concerts*, 453 U.S. 247, 271 (1981)(as a matter of federal law, municipalities cannot be held liable for punitive damages under section 1983); *see also Nykiel v. Borough of Sharpsburg*, Civ. A. No. 08-813, 2009 U.S. Dist. LEXIS 22420 (W.D. Pa. March 19, 2009). Accordingly, to the extent that Plaintiff demands punitive damages from the City, said demand is dismissed.

### F.    Qualified Immunity

Defendant Officers argue that even if Plaintiff has established an issue of material fact regarding his claims, they are entitled to qualified immunity regarding Plaintiff's excessive force claim. (Docket No. 82 at 20). On this point, Defendants argue that any reasonable officer, when

faced with an individual who threatened to leave a scene and who approached a police officer in an agitated manner, would be justified in exerting the forced used by Kreger and Goob. (*Id.* at 21). Thus, the officers are entitled to qualified immunity in their individual capacities. (*Id.*).

Plaintiff argues in response that although a police officer may have some discretion to determine what constitutes excessive force in a particular situation, any reasonable person would agree that when four police officers have handcuffed an unarmed individual and then repeatedly "hit and kick[ed]" him while he laid on the ground handcuffed, those actions constitute excessive force. (Docket No. 85 at 3-4). Plaintiff further argues that because he did not assault or harm the Defendant Officers in any manner, they are not entitled to qualified immunity. (*Id.* at 4). Additionally, Plaintiff recounts that Kreger, who allegedly injured him, has a history of excessive force complaints: two in 1997, one in 1998, one in 1999, and one in 2000. (*Id.*). Plaintiff further cites to the expert report of James Baranowski, in which Mr. Baranowski concludes that the use of force in this matter was unnecessary and unwarranted. (*Id.*; Docket No. 76-9).

Qualified immunity is an affirmative defense for government officials subject to §1983 actions and must be pled by the official against whom a §1983 action has been brought. *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982) (citing *Gomez v. Toledo*, 446 U.S. 635 (1980)). "'The qualified immunity defense shields government agents from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Thomas v. Independence Twp.*, 463 F.3d 285, 291 (3d Cir. 2006) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996)); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In resolving questions of qualified immunity, the Court must undertake "a careful examination of the record ... to establish, for purposes of summary judgment, a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the

29

plaintiff.)." *Grant v. City of Pittsburgh*, 98 F.3d 116, 122 (3d Cir. 1996) (citations omitted).

The determination of whether a government official is shielded by qualified immunity generally requires an objective assessment of the official's conduct. *Harlow*, 457 U.S. at 818.  And, "[i]t is now widely understood that a public official who knows he or she is violating the constitution nevertheless will be shielded by qualified immunity if a 'reasonable public official' would not have known that his or her actions violated clearly established law." *Grant*, 98 F.3d at 123-24. However, in determining whether qualified immunity is a proper defense, "an inquiry into the defendant's state of mind is proper where such state of mind is an essential element of an underlying civil rights claims." *Id. See also Monteiro*, 436 F.3d at 406 (quoting *Crawford-El v. Britton*, 523 U.S. 574, 593-94 (1998)) ("Qualified immunity does not require a plaintiff to demonstrate that the official's conduct was not reasonable under any conceivable set of circumstances.... [Rather], it is sufficient for the plaintiff 'to identify affirmative evidence from which a jury could find ... the pertinent motive,' in order to survive summary judgment on that issue.").

Having determined that, viewed in the light most favorable to Plaintiff, the record evidence is sufficient for a reasonable jury to find a violation of Plaintiff's Fourth Amendment right to be free from the use of excessive force, the Court must next assess whether the particular right infringed was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[17]

In the context of excessive force, qualified immunity protects officers who make reasonable mistakes as to the level of force that is permissible in a particular set of circumstances. In *Saucier*, the Supreme Court noted:

---

[17]

In *Pearson v. Callahan*, -- U.S. -- , 129 S.Ct. 808, 818 (2009), the Supreme Court held that the sequence of the two-pronged qualified immunity analysis set forth in *Saucier* is no longer mandatory and that trial courts now have discretion to determine which of the two prongs of the analysis to apply first.

> It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Saucier*, 533 U.S. at 205.

In arguing that the use of force in this case was reasonable, Defendant Officers focus on Plaintiff's behavior at the time of the incident as they perceived it, which they contend warranted the force used. As discussed above, however, the facts regarding Plaintiff's behavior and what Defendant Officers reasonably could infer from that behavior are disputed, as is the amount of force that the officers actually used in their efforts to subdue Plaintiff. Viewing the facts in the light most favorable to Plaintiff, as this Court must, a jury could find that the "situation [the officers] confronted" was one in which the force they exerted was excessive because Plaintiff was unarmed and not exerting any threats towards the officers. In these circumstances, it could have been clear to a reasonable officer, in light of the factors set forth in *Graham*, that Defendant Officers' actions were unlawful. *See Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)(acknowledging that, "in an obvious case," the standard set forth in *Graham* can "clearly establish that force was excessive, "even without a body of relevant case law"); *Couden v. Duffy*, 446 F.3d 483, 497 (3d Cir. 2006)(denying qualified immunity on Fourth Amendment excessive force claim where factors relevant to excessive force, which are well recognized, suggested use of low level of force). Accordingly, the Court finds that Defendant Officers are not entitled to summary judgment on the basis of qualified immunity as to Plaintiff's excessive force claim.

## VI.    Conclusion

Based on the foregoing, the Court finds that Defendants are entitled to summary judgment

on Plaintiff's claims under the Eight Amendment, 42 U.S.C. §§ 1983, 1985, and 1986, and on his

Pennsylvania state law claims, as contained in Counts II, IV, V, and VI of his Fourth Amended

Complaint (Docket No. 56); therefore, these claims are dismissed. Defendants' Joint Motion for

Summary Judgment is denied as to Plaintiff's Fourth Amendment claims for unlawful arrest, search

and use of excessive force in Counts I and III.

      An appropriate Order follows.


                                                   *s/Nora Barry Fischer*
                                                   Nora Barry Fischer
                                                   United States District Judge


Date:         February 22, 2010.
CC/ECF:     All counsel of record.