**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHARLES JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-111 |
| | ) | Judge Nora Barry Fischer |
| THE CITY OF PITTSBURGH, | ) | |
| PENNSYLVANIA, TIMOTHY KREGER, | ) | |
| MARK GOOB, JAMES JOYCE, | ) | |
| GREGORY WOODHALL, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

I.    INTRODUCTION/RELEVANT PROCEDURE

        This is a civil rights case brought by Plaintiff, Charles Jackson, against Defendants, the City

of Pittsburgh, Pennsylvania, and officers Timothy Kreger, Mark Goob, James Joyce and Gregory

Woodhall, arising from the officers' arrest of Plaintiff on November 2, 2001 and the subsequent

incarceration of him after a traffic stop in the Homewood section of Pittsburgh.[1]  This case is set for

a trifurcated jury trial on Plaintiff's § 1983 claims, commencing with jury selection on August 23,

2010.   The matters to be tried are: first, Plaintiff's § 1983 claims asserting that his Fourth

Amendment rights were violated by the defendant officers for allegedly conducting an unreasonable

search of his vehicle, unlawfully arresting him, and using excessive force against him while

effectuating his arrest; second, Plaintiff's *Monell* claim against the City of Pittsburgh; and, third,

---

[1]

        A more detailed factual summary of the events of this case can be found in the Court's
Memorandum Opinion on Defendants' motion for summary judgment.  (*See* Docket No. 98).  The
Court has also issued three Memorandum Orders limiting the parties' evidence at trial.  (*See* Docket
Nos. 165, 166, 167).

Plaintiff's claims for damages. Presently before the Court are Defendants' motion in limine seeking to preclude the testimony of James E. Baranowski[2] as an expert witness at trial (Docket No. 126), their brief in support of same (Docket No. 127), Plaintiff's brief in opposition and response (Docket No. 145, 149) as well as Baranowski's expert report (Docket No. 76) and subsequently submitted affidavits (Docket Nos. 87-5, 87-6, 151).

The Court heard oral argument from counsel as to Defendants' Motion during the Pretrial Conference on June 16, 2010 (Docket No. 164, 168) and a *Daubert* hearing[3] was held during which Baranowski was examined on August 2, 2010 (Docket No. 190). Plaintiff's counsel withdrew a request for further argument on the motion subsequent to the *Daubert* hearing but the Court permitted supplemental briefing. (Text Order 8/6/10). Defendants filed their supplemental brief on August 10, 2010 (Docket No. 195) and Plaintiff filed his supplement brief on August 11, 2010 (Docket No. 197). Defendants' Motion is now fully briefed and ripe for disposition.

For the following reasons, Defendants' Motion [126] is granted, in part and denied, in part. Baranowski will be permitted to testify as an expert on certain issues at trial; however, his testimony will be limited as set forth below.

II.    BACKGROUND

Plaintiff's proffer of Baranowski's testimony consists of his Report (Docket No. 76), his

---

[2]

Baranowski previously appeared as a Plaintiff in two cases before this Court, both styled *Baranowski v. Waters et al.*, at Civil Action Numbers 05-1379 and 08-544, which was disclosed to counsel during a telephone conference on July 7, 2009. (Docket No. 77). The parties were given an opportunity to object to the Court's continuing to preside over this matter, but no objections were made. (*See* text only entry July 17, 2009).

[3]

The *Daubert* hearing has yet to be fully transcribed. However, the trial in this matter is set for August 23, 2010 and the rulings set forth herein are needed for trial preparation purposes. Therefore, the Court bases its opinion on the evidence presented at the *Daubert* hearing but without citations to the hearing transcript.

subsequently submitted affidavits (Docket Nos. 87-5, 87-6, 151) and his testimony at the *Daubert* hearing on August 2, 2010.

A.    *Baranowski's Qualifications*

Baranowski is a former police officer and is proffered by Plaintiff as an expert in the use of force by the police officers against Plaintiff in this case.  (Docket No. 76).  Baranowski was a member of the Pennsylvania State Police from 1986 through 2003, and a supervisor since 1992. (Docket No. 76-16; Docket No. 151 at ¶ 1).  He attained the ranks of patrol commander, station commander and special projects supervisor.  (Docket No. 151 at ¶ 1).  In these roles, he has had extensive field experience in police actions, including traffic stops, drug raids, undercover work, street busts and saturation patrols. (*Id*.).  He has also acted as a private consultant on police use of force, and police procedures cases, has trained various police departments in Southwestern Pennsylvania in use of force, force justification, officer safety, defensive tactics, and other topics, and has taught these subjects at the Municipal Police Officer's Education and Training Commission, Penn State University, Westmoreland Community College, California University of Pennsylvania and Indiana University of Pennsylvania.  (*Id*.).

Baranowski's consulting experience is largely related to accident reconstruction and, indeed, he fashions himself a "Collision Reconstruction Specialist" on his letterhead and website.  However, he testified that he has been retained as an expert in six use of force cases, and has submitted expert reports in those cases, although he has yet to testify or be qualified as an expert in any of such case because those matters have settled.

B.    *Baranowski's Opinions*

In support of his opinions, Baranowski reviewed the Pittsburgh Office of Municipal Investigation Report as to the incident, the Office of Municipal Investigation ("OMI") statements

of Plaintiff and the Defendant officers, the officers' respective personnel files, and the relevant police reports. (Docket No. 76). He also reviewed the relevant Pittsburgh Bureau of Police Orders and Policies, and testified that he considered additional sources that he did not cite in his report, including: the Commission on Accreditation for Law Enforcement Agencies, Inc. ("CALEA") standards and certain provisions of the Pennsylvania Vehicle Code and Crimes Code. (*Id.*). He further testified that he did not review the Defendant officers' arrest records or traffic incident reports, or the City of Pittsburgh Narcotics Officers' Handbook.

   i. <u>Traffic Stop</u>

Baranowski offers a number of opinions regarding the initial traffic stop wherein the four police officers stopped Jackson for the traffic violation of making a turn without using a signal. (*Id.*). He first opines that because the officers were assigned to the Narcotics Bureau, they should "not be routinely conducting traffic stops, which is primarily a patrol function." (*Id.*). Baranowski believes that making traffic stops is a "poor use" and/or not a "productive use" of the Narcotics Officers' time. (Docket No. 76; Docket No. 151 at ¶ 3). However, he admitted while testifying that he did not review the City's Narcotics Officers' Handbook to determine if making such stops was a part of the officers' duties.

In addition, Baranowski maintains that conducting traffic stops in plain clothes and an unmarked vehicle, as the officers did in this case, is "unsafe and should only be done in exceptional cases." (Docket No. 76). In his view, plain clothes traffic stops have long been discouraged because they "create[ ] problems" and he insists that "most departments have a policy of allowing only officers in uniform [to] conduct traffic stops for minor violations." (*Id.*). He testified that he was not aware if the City of Pittsburgh had such a policy, but his opinion was based on his prior experience and the CALEA standards, which discourage the practice of using unmarked vehicles to

conduct traffic stops.

He also believes that making traffic stops could expose the officers' identities to potential investigation targets, therefore, limiting their ability to make undercover buys and to operate in a covert manner. (*Id*.). He testified that, based on his experience, random traffic stops were counterproductive because of how undercover officers are typically used in the field. Undercover officers attempt to infiltrate a local drug organization and make drug purchases in a specific area, and then, after making a number of buys, they move to another area to work in order to avoid exposing their identities as police officers. In his view, hundreds of traffic stops of this kind would need to be conducted in order to make a significant drug arrest.

Baranowski explained that there are safety issues with the stops as well. In his report, he stated that "stops by persons dressed in the manner that narcotic officers would dress to conduct covert investigations could incite violent reactions from persons involved in the drug culture believing that the officers were going to 'rip them off'. This is why all officers are clearly identified as police officers during [a] raid, using various methods of identification including, raid jackets, uniformed police officers and marked police cars." (*Id*.). He explained that these opinions are rooted in "common sense" and his experience. In support of his safety concerns, he testified that he recalled a number of cases during former Governor Bob Casey's tenure where police impersonators pulled over a number of women and committed rapes. He recalled that the practice of using unmarked cars was discouraged within the state police at that time. As to this case, he did not recall Jackson's statement to OMI that when he was pulled over, he "figured [the car] was a plainclothes police car." However, he commented that Jackson's statement indicates that Jackson was only "assuming" that the car was an undercover vehicle.

Baranowski suggests that the officers in this case could have radioed for a uniformed officer

in a marked car to make the stop for them, rather than making the stop themselves. (*Id*.). But, he testified that he was not aware of how the City staffed its officers in the zone where the traffic stop occurred and had no idea if any such uniformed officers were available at the time of the stop at issue in this case.

In his report, Baranowski comments that the officers were "trolling" for drug arrests. He testified similarly. He bases this opinion on his interpretation of Detective Goob's OMI statement that "it's common for us to stop people for any violation, any and all violations, we stop people for, you know." (*Id*.). Baranowski believes that traffic stops like the one in this case would not yield a high quantity of drug seizures, without good information. He suggests that the officers were "profiling," or targeting a specific type of vehicle and/or driver prior to making the traffic stops, but testified that he was assuming that a profile was used. He further explained that while the use of a profile is common in law enforcement and not necessarily illegal,[4] the use of certain profiles, including racial profiles, have been found unconstitutional by the courts. He admitted in both his report and while testifying that he had not reviewed the traffic arrest records for any of the officers and that this type of information would be helpful to determine the success rate of the profiling and/or these types of traffic stops. Indeed, he commented in his report that "it would be interesting to review the traffic arrests of the officers involved in this incident, to determine whether or not it can be substantiated that these officers always enforce the traffic laws as indicated." (*Id*.).

      ii.    <u>Initial Encounter</u>

As to the initial encounter with police after the traffic stop was effectuated, Baranowski accepts Jackson's statement to OMI that he invoked his Fifth Amendment right to remain silent and

---

[4] As an example, he cited an officer on traffic duty profiling red sports cars for speeding violations.

made no statements to police. (Docket No. 76). He then explains that "[u]nder the Pennsylvania Vehicle Code, municipal police officers do not have the authority to take a Pennsylvania resident into custody for minor traffic violations." (*Id.*). He admitted that a non-Pennsylvania resident without a license could be detained for traffic violations. He also opined that an officer cannot cite a person for a "violation of suspended drivers license" until information regarding the person's driving record received from PennDot is verified and a certified copy of the driving history is obtained. (*Id.*). He testified that PennDot is not operational 24 hours per day. In his view, and given the time of the incident in this case (around 9:00 p.m. or 10:00 p.m.), the officers "would not have been able to obtain these documents immediately and, therefore, the argument can be made that Mr. Jackson would have been free to leave the area." (*Id.*). Baranowski testified that the officers should have permitted Jackson to drive away and, if the officers sometime thereafter received verification from PennDot that Jackson's license was suspended, sent him a citation for driving with a suspended license in the mail.

Baranowski also commented on the merit of the charges against Jackson. In his report, he claims that "no evidence of a crime was ever discovered." (*Id.*). In his affidavit, Baranowski states that "Jackson was stopped for a minor traffic violation and ultimately convicted of a minor traffic violation" and that the other charges against him, including the disorderly conduct charge, were dismissed. (Docket No. 151 at ¶ 5). He then "assumes" that the charges were "without merit." (*Id.*). He posits that the officers "could not prove" that Jackson was operating a vehicle without a license and should not have assumed that his license was suspended. (*Id.*).

### iii.    Plaintiff's Request to Move Car/ Defendants' Tow Policy Violation

Baranowski next accepts Jackson's statement that he later asked to be permitted to move his car off the roadway, so that it would not have to be towed. (Docket No. 76). Baranowski believes

that this request "could have easily been granted." (*Id*.). He explains that there were several parking lots and cross streets in close proximity to the location of the traffic stop where the vehicle could have been moved and that, if the officers did not believe that Jackson should be permitted to move the car, he (Jackson) should have been permitted to contact his father or another family member to move the car or he could have requested that one of the police officers move the car. (*Id*.). Baranowski opines that there was "no reason to tow the vehicle" because it was registered in Ohio and "there was no proof that Mr. Jackson didn't have a valid license." (*Id*.). Finally, Baranowski concludes that the denial of Jackson's request to have his car moved rather than towed was a violation of Pittsburgh Bureau of Police regulations, Order #41-4, sections 1.1, 5.1 and 8.1. (*Id*.).

In his affidavit, Baranowski further states that the City regulations do not grant the officers any discretion when towing vehicles, but give detained drivers like Jackson discretion to request that his car be moved to an area rather than be towed. (Docket No. 151 at ¶ 6).

### iv. Custodial Inventory Search

As to the custodial inventory, Baranowski states that a "custodial inventory is completed for the purpose of protecting and securing items of value inside the vehicle for the owner and to protect the police department and police officer from claims of malfeasance." (Docket No. 76). He also notes that for a custodial inventory to be valid, "there must be a written policy" of the police department requiring same and that the results of the search must be properly documented. (*Id*.). Baranowski concludes that "in no circumstances can a custodial inventory be used in lieu of a search warrant or consent to search the vehicle for evidence." (*Id*.).

### v. Use of Force

Baranowski testified that the force used by the officers in this case was unnecessary and unwarranted and this opinion was based on his personal experience in such situations, his experience

teaching, and his consideration of the City's Use of Force policy, the Continuum of Control and the CALEA standards.  He testified that the City's Use of Force policy is in accord with the CALEA standards, although the City is not accredited by CALEA.

Baranowski admitted that many of the underlying facts are disputed in this case.  But, he testified that he considered the "totality of the circumstances" and all of the evidence presented to him.  Where necessary, he "married up" the facts, i.e., accepted certain facts and rejected others.  He explained that he needed to weigh the facts in order to fully evaluate the case and that this was a practice/procedure that he typically used when conducting an internal evaluation of use of force cases when he was with the state police.  He also considered the credibility of the parties, particularly Jackson's former involvement with law enforcement and the number of excessive force complaints filed against Detective Kreger when he was with the City Police Department. However, Baranowski testified that he did not wholly adopt Jackson's version of this encounter, but adopted some facts from the officers' version as well.

Turning to his opinions, Baranowski accepts the facts that during the custodial inventory of Jackson's car, Jackson asserted a desire to leave, that Jackson approached Detective Kreger, who was located at the driver's door, that Detective Kreger sensed Jackson approaching him, turned to confront him, and then, a confrontation occurred. (*Id*.).

First, Baranowski opined that, contrary to the officers' testimony, he did not believe that Jackson approached Detective Kreger aggressively, menacingly, or with any evil intent.  In his report, he explained that "[i]t is hard to imagine that anyone, but especially someone who like Mr. Jackson has had previous contact with police officers would approach a police officer in a menacing manner, while three other officers were standing by."  (Docket No. 76).  He also felt that "[i]t is a foregone conclusion that Mr. Jackson would not be successful in attacking Detective Kreger in these

circumstances." (*Id*.). In Baranowski's opinion, "[i]t is far more likely that Mr. Jackson approached Detective Kreger to obtain something out of his car or his house keys and Detective Kreger overreacted, setting into motion the use of force in this matter." (*Id*.). He offers a number of additional assertions regarding this encounter:

"In any event, there is no reason for Mr. Jackson to attack Detective Kreger, Jackson was not under arrest and had already invoked his right to leave."

"Mr. Jackson for all intent and purpose is out of there, but he stops to attack Kreger?"

"If Jackson is so incensed over the towing of his vehicle, why does he not attack one of the other police officers who were standing near Jackson?"

"Further, the identity of Mr. Jackson is known to the officers and his vehicle is in police custody at this point. Mr. Jackson has no opportunity to be successful in attacking one of the police officers involved in this incident and no opportunity of getting away with it."

"Mr. Jackson is in a no-win situation by attacking a police officer and quite frankly this scenario just doesn't ring true."

(Docket No. 76).

Baranowski expanded on these initial assertions while testifying. He explained that based on his experience and the location of the individuals at the time, with the car pulled over on the side of a two lane road, where Detective Kreger was conducting an inventory search from the driver's seat of the car with his back turned and the car door opened toward traffic, and Jackson and the three other officers at the rear of the car, that the officers should have handled the situation differently.

In his view, the three officers stationed at the rear of the car near Jackson should not have permitted Jackson to approach Detective Kreger from behind, whether Jackson was agitated or not. He believed that the officers should have intervened between Jackson and Kreger. Since there were

three officers present, the officers should have used a swarming technique, i.e., circle around Jackson in order to prevent him from moving in any direction. This technique would involve minimal or no force. He further explained that the officers should not have permitted Jackson to approach on the driver's side of the car, and walk near potentially oncoming traffic for safety reasons.

Under cross-examination, Baranowski conceded that if Jackson aggressively approached Kreger from behind, Kreger would be justified in using a two hand push technique in order to separate them. He admitted that it is important for an officer to maintain space between himself and an approaching individual, both for the safety of the officer and the individual. Baranowski further testified that use of an armbar by an officer to take down an individual who is acting aggressively is an acceptable use of force in many situations. (*See* Docket No. 196 at 7). However, Baranowski testified that striking and kicking an individual who was subdued on the ground was not an acceptable use of force, given the circumstances.

vi.    *Baranowski's Conclusion*s

Baranowski concludes that the use of force against Plaintiff was "unnecessary and unwarranted"; "the incident could have been avoided, had the officers followed their department's regulations"; "the necessity of using force in this matter [was] suspect and [was] created by the actions of the officers involved" and not by Plaintiff; and, because four officers were present, "it should have been unnecessary to use more than a swarming technique" to control Plaintiff, and "it should have been unnecessary to strike or kick him, once he was on the ground." (*Id*.). In his affidavit, Baranowski states that:

> Mr. Jackson was arrested for Disorderly Conduct, which was later dismissed when he objected to the towing of his vehicle. A person should not be arrested for Disorderly Conduct for voicing concerns

to the police. And in fact, there is no evidence that Mr. Jackson's actions disturbed anyone in the vicinity. Mr. Jackson's actions resulting in his arrest stem from the police officer's use of force against him and not from Mr. Jackson's own actions.

(Docket No. 151 at 7).

III.    DISCUSSION

The use of an expert witness at trial is governed by both the federal procedural and evidentiary rules. Rule 26 of the Federal Rules of Civil Procedure details the discovery procedures for the disclosure of expert witnesses, their reports and matters considered by the expert, while Rule 702 of the Federal Rules of Evidence governs the admissibility of expert opinion testimony at trial.

A.    *Rule 26 Analysis*

Baranowski testified that he did not produce all of the matters that he considered to the Defendants in conjunction with his expert report, including the 4th Edition of the CALEA standards (2001), which he referenced several times during his testimony. This is a violation of Rule 26(a)(2)(B), which provides that:

(2) Disclosure of Expert Testimony.

(A) In General. In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.

(B) Written Report. Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report--prepared and signed by the witness--if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

(I) a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii) ***the data or other information considered by the witness in forming them***;

(iii) any exhibits that will be used to summarize or support them;

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

FED.R.CIV.P. 26(a)(2)(emphasis added).  A party is also required to supplement expert disclosures made under Rule 26(a)(2) pursuant to Rule 26(e)(2). FED.R.CIV.P. 26(e).  Failure to abide by the disclosure requirements in these provisions is governed by Rule 37(c)(1), which provides that "[i]f a party fails to provide information ... as required by Rule 26(a) or (e), the party is not allowed to use that information ... to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED.R.CIV.P. 37(c)(1).  However, prior to excluding evidence, the United States Court of Appeals for the Third Circuit has held that a district court must consider:

(1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted;

(2) the ability of the party to cure that prejudice;

(3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and

(4) bad faith or wilfulness in failing to comply with a court order or discovery obligation.

*Nicholas v. Pennsylvania State University,* 227 F.3d 133, 148 (3d Cir. 2000).  In addition, "'the

importance of the excluded testimony' should be considered." *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997)(quoting *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904 (3d Cir. 1977)).

After considering all of these factors, the Court finds that they weigh against striking the proffered testimony that relies on the CALEA standards. First, Defendants have not expressly claimed prejudice related to the untimely disclosure. Secondly, as Plaintiff has pointed out on multiple occasions, they had the opportunity to depose Baranowski during the discovery phase of this case but chose not to do so. Moreover, after the Court determined that a *Daubert* hearing was necessary to resolve Defendants' motion to exclude Baranowski, they were given the opportunity to cross-examine him. Thus, the prejudice to Defendants is minimal. Thirdly, any such prejudice can be cured by ordering that Plaintiff produce the CALEA standards to the Defendants prior to trial. The CALEA standards are cited in several of the City's Policies. Thus, the Defendants should have some familiarity with these documents, but pretrial disclosure of the specific CALEA standards relied on by Baranowski will enable Defendants to prepare more effective cross examination of him at trial. Finally, there is no evidence that the Rule 26 violation was made in bad faith or that the cited documents were willfully withheld and Baranowski's proffered expert testimony is a significant part of Plaintiff's case.

     B.    *Rule 702 Analysis*

         1.    Legal Standard

In their motion, Defendants have challenged the admissibility of proffered expert testimony. Federal Rule of Evidence 702, which memorializes the Supreme Court's landmark case *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provides the basic framework for the

admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED.R.EVID. 702.[5]  The United States Court of Appeals for the Third Circuit has held that "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit."  *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003)(citations omitted).  "[T]he district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury."  *Id*.  In this role, the district court is not the finder of fact but must focus on the methodology of the expert in order to "satisfy itself that 'good grounds' exist for the expert's opinion."  *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) (citing *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786).  Thus, the district court should not conflate "its gatekeeping function with the fact-finders' function as the assessor of credibility."  *In re TMI Litigation*, 193 F.3d 613, 713 (3d Cir. 1999).

> *Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct. As long as an expert's scientific testimony rests upon "good grounds, based on what is known," it should be tested by the adversary process-competing expert testimony and active cross-examination-rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily

---

[5] FED R. EVID. 702 was amended in 2000 in response to *Daubert*, but pre-2000 precedent regarding the *Daubert* analysis also applies to the analysis under Rule 702. *See, e.g., Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008).

weigh its inadequacies. In short, *Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance. It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.

*Mitchell*, 365 F.3d at 244 (quoting *Ruiz-Troche v. Pepsi Cola Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)(citations omitted))*; see also Kannankeril v. Terminix Intern., Inc.*, 128 F.3d 802, 809 (3d Cir. 1997)("The trial judge must be careful not to mistake credibility questions for admissibility questions."). The party asserting the admissibility of the proffered testimony has the burden to demonstrate by a preponderance of the evidence that the opinions are based on "good grounds." *Kannankeril*, 128 F.3d at 807.

In a case such as this, where an expert is proffered to testify regarding non-scientific matters, "[t]he relevant reliability concerns [will] focus upon personal knowledge [and] experience" of the witness and the methodology used will be applying that experience to the facts of the case. *Roberson v. City of Philadelphia*, Civ. A. No. 99-3574, 2001 WL 210294, at *5, n. 10 (E.D.Pa. Mar. 1, 2001)(internal quotation omitted); *see also* Fed.R.Evid. 702, Advisory Comm. Notes, 2000 Amd. ("when a law enforcement agent testifies regarding the use of code words in a drug transaction, the principle used by the agent is that participants in such transactions regularly use code words to conceal the nature of their activities. The method used by the agent is the application of extensive experience to analyze the meaning of conversations."); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 907 (6th Cir. 2004). As in other contexts, a witness may not testify as an expert outside the scope of his or her expertise – the expert's qualifications and skills set the boundaries for that expert's testimony.

Regarding the "fit" element of the analysis, a non-scientific expert "must apply his experience reliably to the facts; his opinions must be well-reasoned, grounded in his experience, and not speculative." *See Roberson*, 2001 WL 210294, at *4. Further, a properly qualified non-scientific expert may not offer an opinion as to an ultimate legal issue because to permit this type of evidence would subvert the jury's function to decide the disputed facts and issues after being properly instructed as to the law by the court. *See Whitmill v. City of Philadelphia*, 29 F.Supp.2d 241, 246 (E.D.Pa. 1998)(excluding proffered expert testimony that an interaction with law enforcement "was not a proper *Terry* stop"); *Watkins v. New Castle County*, 374 F.Supp.2d 379, 392-93 (D.Del. 2005)(excluding proffered expert testimony that the defendant police officers' conduct was reckless, willful, indifferent, and that they violated the plaintiff's constitutional rights); *Roberson*, 2001 WL 210294, at *5, n. 10 (excluding proffered expert testimony that an officer's conduct was "deliberately indifferent" toward the plaintiff). Likewise, non-scientific expert witnesses are not permitted to express opinions as to the credibility of witnesses or of the facts generally. *See Whitmill*, 29 F.Supp.2d at 246-47 (excluding proffered expert testimony discussing the credibility of an officer-defendant). The ultimate inquiry is whether the proffered testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." FED.R.CIV.P. 702.

2.    Trial Issues

The matter is set for jury selection and trial on August 23, 2010. In their Joint Stipulations, the parties have proffered the following issues to be resolved at said trial:

1. Did the officers have probable cause to arrest the plaintiff and take him into custody for violating Pennsylvania Crimes Code 18 Pa.C.S.A. §5503 and 5504, Disorderly Conduct and Resisting Arrest?

2. In making the arrest, was the force used by the officers reasonable and necessary?

3. The officers performed a search of the vehicle. It is disputed whether such search was an inventory search or a more invasive search which would require a warrant. If it was an inventory search, did the officers have a lawful basis to conduct an inventory search?

4. Are the Defendant officers entitled to qualified immunity on each of Plaintiff's claims as they did not violate the clearly established rights of the Plaintiff and their actions on November 2, 2001, were objectively reasonable?

5. Did the Plaintiff suffer any compensable injuries, and if so, what is the proper measure of damages for such injuries?

6. Are punitive damages to be awarded to the Plaintiff?

(Docket No. 140).

3.     *The Parties' Arguments*

Defendants challenge the foundation of Baranowski's opinions, arguing that they are unreliable because they are based on unproven or speculative facts. (Docket No. 126). They further maintain that Plaintiff's proffer of Baranowski is improper because his "opinions" are either not relevant to the issues in dispute at trial, or are not proper expert opinions because they involve statements resolving disputed facts, the resolution of which are within the province of the jury. Defendants concede that if Baranowski had the type of training and experience that he proffers in his report and affidavit, he would have the necessary qualifications to offer an opinion regarding the force used by the officers in this case. However, they do not believe that type of opinion is what has been proffered.

They specifically seek to exclude Baranowski's opinions that: (1) plain clothes, narcotics

officers, such as the Defendants in this case, should not routinely engage in traffic stops because it is not a productive use of their time and can be dangerous when conducted out of uniform; (2) the Defendants were "trolling" or profiling for arrests prior to their stop of Plaintiff's car; (3) the Defendants acted improperly by arresting Plaintiff and taking him into custody for minor traffic violations[6]; (4) the Defendants acted improperly by refusing Plaintiff's request to call a family member to pick up his car, rather than to have it towed; and (5) Defendant Kreger's actions in pushing Plaintiff, who approached him from the rear, were not warranted given Baranowski's interpretation of the facts of the case.  (Docket No. 127).  In later briefing, Defendants further contend that several of Baranowski's opinions are improper legal conclusions and that, ultimately, his use of force opinion is within the understanding of lay jurors, negating the need for expert testimony on the issue of the reasonableness of the force used.  (Docket No. 195).

In response, Plaintiff maintains that Baranowski's expert report and proffered testimony are sufficient to withstand *Daubert* scrutiny and that any discrepancies should be tested by Defendants during cross-examination.  (Docket No. 145).  Plaintiff believes that Baranowski is properly qualified and has sufficient personal knowledge and experience regarding all matters raised in his report and later testimony.  (Docket No. 197).  Plaintiff contends that Baranowski's opinions are critical to his case and that they will assist the jury in resolving the disputed facts in this case.  (*Id*.).

4.    *Analysis of Baranowski's Opinions*

With this backdrop, the Court now turns to Defendants' challenge to the proffer of Mr. Baranowski.  In this Court's estimation, Baranowski is qualified to offer an expert opinion regarding

---

[6]

Defendants contend that Plaintiff was arrested for disorderly conduct resulting from his threatening actions toward them made after the traffic stop.  (Docket No. 127).

the use of force by the officers and their application of standardized police procedures in this case as well as the use of force continuum and the proper training for same, based on his experience with the state police, his training and his related teaching experience. Defendants admitted same during the pretrial conference. The methodology used by Baranowski in forming his opinions was to apply his personal knowledge and experience to the facts of this case. This type of methodology is permitted in the context of expert testimony offered by a non-scientific expert. As noted, Defendants primarily challenge the "reliability" or "fit" of Baranowski's various opinions. They claim that many of his opinions are not relevant to the issues to be tried and that others are based on assumptions and speculation. They further argue that his opinions should be excluded because they are based on a flawed analysis of the facts, including his resolution of disputed factual issues and credibility assessments. The Court will address each of the challenged areas, in turn.

i.     Traffic Stop

Baranowski's opinions regarding the propriety of the initial traffic stop and the City's alleged misuse of Narcotics Officers, in plain clothes and unmarked vehicles, to make traffic stops are not relevant and are based on improper assumptions and speculation. Thus, these opinions will be excluded at trial. First, the propriety of the traffic stop is not at issue in this case as Plaintiff pled guilty to a summary offense and paid a fine for failing to operate a turn signal. The disputed issues at trial are the reasonableness of the inventory search of Jackson's car, whether there was probable cause to arrest Jackson for disorderly conduct and/or resisting arrest and the reasonableness of the force used against Jackson during the arrest. (Docket No. 140, *Parties' Joint Stipulations*). Thus, the proffered opinions that the narcotics officers were misused when making traffic stops or that it is unsafe to use undercover officers to make traffic stops are not relevant.

In any event, Jackson recognized that the unmarked vehicle that pulled him over was a police car. Specifically, in his sworn statement to OMI, Jackson stated "I went past Beer World, and I noticed there were lights like in the grill ... of a vehicle, which I figured was a plainclothes police car, pulled over to the right, thinking they're going – like going after someone around me or going somewhere, and they pulled right behind me." (Docket No. 83-2 at 36). Therefore, the safety concerns articulated by Baranowski simply were not present in this case. Further, as to Baranowski's suggestion that the officers should have radioed for a marked police car to make the stop, Baranowski admitted that he did not know if the City had a policy requiring them to do so, or if there were any marked police cars available in the area that could have made the stop if they had called. Thus, this opinion is without factual support.

However, even if the traffic stop were in issue, Baranowski would not be permitted to testify regarding his opinions that the officers were "trolling" for drug arrests or "profiling" at the time of the incident. Baranowski admitted that he was assuming that a profile was used by the officers on the date of the arrest but pointed to no evidence in support of this assertion. He relied on a statement by Detective Goob that the officers often make traffic stops when on narcotics duty in support of his opinion that the officers were "trolling" for drug arrests but that term was not used at any point in the record. Baranowski did not review any of the officers' arrest records to determine if his belief that they did not always enforce traffic laws as they asserted was in error. Thus, these opinions are based on improper assumptions and/or speculation and must be excluded. Moreover, the terms "trolling" and "profiling" are prejudicial to Defendants, and the prejudice to them substantially outweighs the limited probative value of Baranowski's use of these terms, given that they have no factual support in the record. *See* FED. R. EVID. 403 ("evidence may be excluded if its probative value

is substantially outweighed by the danger of unfair prejudice").

In sum, the proffered expert testimony regarding the traffic stop is not relevant under Rule 403 and, the testimony relying on assumptions and speculation do not "fit" the case, and would not assist the trier of fact under Rule 702.

ii.    <u>Initial Encounter</u>

Baranowski's opinions as to the initial encounter between Jackson and the officers after the traffic stop shall be excluded. Based on his experience as a state trooper, Baranowski is arguably qualified to render an opinion as to the proper procedure to be followed after a traffic stop is made. However, his opinions as to how an officer is to determine if a person's license is suspended must be excluded because they are improper legal conclusions and/or without foundation. For instance, he summarizes the law; stating that an officer cannot arrest an individual for violation of traffic laws, but also that an out of state resident can be arrested for violations of traffic laws. He testified to his belief that an individual cannot be arrested for driving with a suspended license without first receiving information from PennDot that the person's license is suspended in the form of a certified copy of the person's driving record. He explained that officers in the field cannot rely on the information that is provided regarding a person's driving history in the computers in their squad cars to determine if a person's license is suspended. The parties dispute the applicable law in this area. Defendants challenged Baranowski on his interpretation of the law at the *Daubert* hearing, but he offered no policy, regulation or statute in support for his opinion. Defendants cited 75 Pa.C.S. § 6309.2 in opposition. The version of that statute in effect on November 2, 2001, provided, in relevant part, that:

> If a person operates a motor vehicle or combination on a highway or

22

> trafficway of this Commonwealth while the person's operating
> privilege is suspended, revoked, recalled or disqualified,
> or where the person is unlicensed, as verified by an appropriate law
> enforcement officer in cooperation with the department, the law
> enforcement officer shall immobilize the vehicle and the appropriate
> judicial authority shall be so notified.

75 Pa.C.S. § 6309.2(a)(1)(1996), 1996 July 2, P.L. 535, No. 93, § 5.[7] This statute is silent regarding

whether a certified copy of a person's driving record is required. Thus, there is no foundation for

Baranowski's opinion. Baranowski, a former police officer, is not qualified to engage in an analysis

of the applicable law. Because there is no foundation for this testimony, it must be excluded.

>   iii.   Plaintiff's Request to Move Car/ Defendants' Towing Policy
>          Violation

Baranowski's opinions regarding the City's Towing Policy and the officers' compliance with

same must also be excluded. The relevant policy provides that:

> Vehicles of arrested persons shall not be towed unless:

---

[7]

The present version of this statute provides that:

> If a person operates a motor vehicle or combination on a highway or
> trafficway of this Commonwealth while the person's operating
> privilege is suspended, revoked, canceled, recalled or disqualified or
> where the person is unlicensed, as verified by an appropriate law
> enforcement officer in cooperation with the department, the law
> enforcement officer shall immobilize the vehicle or combination or,
> in the interest of public safety, direct that the vehicle be towed and
> stored by the appropriate towing and storage agent pursuant to
> subsection (c), and the appropriate judicial authority shall be so
> notified.

75 Pa.C.S. § 6309.2(a)(1)(2005). In any event, it is unclear whether either version of this statute was
adopted by the City of Pittsburgh on the date of the incident. *See Commonwealth v. Henley*, 909
A.2d 352, 361-62 (Pa.Super. 2006)(holding that the City of Pittsburgh did not adopt section 6309.2
and "municipalities are only subject to the specific procedures set forth in the statute if they choose
to adopt them.").

- the vehicle presents a traffic hazard and cannot be driven away;
- it is necessary for investigative or evidentiary purposes;
- the arrested person may give his permission to another person to move the vehicle;
- the disposition of the vehicle shall be noted on the police report.

(Docket No. 160-2, D-10, Order #41-4, § 5.1.).  Baranowski's opinions consist of his interpretation of this law and do not rely on his experience with any other towing laws or regulations.  His opinions are more akin to legal argument than expert testimony.  He testified that the Towing Policy, as written, takes all discretion away from the officers in making a determination regarding whether to tow a vehicle but grants the arrested person, Plaintiff in this instance, the discretion to request that he be able to call another person to come to the scene of the traffic stop and move the car on his behalf.  Baranowski then concluded that the officers acted in violation of this policy when they rejected Plaintiff's request to call his father to move the vehicle for him.

In this Court's estimation, Baranowski's analysis is an improper legal conclusion, which subverts both the Court's role in instructing the jury on the law and also the jury's role in resolving the disputed facts. There is also no factual or legal foundation for Baranowski's analysis; the policy is silent regarding the proper procedures to be used in the situation that these officers were presented with on November 2, 2001, i.e., Jackson is pulled over while driving by himself, the officers determine that he has a suspended Pennsylvania license, they determine that the vehicle is blocking traffic and must be towed, and Jackson requests that he be able to call a third party to move his car rather than have it towed.  Accordingly, Baranowski's opinions interpreting the Towing Policy are excluded.

iv.     Custodial Inventory

Baranowski's opinions, to the extent that he has offered any, regarding the custodial

inventory search are also excluded. In his report, Baranowski purportedly summarizes the law regarding a custodial inventory, and offers no actual opinions regarding how the search itself was conducted by the officers. Likewise, his affidavits and testimony did not address the custodial inventory. Because Baranowski's summary of the law regarding custodial inventories is not offered in support of any actual opinions, any testimony in this regard would serve no purpose other than to confuse the jury. This type of testimony would also invade the Court's duty to charge the jury as to the applicable law. Further, as no opinions on this issue were ever proffered, to the extent that Baranowski attempts to testify regarding the custodial inventory at trial, his opinions will be excluded as a violation of Rule 26 in light of the standards set forth above.

v. <u>Reasons for the Disposition of the Dismissed Charges</u>

Baranowski's opinions regarding the reasons for the dismissal of the charges initially brought against Jackson, including resisting arrest and disorderly conduct, are excluded. Like the other matters discussed above, these opinions are also not grounded in fact and are legal conclusions or assumptions and speculation. To that end, Baranoski may not testify to any of the following: that because the charges were dismissed, one can "assume" that the charges were without merit; that no evidence of any crime ever existed; or that the officers did not have sufficient evidence to prove any of the dismissed charges. Moreover, Baranowski does not have expertise in the type of prosecutorial discretion involved in making the decision of whether to prosecute charges against an individual. Further, the Court will charge the jury regarding the dismissal of the charges consistent with the instruction recommended in the Third Circuit's Model Civil Jury Instructions. *See* 3d Cir. Model Civil Jury Inst., § 4.12.2.

vi. <u>Use of Force</u>

Baranowski will be permitted to testify as to the use of force by the police officers in this case. However, his testimony will be limited. Defendants contend that Baranowski's use of force opinions should be excluded because they involve improper credibility assessments and the resolution of disputed facts. The Court agrees that Baranowski is not permitted to make credibility assessments of the witnesses, including the truthfulness of their respective testimony or statements. *See Whitmill*, 29 F.Supp.2d at 246-47. Credibility assessments are left solely for the jury to decide and Baranowski's opinions evaluating the credibility of Jackson given his prior involvement with law enforcement and Detective Kreger in light of the prior complaints against him, will be excluded. *Id*. Baranowski's report and testimony also consist of his resolution of many factual disputes and he admitted that he was acting as a "fact finder" during his analysis. The resolution of factual disputes is likewise within the province of the jury, but "[a]n expert is ... permitted to base his opinion on a particular version of the disputed facts and the weight to be accorded to that opinion is for the jury." *Walker v. Gordon*, 46 Fed.Appx. 691, 695-96 (3d Cir. 2002)(not precedential); FED.R.EVID. 702, 2002 Amendments ("The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."). Therefore, in this Court's estimation, Baranowski cannot testify in the manner that he has presented in his report. Many of his opinions and statements explain only why he feels certain evidence is more credible than the other evidence. These types of explanations impinge on the jury's function. To this end, given these and the other matters discussed above which are not admissible, Baranowski's report cannot be presented to the jury as an exhibit as Plaintiff has requested. *See* FED.R.EVID. 703 ("Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless

the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect."); FED.R.EVID. 703, 2000 Amendments Comm. ("Rule 703 has been amended to emphasize that when an expert reasonably relies on inadmissible information to form an opinion or inference, the underlying information is not admissible simply because the opinion or inference is admitted.").  But, Baranowski's report may be used to impeach him.

Despite the fact that Baranowski's presentation of the facts in his report resolves matters left for a jury determination, his opinions can be presented at trial if they are offered in response to properly formulated hypothetical questions.  Said hypothetical questions must be founded on facts already in evidence and they must not be phrased in a manner requesting that the expert testify on the ultimate legal issue of whether the force used by the officers was "reasonable."  *See Samples v. City of Atlanta*, 916 F.2d 1548, 1551-52 (11th Cir. 1990)(discussing the use of a hypothetical question by a use of force expert in a § 1983 case); *Burger v. Mays*, 176 F.R.D. 153, 157 (E.D.Pa. 1997)(holding that use of force expert may testify as to whether an officer's actions "were in line with standard police procedures," but prohibiting testimony that the officer's actions were "unreasonable"); *Tschappat v. Groff*, Civ. A. No. 3:CV-01-2279, 2004 WL 5509087, at *4 (M.D.Pa. Jun. 2, 2004).  These opinions can then be tested through cross examination.  *See Walker*, 46 Fed. Appx. at 696 (citing *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002)).

Finally, Defendants summarily contend that expert testimony is not needed in this case because the content of Baranowski's proffered testimony is not "beyond the ken of the average juror." (Docket No. 195).  The Court disagrees.  Expert testimony is commonly permitted in use of force cases and given Baranowski's considerable background and experience in these areas, his

proffered testimony, so limited by this opinion, will assist the trier of fact on the disputed issues in this case.

The scope of Baranowski's permitted testimony is as follows:

(1)    His knowledge, experience and extensive law enforcement background;

(2)    The standardized police procedures at issue in this case, including the City of Pittsburgh's Use of Force Policy, the Continuum of Control, and the CALEA standards (if the CALEA standards are produced prior to trial as discussed above); and,

(3)    Whether the Defendants' use of force was in accord with the standardized police procedures given the facts of this case (properly presented to him by way of a hypothetical question).

IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion [126] is granted, in part and, denied, in part. An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Court

Date:   August 13, 2010

cc/ecf:  All counsel of record