**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

CHARLES JACKSON,         )
                                    )
            Plaintiff,     )
                                    )
         v.            )     Civil Action No. 07-111
                                    )     Judge Nora Barry Fischer
THE CITY OF PITTSBURGH, a PA   )
Municipal Corporation, et al.     )
                                    )
            Defendants.   )

## MEMORANDUM OPINION

I.     INTRODUCTION

This is a civil rights case brought by Plaintiff, Charles Jackson,[1] against Defendants, the

City of Pittsburgh, Pennsylvania, and officers Timothy Kreger, Mark Goob, James Joyce and

Gregory Woodhall (the "Defendant Officers"), arising from the officers' arrest of Plaintiff on

November 2, 2001 and the subsequent incarceration of him after a traffic stop in the Homewood

section of Pittsburgh. This matter was tried before a jury for five days from August 23, 2010

through August 27, 2010. (Docket No. 204). The trial was trifurcated: phase I involved

Plaintiff's § 1983 claims asserting that his Fourth Amendment rights were violated by the

---

[1]     Plaintiff was represented by Bonnie Kift, Esquire at trial but has since discharged her and is representing himself in post-trial proceedings. (*See* Docket No. 230). This Court is required to give liberal construction to the allegations in Plaintiff's *pro se* submissions. *See Gilmore v. Macys Retail Holdings, Inc.*, 385 F.App'x. 233, 236 (3d Cir. 2010). However, the Court need only interpret his allegations of error to the best of its ability in order to determine if they have any merit in light of the trial record. *Id.* Finally, to the extent that Plaintiff complains of his former counsel's unsatisfactory performance, dissatisfaction with one's attorney does not provide appropriate grounds for a new trial. *Id.* (citing *Walker v. Sun Ship, Inc.*, 684 F.2d 266, 268 (3d Cir.1982) (because a litigant "voluntarily chose this attorney as his representative in the action, ... he cannot now avoid the consequences of the acts or omissions of this freely selected agent."); *Kushner v. Winterthur Swiss Ins. Co.*, 620 F.2d 404, 408 (3d Cir.1980) (civil litigants do not have a right to effective assistance of counsel)).

Defendant Officers for allegedly conducting an unreasonable search and seizure of his vehicle, unlawfully arresting him, and using excessive force against him while effectuating his arrest; phase II involved Plaintiff's *Monell* claim against the City of Pittsburgh; and, phase III involved Plaintiff's claims for damages against all Defendants. At the conclusion of all of the evidence in phase I, the Court granted the Defendant Officers' motion for judgment as a matter of law on Plaintiff's claim that the inventory search and later seizure of his vehicle violated his Fourth Amendment rights. (Docket No. 204). After deliberations, the jury entered a verdict against Plaintiff on the remainder of his constitutional claims against the Defendant Officers, including his unlawful arrest and excessive force claims. (Docket No. 206). The Court then dismissed Plaintiff's claims against the City of Pittsburgh because the underlying claims against the Defendant Officers, upon which Plaintiff's *Monell* claim against the City relied, had been dismissed. (Docket No. 208). Because all of Plaintiff's claims were either dismissed or resulted in a verdict against him, the case did not proceed to the damages phase.

Presently before the Court are post-trial motions filed by Plaintiff, *pro se*. In his motions, Plaintiff seeks both a new trial and reconsideration of several Court Orders, including those dismissing his claims against the City of Pittsburgh. (Docket Nos. 214, 218). He also seeks relief from judgment based on alleged newly discovered evidence, which he claims was fraudulently withheld by the defense. (Docket No. 251). Defendants oppose Plaintiff's motions. (Docket Nos. 236, 237, 256). Upon consideration of the trial record[2] and the parties' submissions, and for the following reasons, Plaintiff's motions are DENIED.

---

[2] The trial record consists of the testimony at trial on August 23, 2010 through August 27, 2010, (*see* Docket Nos. 239, 240, 241, 246, 245), and the admitted exhibits, (Docket No. 205). Herein, the Court also references its pretrial rulings and those exhibits which were marked or referenced but not admitted during trial, to which Plaintiff now complains, were excluded in error. The Court also issued a number of pretrial rulings on motions in limine. *See*

II.    FACTUAL BACKGROUND[3]

On November 2, 2001, the Defendant Officers were patrolling the Homewood section of

Pittsburgh, Pennsylvania in an unmarked police car.   (Docket No. 241 at 185-186).   This section

of the city is a high-crime area and the Defendant Officers were aware that numerous homicides,

stabbings, robberies and narcotics transactions had taken place in the Homewood area.   (Docket

No. 246 at 11-12, 23).   The Defendant Officers were on an undercover narcotics detail and

dressed in plainclothes on November 2, 2001.   (Docket No. 241 at 185-186).   They were working

on the Impact Squad, a division of the City Police Department within Narcotics and Vice.

(Docket No. 241 at 215).   Plaintiff was driving his car on Hamilton Avenue from the Frankstown

Road area near his home in Penn Hills; he was on his way to meet his parents for bowling.

(Docket No. 240 at 29; Jt. Ex. 2).   Unbeknownst to him, the Defendant Officers observed Plaintiff

make a right turn from Hamilton Avenue to North Braddock Avenue, without first operating his

turn signal.   (Docket No. 241 at 188; Docket No. 246 at 23).   The Defendant Officers ran his

license plate while pursuing him; then pulled him over on North Braddock Avenue between cross

streets Thomas and Meade.   (Docket No. 246 at 36-39).   He was pulled over around 9:10 or 9:15

p.m.   (Docket No. 240 at 29).

In large part, the witnesses presented differing versions of the subsequent events at trial.

Plaintiff testified that the Defendant Officers approached his vehicle with guns drawn, flashed

---

n. 3, *infra*.

[3]      The Court includes only the facts relevant to the disposition of the present motions.   Unless otherwise noted,
the facts were uncontested at trial.   For a more detailed recitation of the facts, please consult the Court's prior
Memorandum Opinions and Orders in this matter, *see, e.g., Jackson v. City of Pittsburgh*, 688 F.Supp.2d 379 (W.D.
Pa. Feb. 22, 2010) (ruling on Defendants' motion for summary judgment), 2010 WL 2511380 (W.D. Pa. Jun. 17,
2010) (ruling on parties' motions in limine regarding the admissibility of Plaintiff's prior convictions), 2010 WL
2510137 (Jun. 17, 2010) (ruling on Defendants' motion in limine to exclude evidence of damages to Plaintiff's car),
2010 WL 3222137 (W.D. Pa. Aug. 13, 2007) (ruling on Defendants' *Daubert* motion to exclude testimony of
Plaintiff's expert witness James Baranowski).

lights into his face, and ordered him out of the car.   (Docket No. 240 at 31).   He asserted that the

Defendant Officers accused him of being a known drug dealer, forcefully demanded that he exit

his vehicle and pulled him out of the car.   (*Id*. at 31-32).   Plaintiff stated that they gave him no

reason for pulling him over at that time, did not ask for his license and registration, and he made no

statements to the officers.   (*Id*. at 31-32, 36).   The Defendant Officers then took him to the rear of

the vehicle and one of the officers began searching the vehicle and another of them searched him.

(*Id*.).   Plaintiff alleged that Woodhall again accused him of being a known drug dealer.   (*Id*. at

34-36, 39, 41-42).   Plaintiff did not respond to these accusations.   (*Id*. at 36, 41-41).

While remaining at the rear of the vehicle, Plaintiff stated that he was minding his own

business, saying a prayer to himself that nothing would happen to him.   (*Id*. at 45).   One of the

officers (Goob), then grabbed Plaintiff from behind around his waist and "tried to body slam" him.

(*Id*. at 45-46).   Kreger, who was previously searching the car from the front passenger side of the

vehicle, came to the rear of the car and assisted.   (*Id*.).   Plaintiff explained that Kreger punched

him in the throat, which caused him to start to lose consciousness.   (*Id*. at 49).   At this point,

Plaintiff put his hands in the air and permitted the officers to take him to the ground and handcuff

him.   (*Id*. at 50).   He was adamant that he did not resist the arrest.   (*Id*. at 50).   As he was lying

face-down on the ground, one of the Defendant Officers (Goob) forcibly held him down and

Kreger jammed his knuckle into Plaintiff's eye.   (*Id*. at 50-52).   Later, as he was sitting on the

ground handcuffed, Plaintiff claimed that one of the officers slapped him in the head with his hat

(which had fallen off) and threw his own lighter at him (which he had dropped during the

altercation).   (*Id*. at 55).

The Defendant Officers' testimony directly contradicted much of Plaintiff's version of the

facts.   From their view, they pulled Plaintiff over and Goob approached the driver's side of the

vehicle while Woodhall approached from the passenger side, shining a flashlight into the car for safety reasons, i.e., to check for weapons. (Docket No. 246 at 24). Goob displayed his badge to Plaintiff and asked him for his license and registration. (Docket No. 241 at 192). Goob testified that Plaintiff appeared very upset and questioned why he was pulled over. (*Id*.). Plaintiff was also not able to produce a Pennsylvania driver's license. (*Id*.). Instead, he attempted to explain that he had a license but there was some type of problem with it. (*Id*.). However, Goob was able to elicit Plaintiff's name, address and date of birth. (*Id*.). Goob gave this information to one of his fellow officers and asked that they determine if Plaintiff had a valid license. (*Id*.).

The Defendant Officers contacted the INDEX system and were advised that Plaintiff's Pennsylvania driver's license was under suspension. (*Id*.). Goob then returned to the car, advised Plaintiff that his license was under suspension, asked him to exit the vehicle and explained to him that because his vehicle was in a lane of travel, and he was not authorized to drive it, they were going to tow his vehicle. (*Id*. at 192-194). The Defendant Officers called for a tow truck. (*Id*. at 195). While they were waiting, Goob filled out a tow slip while Kreger conducted an inventory search of the vehicle. (*Id*. at 195-196). All of the Defendant Officers testified that the vehicle was in poor condition, with garbage and other clutter throughout the interior. (*Id*. at 196-197; *see also Woodhall*, 246 at 27 ("It was … a disaster."); *Kreger* 246 at 94 ("It was a pig sty. It appeared to me that Mr. Jackson may be living out of the vehicle.")).

Goob testified that Plaintiff was "irate" after he was informed that his car was being towed. (Docket No. 241 at 197). He observed Plaintiff pacing back and forth and swearing. (*Id*.). Also, Plaintiff was continually stating that his license was not suspended and there was some type of mistake. (*Id*.). Goob permitted Plaintiff to walk around in this manner, providing him an outlet to "vent." (*Id*. at 198). However, he also requested that Plaintiff "calm down" multiple

times. (*Id*.). Instead of heeding this advice, Plaintiff started yelling and becoming more and more agitated. (*Id*.). After some time, Goob instructed Plaintiff that if he did not settle down, he would be arrested. (*Id*.). In response, Plaintiff said "fuck this" and started walking toward the front of the car. (*Id*.). Goob initially thought that Plaintiff was leaving the scene, and because they already had all of Plaintiff's information and could send him a citation in the mail, he did not think anything of his movements. (*Id*.).

However, rather than leave the scene, Plaintiff approached Kreger from behind, while Kreger was bent over conducting the inventory search. (*Id*.). Kreger testified that he felt Plaintiff approach him on the side of his body where he carries his gun. (Docket No. 246 at 97). Goob started following Plaintiff at that point and then observed Kreger stand up, turn around and push Plaintiff away from him. (Docket No. 241 at 198). Kreger said that Plaintiff was within two feet of him when he turned and that he felt threatened by Plaintiff's presence there. (Docket No. 246 at 97). Upon turning around, Kreger observed that Plaintiff had a blank stare in his face and was in a position to initiate an attack against him. (*Id*. at 137). Kreger explained that he pushed Plaintiff with two hands while simultaneously stepping backward. (*Id*.). He did this just to create a little distance between them. (*Id*.).

Upon seeing this interaction, Goob announced that Plaintiff was under arrest for disorderly conduct and continued toward Plaintiff until he grabbed him from behind in an effort to control him. (Docket No. 241 at 199-200). Plaintiff resisted. (*Id*. at 200). In response, Goob immediately tried to take him to the ground using an arm bar technique, which he demonstrated to the jury by performing said technique on Woodhall. (*Id*. at 200-202). Goob believed that he was able to maneuver Plaintiff to the ground without Kreger's assistance, although Kreger was close by. (*Id*. at 202). Now, Goob had Plaintiff face-down on the pavement. (*Id*. at 202-203).

Plaintiff, however, resisted being handcuffed and Kreger had to grab one of Plaintiff's arms to assist in handcuffing Plaintiff. (*Id*. at 203-204). Goob estimated that the entire interaction took about 20 seconds. (*Id*. at 204). The other officers testified to a similar account of the interaction between Goob, Kreger and Plaintiff. (*Woodhall*, Docket No. 246 at 25-30, 32; *Joyce*, Docket No. 246 at 75-79; Kreger, Docket No. 246 at 92-100).

After Plaintiff was successfully handcuffed, the officers brought him to his feet. (Docket No. 241 at 204). They then called for a paddy wagon to transport Plaintiff to Allegheny County Jail. (*Id*.). Goob observed that Plaintiff had a bruise on his face. (*Id*.). Likewise, Kreger viewed an abrasion under Plaintiff's eye before he was placed in the paddy wagon. (Docket No. 246 at 100). The Defendant Officers proceeded to take Plaintiff to jail rather than to the hospital because Plaintiff did not complain about the injury or request medical assistance and the Defendant Officers did not believe that his injury was severe. (Docket No. 241 at 204-205; Docket No. 246 at 79).

Despite these factual differences in the events that transpired on November 2, 2011, several important facts were undisputed. First, Plaintiff pled guilty to failing to use a turn signal and was precluded from taking a contrary position at trial. *See Heck v. Humphrey*, 512 U.S. 477, 486-87 & n.6 (1994); *see also Jacobs v. Bayha*, 2011 WL 1044638, at *2 (W.D.Pa. Mar. 18, 2011) ("pursuant to the *Heck* doctrine, factual allegations that are inconsistent with the validity of a conviction cannot be used to support a civil action."). Thus, Plaintiff was prevented from contesting the legality of the traffic stop itself. Second, Plaintiff admitted that his Pennsylvania driver's license was suspended on the date of the incident and that he did not provide the Defendant Officers with any proof that he had a valid Pennsylvania driver's license. (Docket No. 240 at 143). Therefore, he was not permitted to drive the vehicle under the law. (Docket No.

241 at 193-194; 246 at 25-26).   Third, after Plaintiff was pulled over, his car was blocking traffic on North Braddock Avenue and needed to be removed from the road.   (Docket No. 246 at 92). Fourth, the Defendant Officers were not permitted to drive Plaintiff's vehicle by City policy. (Docket No. 246 at 26).   Fifth, the City of Pittsburgh's Towing Policy permitted the officers to order a car to be towed.   (Docket No. 246 at 93).

Plaintiff was placed in the "paddy wagon" and transported to the Allegheny County Jail. (Docket No. 240 at 109).   He was charged with resisting arrest, disorderly conduct,[4] failure to use a turn signal and for driving with a suspended license.   (Jt. Ex. 5).   Plaintiff was imprisoned at the Allegheny County Jail and did not request any medical assistance at that time.   (Docket No. 246 at 79).   The Defendant Officers explained that the Allegheny County Jail would not have kept him overnight if he had a serious injury.   (Docket No. 246 at 205).   Instead, Plaintiff would have been taken to the hospital for treatment consistent with jail booking procedures, which were explained as follows.   (Docket No. 246 at 205).   After arriving at the jail, law enforcement officers are required to exit their vehicles and lock up their weapons prior to escorting the arrestee inside. (Docket No. 246 at 30, 206).   They then take the prisoner inside the facility into a small holding cell where they are searched and put through a metal detector.   (*Id*.).   Next, the arrestee is interviewed by a nurse at the scene, who asks if the arrestee has any health problems or injuries. (*Id*. at 31, 206-207).   The nurse also observes the arrestee for any visible sign of injuries.   (*Id*.).

---

[4]        Under Pennsylvania law,

> A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:
> (1)  Engages in fighting or threatening, or in violent or tumultuous behavior;
> (2)  Makes unreasonable noise;
> (3)  Uses obscene language, or makes an obscene gesture; or
> (4)  Creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

18 Pa.C.S. § 5503(a).

If the prisoner complains of injuries before his arraignment, a police officer is required to return to the jail, pick up the prisoner and escort him to the hospital for treatment. (*Id*.). If a prisoner is taken to the hospital, jail staff will only readmit him for incarceration after medical clearance is granted by a doctor. (*Id*.). In this instance, the officers are typically presented a note from a doctor similar to a prescription, which states that the arrestee is able to be incarcerated. (*Id.* at 31).

Plaintiff was released from jail the day after his arrest, on November 3, 2001, in the afternoon. (Docket No. 240 at 109). Upon his release, Plaintiff went to the emergency room at West Penn Hospital, and he was examined by Dr. Kenneth Ung, M.D.[5] four days later, on November 7, 2001. (Docket No. 240 at 6-7). Dr. Ung testified as a treating physician via a videotaped deposition at trial.[6] (Docket No. 116 at ¶ 4). As such, during his testimony Dr. Ung reviewed both the records from Plaintiff's visit to West Penn Hospital and from the examination that he conducted of Plaintiff on November 7, 2001. (Docket No. 240 at 6-18; Docket No. 241 at 159-162). Dr. Ung gleaned from the medical records that Plaintiff had reported to hospital staff that he had been kicked in the cheek, punched in the throat and was experiencing difficulty with solid foods and shortness of breath. (Docket No. 241 at 160-161). Dr. Ung also noted that the records of Plaintiff's visits stated that he had an abrasion of the right cheek but "no signs of serious injury." (Docket No. 240 at 18). He further observed some bruising and tenderness in Plaintiff's

---

[5] Dr. Ung was proffered as Plaintiff's primary care physician at the time of the events in question. (Docket No. 116 at ¶ 4).

[6] Dr. Ung did not prepare an expert causation report and was not permitted to testify as a causation expert in this case. *See Allen v. Parkland Sch. Dist.*, 230 F.App'x, 189, 194-195 (3d Cir. 2007). Therefore, he was not able to testify that Plaintiff's injuries were actually caused by a kick or punch by the Defendant Officers. *Id.* However, as a treating physician, Dr. Ung was permitted to testify regarding his observations of Plaintiff during the examination, and his diagnoses of Plaintiff's conditions. *Id.* Dr. Ung was also permitted to review and discuss the West Penn medical records during his testimony. *Id.* Finally, the Court notes that none of the medical records were moved into evidence by Plaintiff at trial. (*See* Docket No. 205).

throat and neck muscles. (Docket No. 240 at 10-11). Plaintiff's injuries were documented by his father, who took pictures of Plaintiff's injuries at the emergency room. (Pl. Exs. 4, 5).

Also, on November 3, 2001, Plaintiff retrieved his vehicle from the impound lot. (Jt. Ex. 1). At that time, Plaintiff signed a tow receipt which states that "AFTER INSPECTING MY VEHICLE, I HEREBY RELEASE THE CITY OF PITTSBURGH AND/OR THE TOWING CONTRACTOR FROM ANY CLAIM FOR DAMAGES RESULTING FROM TOWING OPERATIONS OR ASSOCIATED PROCEDURES." (*Id.*). Plaintiff's father also took a number of pictures of his car after it was retrieved. (Pl. Exs. 8, 9, 10, 11, 12, 13, 14).

Subsequent to the arrest, and after their shift had ended, the Defendant Officers returned to the station and completed necessary paperwork. Kreger prepared an arrest report, incident report and subject resistance reports detailing the force used by both Goob and him during their confrontation with Plaintiff. (Docket No. 246 at 102; Jt. Ex. 4). Goob testified that he told Kreger what type of force he used and then Kreger wrote the actual report. (Docket No. 241 at 218; Jt. Ex. 4). He explained that while Kreger may have referred to his actions as a "universal take down hold" in the report, he would have referred to this technique as the use of an "arm bar."[7]

---

[7] Goob testified that the "arm bar" technique involved the following. (Docket No. 241 at 201). First, an officer grabs a subject's arm with one hand and pulls it towards his side. (*Id.*). Then, the officer uses his other arm to apply pressure on the rear of the subject's elbow, driving the subject to the ground. (*Id.*). Goob also contemporaneously demonstrated the use of an "arm bar" technique on Woodhall at trial. (*Id.*). He qualified his testimony, however, stating that it is an easy technique to use and apply when a subject is compliant but is more difficult to execute in the field, particularly when the subject resists. (*Id.*). Plaintiff's expert, James Baranowski, testified similarly. (Docket No. 241 at 106). Specifically, he stated that "[t]he way you do an arm bar take-down, you grab by the wrist with one hand. You take the other hand, you place it above the elbow, and you hyperextend, or straighten out the arm. By doing that, you're going to off balance the person, and you're going to rotate and guide them to the ground with the arm, with the hand by the elbow." (*Id.*).

On cross-examination, Goob testified that the phrase "universal take down" is used interchangeably with "arm bar" on occasion. (*Id.* at 216). Baranowski again agreed, recognizing that the two terms generally refer to the same technique. (*Id.* at 107). "There's not, per se, a universal hold. Some officers have called the take-down, the universal arm take-down, but for the most part, we call it the arm bar take-down, or the take-down." (*Id.*).

(Docket No. 241 at 218).   Kreger's supervisor, Sergeant Epler, instructed him to prepare a supplemental subject resistance report to include more specific information, including that an "arm bar" technique was used.   (Docket No. 246 at 117).   He did as instructed on December 29, 2001. (Jt. Ex. 4).

At a preliminary hearing held on December 6, 2001, Plaintiff pled guilty to the charge of failing to use a turn signal but the other charges were dismissed.   (Pl. Ex. 15; Docket No. 240 at 143).   After that, Plaintiff filed complaints with the City's Office of Municipal Investigations ("OMI") and with the Citizens Review Board.[8]   (Docket No. 240 at 106-07).   He later initiated this civil rights lawsuit.

Also relevant to the instant motions, James Baranowski, a former state police trooper, testified as an expert witness on Plaintiff's behalf regarding the use of force by both Kreger and Goob.   The scope of his testimony was limited by the Court in a pretrial ruling.[9]   *See Jackson*, 2010 WL 3222137.   He testified regarding his prior education, background and experience, and the Court accepted him as an expert witness.   (Docket No. 241 at 53- 54, 59-61, 91-95, 134).   He also explained the City of Pittsburgh's Use of Force Policy and the Use of Force Continuum, among other applicable police procedures and maneuvers.   (*Id*. at 61-67, 73-74, 96, 101-103, 104-111).   With respect to the events of November 1, 2001, Baranowski testified that if Plaintiff's version of the events was accepted, then Goob and Kreger used excessive force.   (Docket No. 241 at 150-151).   However, on cross-examination, Baranowski admitted that if the Defendant Officers' account was accepted, then the use of force by the officers was acceptable.   (*Id*. at 151-153).

---

[8]       The results of these investigations were never admitted into evidence at trial.

[9]       *See* § V.B.3, *infra*.

III.    PROCEDURAL HISTORY

Plaintiff was represented by counsel, Bonnie Kift, Esquire, during pretrial proceedings and throughout the trial.[10]    This Court granted, in part, and denied, in part, the Defendants' motion for summary judgment on February 22, 2010.    (Docket Nos. 98, 99).    The Court further ordered the parties to submit pretrial statements and then held a status conference to discuss trial scheduling issues on March 24, 2010.    (Docket No. 108).    At the conference, the Court inquired with counsel regarding whether the trial should be trifurcated in the following manner: phase I, individual liability of the Defendant Officers; phase II, liability of the City of Pittsburgh; and, phase III, damages.    (*Id*.).    At a follow up status conference, all agreed to the proposed trifurcation of the trial and the Court's deadlines set forth in a previously circulated draft pretrial order.    (Docket No. 109).    The Court then entered its Pretrial Order scheduling jury selection and trial to commence on June 21, 2010 at 9:30 a.m. and setting other pretrial hearings and deadlines. (Docket No. 111).

In response to the Pretrial Order, the parties filed their respective witness lists and offers of proof, motions in limine, objections to exhibits, joint stipulations and proposed jury instructions. (See Docket Nos. 116, 120, 124-152, 155-163). The Court held a lengthy Pretrial Conference on June 16, 2010, during which objections to exhibits were ruled upon and argument as to the parties' motions in limine and other trial issues was heard.    (Docket No. 164).    The next day, the Court issued rulings on several of the parties' motions in limine.    (Docket Nos. 165, 166, 167).    The Court also convened a status conference to discuss with counsel whether a *Daubert* hearing was necessary to resolve the Defendants' motion in limine to exclude the testimony of Plaintiff's proposed expert witness, James Baranowski.    (Docket No. 168).    During the conference, the

---

[10]        *See* n. 1, *supra*.

Court and parties inquired with Baranowski regarding his availability for the *Daubert* hearing prior to the commencement of trial. (*Id.*). At that time, Baranowski advised that a serious health issue of a relative would likely prevent him from appearing in court the next week for either the *Daubert* hearing or trial. (*Id.*).

In response to same, Plaintiff made a motion to continue the trial, to which Defendants did not object, and the Court granted same. (*Id.*). Jury selection and trial were then rescheduled for August 2, 2010. (*Id.*). The *Daubert* hearing was scheduled for July 22, 2010. Later, Defendants moved to continue the trial again because of the trial schedule of their attorneys. (Docket No. 182). Also, Plaintiff moved to continue the *Daubert* hearing. (Docket No. 184). The Court granted both motions and the *Daubert* hearing was reset for August 13, 2010, while jury selection and trial were set to commence on August 23, 2010. (Docket Nos. 183, 185).

The *Daubert* hearing was consolidated with a hearing under *Sides v. Cherry*, 609 F.3d 576 (3d Cir. 2010), regarding the restraints to be placed on Plaintiff (who was then incarcerated on convictions unrelated to the instant case) during trial. Subsequent to the hearing, the Court issued Orders with respect to both matters: Plaintiff was ordered to be restrained during trial, but the restraints would be shielded from the jury; and Baranowski was permitted to testify as an expert witness, with some limitations. (Docket Nos. 191, 198, 199; *Jackson*, 2010 WL 3222137).

Jury selection and trial proceeded as scheduled on August 23, 2010. (Text Entry, 8/23/10). The jury was empaneled without incident and no objections were raised by the parties during jury selection. At the conclusion of phase I of the trial, the Court granted the Defendant Officers' motion for judgment as a matter of law regarding Plaintiff's claim that his vehicle was unlawfully searched and seized by the Defendant Officers. (Docket Nos. 204, 207). The jury then returned a verdict in favor of the Defendant Officers regarding Plaintiff's remaining claims

against them, i.e., unlawful arrest and excessive force. (Docket No. 206, 207). Finally, the Court granted the City of Pittsburgh's motion to dismiss Plaintiff's *Monell* claim and the case was closed. (Docket No. 208).

After trial, Plaintiff terminated Ms. Kift's representation. (Docket No. 214). He then filed a Notice of Appeal *pro se* and has since been representing himself. (*Id*.). In an Order of Court issued on September 17, 2010, the Court construed Plaintiff's filing as including a motion for a new trial under Rule 59 and ordered the Defendants to respond to this motion. (Docket No. 216). The Court also denied Plaintiff's request that he be granted an indefinite extension of time within which to amend his motion for a new trial but granted Plaintiff leave to appeal *in forma pauperis*. (*Id*.).

Later, Plaintiff filed a supplement to his motion for a new trial under Rule 59(b) and a motion for reconsideration under Rule 59(e). (Docket No. 218). This filing was received by the Court on October 4, 2010. (*Id*.). Defendants challenged the timeliness of these motions under Rules 59(b) and 59(e), which require said motions to be filed within 28 days of the entry of judgment. (Docket No. 220). Plaintiff responded by averring that his filing was timely because he placed it in the prison mail system on September 17, 2010, within the applicable 28-day period. (Docket No. 225). Upon consideration of the parties' arguments, the Court found that the prisoner mail box rule was applicable and that Plaintiff's motions were timely made because his filing was received as of September 17, 2010. (Docket No. 227); *see Houston v. Lack*, 487 U.S. 266, 271 (1988), *see also Asford v. Bartz*, Civ. A. No. 1:04-cv-00642, 2010 WL 272009 (M.D. Pa. Jan. 20, 2010) (applying prisoner mailbox rule to a motion for a new trial).

The Court then set a briefing schedule regarding Plaintiff's motion for new trial, his supplemental motion and his motion for reconsideration. (Docket No. 227). Defendants sought

two extensions of time from this schedule so that they could respond with the benefit of the trial transcripts, which had yet to be purchased or produced.   (Docket Nos. 231, 234).   These motions were granted.   (Docket Nos. 232, 235).   Likewise, Plaintiff sought copies of the trial transcripts for use in support of his motions and filed motions requesting that he be provided with free copies of same due to his present incarceration and lack of funds.[11]   The Court denied his initial request, without prejudice, but later granted same and the trial transcripts were provided to him.   (Docket Nos. 229, 233).

Ultimately, the Defendants filed their Response and Brief in Support on January 28, 2011. (Docket Nos. 236, 237).   Plaintiff was granted an extension of time to file any reply brief by April 15, 2011 and the Court received his filing on May 5, 2011.   (Docket No. 251).   The Court accepted said filing as filed on April 14, 2011 under the aforementioned prisoner mail box rule and ordered the Defendants to file a response.   (Docket No. 253).   After receiving an extension of time to do so, Defendants filed their Joint Response on June 20, 2011.   (Docket No. 257). Without first seeking leave of court to do so, Plaintiff filed a response to Defendants latest brief as of June 27, 2011.[12]   (Docket No. 258).   Accordingly, the Court considers the pending motions

---

[11]       The Court notes that Plaintiff's initial motion merely stated "Plaintiff (Charles Jackson) requests this Honorable Court to purchase all transcripts in forma pauperis and to amend Rule 59 and 59(E) Motions 30 days after transcripts are received."   (Docket No. 219).   The Court deemed this insufficient but later reconsidered its order after Plaintiff provided factual support for his motion.   (Docket No. 229).

[12]       Defendants have not moved to strike or asserted any objections to the Court's consideration of said pleading. This Court's Practices and Procedures provide that "[t]he parties must seek leave of Court to file reply and sur-reply briefs and will be limited to five (5) pages, if leave is granted."   *Practices and Procedures of Judge Nora Barry Fischer*, § II.B, *available at*: http://www.pawd.uscourts.gov/Documents/Judge/fischer_pp.pdf (effective March 23, 2010).   Plaintiff's filing – his fourth brief addressing the pending matters – violates both aspects of this rule because: (1) he failed to seek leave of court before submitting such filing; and (2) the filing is 15 pages in length.   If Defendants had sought to strike said pleading as violative of the Court's Practices and Procedures, they would have been within their rights to do so.   However, as set forth herein, because Plaintiff is now representing himself *pro se* and his June 27, 2011 response does not change the Court's analysis of the pending motions, the Court will not *sua sponte* strike Plaintiff's submission.   *See* p. 13, *supra*.   Alternatively, the Court considered denying any relief sought by Plaintiff in this pleading, without prejudice, and granting him leave to re-file same in accordance with the applicable page

fully briefed and ripe for disposition.

IV.  LEGAL STANDARD

A.  *Motion for a New Trial*

A motion for a new trial pursuant to Federal Rule of Civil Procedure 59 can be granted "to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury." Fed.R.Civ.P. 59(a). The Court is also "empowered to order a new trial on its own initiative 'for any reason that would justify granting one on a party's motion.' " *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 453 (3d Cir.2001) (quoting Fed.R.Civ.P. 59(d)). A new trial is most commonly granted in select situations, including: (1) when the jury's verdict is against the clear weight of the evidence; (2) when new evidence surfaces that would have altered the outcome of the trial; (3) when improper conduct on the part of an attorney or the court unfairly influenced the verdict; or (4) where the jury's verdict was facially inconsistent. *Davis v. Mountaire Farms, Inc.*, 598 F.Supp.2d 582, 587 (D. Del. 2009).

The Court's level of discretion varies, depending on the type of error alleged. *Moussa v. Commonwealth of Penn. Dep't of Pub. Welfare*, 289 F.Supp.2d 639, 648 (W.D.Pa. 2003) (citing *Klein v. Hollings*, 992 F.2d 1285, 1289-90 (3d Cir. 1993)). When the motion for a new trial is based on the claim that the verdict is against the clear weight of the evidence, the Court's discretion is limited: the verdict must be "contrary to the great weight of the evidence; that is, where a miscarriage of justice would result if the verdict were to stand." *Pryer*, 251 F.3d at 453. And, a verdict may not be set aside when there is a plausible or rational basis for the decision.

limitations.  But, trial in this case ended on August 27, 2010 and the present motions have been pending since September 14, 2010.  (Docket No. 214). Therefore, such a disposition would only increase delays in the disposition of this case and would run counter to Rule 1 of the Federal Rules of Civil Procedure, which requires the "just, speedy and inexpensive determination of every action and proceeding."  Fed.R.Civ.P. 1.

*Moussa*, 289 F.Supp.2d at 648. The Court must not substitute its own judgment of the facts and assessment of the witnesses' credibility for the jury's. *Davis*, 598 F.Supp.2d at 587. When the basis for the motion is an alleged error on the part of the Court, such as an error in evidentiary rulings, a District Court must first determine whether an error was made, and must then determine "whether that error was so prejudicial that refusal to grant a new trial would be 'inconsistent with substantial justice.'" *Bhaya v. Westinghouse Elec. Corp.*, 709 F.Supp. 600, 601 (E.D.Pa.1989) (quoting Fed.R.Civ.P. 61). "Generally, a party is not entitled to receive a new trial for objections to evidence that he did not make at or prior to the initial trial, even if they may have been successful." *Ashford v. Bartz*, Civ. A. No. 1:04-cv-00642, 2010 WL 272009, at *4 (M.D.Pa. 2010) (citations omitted); *see also Kiewit Eastern Co., Inc. v. L & R Const. Co., Inc.*, 44 F.3d 1194, 1204 (3d Cir. 1995) ("Courts often take a dim view of issues raised for the first time in post-judgment motions. Generally, this is a decision within the sound discretion of the district court.").

B. *Motion for Reconsideration*

"Motions for reconsideration under Rule 59(e) of the Federal Rules of Civil Procedure are granted *sparingly* '[b]ecause federal courts have a strong interest in finality of judgments.'" *Jacobs v. Bayha*, Civ. A. No. 07-237, 2011 WL 1044638, at *2 (W.D.Pa. Mar. 18, 2011) (quoting *Continental Cas. Co. v. Diversified Indus., Inc.*, 884 F.Supp. 938, 943 (E.D.Pa. 1995)) (emphasis added). "Because of the interest in finality, at least at the district court level … the parties are not free to relitigate issues the court has already decided." *Williams v. City of Pittsburgh*, 32 F.Supp .2d 236, 238 (W.D.Pa.1998) (citing *Rottmund v. Continental Assurance Co.*, 813 F.Supp. 1104, 1107 (E.D.Pa.1992)). The purpose of a motion for reconsideration is "'to correct manifest errors of law or fact or to present newly discovered evidence.'" *Max's*

*Seafood Café v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (quoting *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985)). A Court may grant a motion for reconsideration if the moving party shows: (1) an intervening change in the controlling law; (2) the availability of new evidence which was not available when the court issued its order; or (3) the need to correct a clear error of law or fact or to prevent a manifest injustice. *Max's Seafood Café by Lou Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (citing *North River Ins. Co. v. Cigna Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995)).

    C. *Timeliness of Motions Under Rules 59(b) and 59(e)*

    As noted above, Motions for a new trial under Rule 59(b) and to amend or alter judgment under Rule 59(e) each "must be filed no later than 28 days after entry of judgment." Fed.R.Civ.P. 59(b), 59(e). Rule 6(b)(2) provides that the time limitations set forth in Rules 59(b) and 59(e) may not be extended by the Court. *See* Fed.R.Civ.P. 6(b)(2) ("A court must not extend the time to act under Rules 50(b) and (d), 59(b), (d) and (e)."); *see also Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 402 (3d Cir.2003) (holding that the district court lacked authority to extend the 10 day period in the former version of Rule 59(b)). Thus, the Court is constrained from considering arguments raised for the first time in an untimely submitted pleading. *Id*.

    V.   DISCUSSION

    At the outset, the Court notes that to the extent Plaintiff relies on Rules 59(b) and 59(e) as authority for the new arguments presented for the first time in his latest filings, including advancing alleged newly discovered evidence, these matters are untimely. (Docket Nos. 251, 258). Judgment was entered in this case on August 27, 2010 but these new issues were first raised in Plaintiff's response, which was filed as of April 14, 2011 and reiterated in his further response filed as of June 27, 2011. (Docket Nos. 207, 251, 258). Therefore, the Court is precluded from

considering these arguments under Rules 59(b) and 59(e). *See* Fed.R.Civ.P. 6(b)(2). However, the Court will consider Plaintiff's arguments to the extent they implicate Rule 60 of the Federal Rules of Civil Procedure. *See* § V.E., *infra*.

In his initial filings, Plaintiff asserted that the Court committed numerous errors at trial and that the jury's verdict is against the weight of the evidence. (Docket Nos. 214, 218). Many of these alleged errors are related factually and/or legally and can be addressed together. (*Id.*). Therefore, the Court has grouped the related issues as follows: (A) jury selection; (B) evidentiary rulings; (C) weight of the evidence; and (D) motion for reconsideration. The Court will now address the alleged errors in each of the groups, in turn. Then, the Court will proceed to evaluate his claimed newly discovered evidence under Rule 60.

A. *Jury Selection – Motion for a New Trial*

Plaintiff first argues that a new trial is warranted because he was discriminated against due to his race, African American, during jury selection. (Docket No. 218 at 2, ¶ A). He contends that no African American jurors were questioned during the voir dire process, and that African American jurors were selectively stricken from the jury panel by the defense, violating his Constitutional right to Equal Protection under the laws. (*Id.*). He further complains that the jury was biased against him because the Defendant Officers are all Caucasians as are the jurors who were empaneled in his case. (*Id.*). Plaintiff argues that he is entitled to a new trial with at least three (3) of the jurors being African Americans. (*Id.*). Defendants maintain that Plaintiff's claims are without merit and otherwise fail because he failed to lodge any objections during jury selection. (Docket No. 237 at 12-15).

Indeed, this Court's review of the record demonstrates that Plaintiff did not raise *any* objections during voir dire or the trial regarding the composition of the jury venire, the jury pool or

the jury panel or any alleged bias against him based on his race.[13]    In fact, Plaintiff's counsel told the jurors during her opening statement that "I believe you're probably as just and fair as you can possibly be."   (Docket No. 239 at 47).   "[I]t is clear that a party who fails to object to errors at trial waives the right to complain about them following trial."   *Waldorf v. Shuta*, 142 F.3d 601, 629 (3d Cir. 1998).   Following this general rule, courts have held that a party must raise objections to the composition of the jury pool and/or a *Batson* challenge to his opponent's alleged misuse of preemptory challenges during jury selection or trial.   *See Mullins v. City of Philadelphia*, Civ. A. No. 06-2186, 2007 WL 712418 (E.D. Pa. Mar. 6, 2007), *aff'd*, 287 F. App'x 201 (3d Cir. 2008) (plaintiff's motion for new trial denied because his failure to raise *Batson* challenge waives any objection to composition of jury venire, jury pool or jury panel).   Otherwise, the party waives the right to argue either issue in a post-trial motion. *Id*.   Thus, because he made no objections during jury selection or trial, Plaintiff has waived any objections to the selection and

---

[13]        The Court's standard civil voir dire procedures are fully set forth in the Court's Practices & Procedures:

> The Judge's deputy clerk generally conducts both general and individual voir dire in civil cases. The Judge may become involved, if the situation warrants.
>
> Unless otherwise ordered by the pretrial order, counsel are permitted to supplement the standard questions. Counsel shall attempt to obtain consent of opposing counsel prior to submission of any such supplemental voir dire. Those supplemental voir dire questions to which counsel have agreed upon shall state "Consented To By Counsel." Any supplemental voir dire is due at least seven (7) working days before the trial date. The Court will circulate by e-mail proposed voir dire in advance of the pretrial conference at which time the Court will entertain any objections or argument, and make rulings thereon.

*Practices and Procedures of Judge Nora Barry Fischer*, § III.E.5., *available at*: http://www.pawd.uscourts.gov/Documents/Judge/fischer_pp.pdf (effective March 23, 2010). The Court followed this procedure for this trial with the parties submitting proposed voir dire and the Court incorporating appropriate questions and then supplying the initial draft of the voir dire to counsel.   At the pretrial conference on June 16, 2010, "[t]here were no objections to the voir dire produced by the Court and presented to counsel by email from the Court's Law Clerk."   (Docket No. 164).   The Court detailed the aforementioned jury voir dire procedure on the record prior to the commencement of jury selection on August 23, 2010, including that the Court's Deputy Clerk would be handling jury selection and the undersigned would be available only if any objections were raised.   (Docket No. 239 at 23).   Jury selection was completed on August 23, 2010 pursuant to this procedure, without any objections to the same being asserted by the parties.   (*Id*. at 24).

composition of the jury in this case and cannot raise these arguments now. Accordingly, Plaintiff's motion for a new trial is denied to the extent that he relies on any alleged error during jury selection.

B. *Evidentiary Rulings – Motion for New Trial*

Plaintiff next raises a number of challenges to the Court's evidentiary rulings made during pretrial proceedings and at trial. (Docket Nos. 214, 218). He claims that the decisions by the Court were "unfair" and necessitate that he be granted a new trial. (*Id.*). Defendants counter that the Court did not err on any of the alleged evidentiary issues and, alternatively, that if any such error is found, the same was harmless given the evidence presented at trial and the jury's verdict in favor of the Defendant Officers. (Docket Nos. 236, 237).

1. Todd Lesesne / Plaintiff's Exhibit 15

In separate, but related orders, the Court precluded Plaintiff from presenting the testimony of prospective witness Todd Lesesne and from introducing Plaintiff's Exhibit 15 into evidence during the trial. Plaintiff argues that these rulings were made in error. (Docket Nos. 214, 218). Defendants maintain that the proffered evidence was properly excluded. (Docket Nos. 236, 237).

Relevant here, Plaintiff was charged with four offenses as a result of the November 2, 2001 incident: (1) disorderly conduct; (2) resisting arrest; (3) "turn signals required"; and (4) "driver required to be licensed." (Plaintiff's Ex. 15). Plaintiff appeared in Traffic Court before Judge Irene McLaughlin on December 6, 2001 in relation to said charges. (*Id.*). At that time, Plaintiff pled guilty to the charge of "turn signals required" and the three other charges were dismissed, including: disorderly conduct; resisting arrest; and "driver required to be licensed." (*Id.*). Plaintiff's Exhibit 15 is the Traffic Court's official record of the disposition of these charges and reflects that the three aforementioned charges were "DIS", i.e., dismissed. (*Id.*). Todd Lesesne

21

was the clerk for Judge McLaughlin and was purportedly present during the December 6, 2001 hearing. (Docket No. 201).

Plaintiff's counsel first identified Mr. Lesesne as a potential witness in this case on the Friday before the scheduled start of jury selection and trial, August 20, 2011.[14] (Docket No. 201). Plaintiff's proffer regarding his probable testimony included that he would verify that the three charges were dismissed at the December 6, 2001 Traffic Court hearing. (*Id*.). The defense objected to his testimony on two bases: first, that he was never disclosed nor identified during discovery or pretrial proceedings in violation of the Federal Rules and numerous Court Orders; and second, that his testimony was not relevant to the issues in dispute in this case. (Docket No. 239 at 2-7). The Court agreed with the defense, sustained their objection and excluded Mr. Lesesne's testimony as a sanction because the late disclosure violated the Federal Rules of Civil Procedure and pertinent Court Orders and his proffered testimony was otherwise not relevant to the issues in the case. (Docket No. 202; Docket No. 239 at 2-7).

At trial, Plaintiff's counsel sought reconsideration of this Order and also attempted to admit Plaintiff's Exhibit 15 into evidence. (Docket No. 240 at 196). In support of same, Plaintiff argued that the fact that the three charges were dismissed by Magistrate Judge McLaughlin was probative of whether the Defendant Officers had probable cause to arrest Plaintiff on the date in question. (Docket No. 239 at 2-7; Docket No. 240 at 116-120; Docket No. 241 at 41-46). The defense again objected to the admission of the contested evidence for this purpose, arguing that such evidence was not relevant. (Docket No. 240 at 197-199). The Court sustained the objections once more. (*Id*. at 199).

---

[14]     As discussed in § III, *supra*, jury selection and trial were initially scheduled to commence on June 21, 2010, but were rescheduled twice: first, to start on August 2, 2010 and; second, to start on August 23, 2010. *See* pp. 12-13, *supra*.

Certainly, one of the central disputed issues at trial was whether the Defendant Officers had probable cause to arrest Plaintiff for resisting arrest and/or disorderly conduct on November 2, 2001. "'Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested.'" *Merkle v. Upper Dublin School Dist.*, 211 F.3d 782, 788 (3d Cir. 2000) (quoting *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). Because of the disputed factual issues in this case, the issue of probable cause was presented to the jury to weigh the facts and the credibility of the witnesses. *See Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997) ("In a § 1983 action the issue of whether there was probable cause to make an arrest is usually a question for the jury...."). After deliberations, the jury entered a verdict in favor of the Defendant Officers and against Plaintiff, finding that none of the Defendant Officers "deprive[d] plaintiff of his Constitutional right to be free from an arrest without probable cause." (Docket No. 206, ¶¶ 1, 3, 5, 7).

In contrast, the disposition of the charges by the Magistrate Judge involved a different legal standard, i.e., whether the Commonwealth presented sufficient evidence to establish a *prima facie* case of Plaintiff's guilt of the charges against him at the preliminary hearing. Under Pennsylvania law, proof of a *prima facie* case requires the Commonwealth to present evidence "'such that if presented at the trial in court, and *accepted as true*, the judge would be warranted in letting the trial go to the jury.'" *Stewart v. Abraham*, 275 F.3d 220, 229 (3d Cir. 2001) (quoting *Commonwealth v. Wojdak*, 502 Pa. 359, 466 A.2d 991, 996 (Pa. 1983) (emphasis in original)). Pennsylvania courts have long recognized that the standard to establish probable cause sufficient to support an arrest is fundamentally different than the standard required to establish a *prima facie* case. *Stewart*, 275 F.3d at 230 ("Pennsylvania cases recognize[e] that the standard of probable cause and the *prima*

23

*facie* case standard are conceptually distinct."); *Shurney v. Scott's Econo Inn, Inc.*, Civ. A. No. 1:05-cv-196, 2006 WL 1766813, at *5 (W.D.Pa. Jun. 23, 2006) ("Fundamentally, courts have interpreted Pennsylvania law as requiring differing levels of proof to support a finding of probable cause versus a prima facie case of guilt at the preliminary hearing stage."). Indeed, because of the differing standards, courts have acknowledged that the fact that charges were dismissed at a preliminary hearing clearly does not preclude a finding that probable cause existed to arrest an individual. *Shurney*, 2006 WL 1766813, at *5 ("the fact that the charges were dismissed at the preliminary hearing stage does not thereby negate the existence of probable cause to support Plaintiff's initial arrest and detention."). The former involves a judicial determination as to the weight of evidence presented to a magistrate judge while, pertinent here, the latter involves the jury's evaluation of the facts and circumstances known to the Defendant Officers at the time of Plaintiff's arrest. *Id.*

Generally, evidence is only relevant and thus, admissible, if it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. In support of his proffer of evidence, Plaintiff argued that the fact that the charges were dismissed was relevant to the issue of whether the Defendant Officers had probable cause to arrest Plaintiff. (Docket No. 239 at 2-7; Docket No. 240 at 116-120; Docket No. 241 at 41-46). However, considering the above authority, the Magistrate Judge's dismissal of the charges in this case was not probative of whether probable cause existed at the time of the arrest. Therefore, the proffered evidence was not relevant to the jury's determination of probable cause and the Court properly exercised its discretion by excluding the evidence at trial. *See Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc.*, 386 F.App'x. 214, 218 (3d Cir. 2010) ("A district court is accorded wide discretion in

determining the admissibility of evidence under the Federal Rules.").   Moreover, even if the disposition of the charges was deemed relevant, the evidence was also properly excluded under Rule 403 because the probative value of such evidence was substantially outweighed by the fact that the different legal standards employed in the two scenarios would unnecessarily confuse the issues, mislead the jury and prejudice the Defendants.[15]   *See* Fed.R.Evid. 403[16]; *see also* *McKenna v. City of Philadelphia*, 582 F.3d 447, 461 (3d Cir. 2009) ("A trial court is afforded substantial discretion when striking a Rule 403 balance with respect to proffered evidence").

Finally, the Court notes that Plaintiff alleges that the Court's striking of Lesesne was "unfair" because the Court also ruled that the Defendants could present a substitute witness (Sergeant Keith Nemeth) in the place of Kathy Kraus, who was unavailable to testify during trial. (Docket No. 218 at 4, ¶D).   However, the substitute witness was proffered as a potential witness for the City of Pittsburgh during only phase II of the trial.   (Docket No. 239 at 15-16).   Because the case did not reach phase II, the substitute witness was never called to testify and, thus, no error was committed by the Court's ruling.

Nonetheless, even if substitute witness Sergeant Nemeth had testified, the Court properly exercised its discretion to permit the substitution and decline to strike the witness as a discovery violation under Rule 37(c)(1).   *See* Fed.R.Civ.P. 37(c)(1).   Prior to excluding the testimony of a witness at trial for a violation of a discovery order, the Court must evaluate: "(1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability

---

[15]     The Court notes that Plaintiff twice mentioned during his testimony that the suspended license charge was "dismissed", without objection from Defendants.   (*See* Docket No. 240 at 142, 173).   However, he did not testify as to the disposition of the remaining charges.

[16]     Rule 403 provides that: "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."   Fed.R.Evid. 403.

of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or willfulness in failing to comply with a court order or discovery obligation." *See Nicholas v. Pennsylvania State University*, 227 F.3d 133, 148 (3d Cir. 2000).

As to factors (1) and (2) set forth in *Nicholas*, the substitution of witnesses caused no prejudice to Plaintiff. First, Plaintiff's counsel did not argue that he suffered any such prejudice at trial. (Docket No. 239 at 15). Instead, she merely contended that the substitute witness was untimely, which is an insufficient basis to exclude a witness. (*Id*.). In addition, Plaintiff would not have suffered any actual prejudice by the substitution. To this end, during pretrial proceedings, the City of Pittsburgh advised that either Roy Dean or Kathy Kraus would testify regarding the procedures at OMI. (Docket No. 120). These individuals were previously disclosed as potential witnesses to Plaintiff; however, neither witness was deposed by Plaintiff during discovery.[17] (*See* Docket No. 120). During the pretrial conference, counsel for the City of Pittsburgh advised that he would likely call Kathy Kraus but that he may be required to substitute or call either of these witnesses depending on their availability because they were high ranking officials and both had demanding work commitments. *Trans of Pretrial Conf. 6/16/10* at 73-74; *Trans of Cont. Pretrial Conf. 6/17/10* at 17-18. The Court ordered that counsel for the parties work together to identify the witnesses who would testify at trial and to ensure that they are available to be called at the appropriate times. (Docket No. 168; *Trans of Cont. Pretrial Conf.*

---

[17] Plaintiff certainly had the opportunity to depose any of these individuals during discovery as the parties were afforded an unusually lengthy period of time of almost two years to conduct discovery, i.e., from August 21, 2007 to July 21, 2009. (*See* Docket Nos. 20, 47, 55, 62, 68, 70, 71, 73). Despite same, Plaintiff did not seek or take the depositions. In addition, Plaintiff potentially could have taken a trial deposition during the time period between the initial trial date of June 21, 2010 and when trial actually commenced on August 23, 2010, but chose not do to so.

6/17/10 at 18). Plaintiffs' counsel did not object to this procedure at that time.[18] (*Id*.). At trial, the proffer of Sergeant Nemeth's testimony was virtually identical to that of the proffered testimony of Kathy Kraus. (*Compare* Docket Nos. 120, 200, 239 at 15-16). Moreover, while Kathy Kraus was the Director of OMI at the time of the trial, she was not employed by OMI on the date of the incident, November 2, 2001. (Docket No. 239 at 15-16). On the other hand, Sergeant Nemeth was employed by OMI on that date and could testify as to the procedures at that time. (*Id*.). As the Court recognized at trial, Sergeant Nemeth would have provided more relevant testimony than Kathy Kraus because he had greater knowledge of the OMI procedures at issue in this case. (*Id*. at 21).

As to the third factor, the substitution would have caused no disruptions in the trial schedule because Plaintiff had not sought the depositions of any of the earlier identified witnesses who were proffered to testify as to the same facts. *See Nicholas*, 227 F.3d at 148 (the Court of Appeals noted that striking late disclosed evidence was necessary because permitting it would require a stay of the trial and a lengthy continuance). Hence, no further discovery of the substitute witness was warranted prior to his testimony and no delays would have resulted from the substitution. There was also no evidence of bad faith on behalf of the Defendants in requesting the substitution. (*See* Docket Nos. 200, 239 at 15-16). They simply proffered a more knowledgeable and available witness to testify as to the same facts which were previously disclosed. (*Id*.). Therefore, weighing the factors set forth in *Nicholas*, the Court properly

---

[18]     Plaintiff's counsel did object to the Court's striking of subpoenas served on Kraus and Dean requesting their presence at trial. (*See* Docket Nos. 164, 168). However, the subpoenas were stricken because of the fact that they included requests that these individuals produce certain documents which were not requested during discovery. (*Id*.). The subpoenas were also overbroad as they requested that both individuals be present for the duration of the trial while the Court only required that counsel work together to guarantee their appearances. (*Id*.). Finally, the objections to the subpoena are not relevant to the present dispute because Plaintiff did not call Kraus, Dean or Nemeth to testify during his case-in-chief. *See* p. 23, *supra*.

declined to strike the substitute witness, who was never even called to testify.

For these reasons, Plaintiff has failed to demonstrate that any error was committed by the Court in its rulings regarding Todd Lesene and proposed Plaintiff's Exhibit 15; therefore, his motion for a new trial is denied on these bases.

### 2. Rebuttal Testimony Regarding Condition of Vehicle/ Carfax Report

Plaintiff next contends that the Court erroneously excluded evidence regarding his vehicle. (Docket No. 218 at 3-4, ¶C). Specifically, he argues that he should have been permitted to testify in rebuttal regarding the condition of his vehicle and that Plaintiff's Exhibit 20, a Carfax Report purportedly depicting the history of Plaintiff's vehicle, was improperly refused at trial. (*Id.*). Upon review of the trial record, the Court properly exercised its discretion by excluding the challenged evidence.

Whether to permit or prohibit the introduction of rebuttal evidence is committed to the sound discretion of the trial court. *See* Fed.R.Evid. 611(a)[19]; *see also Bhaya v. Westinghouse Elec. Corp.*, 922 F.2d 184, 190 (3d Cir. 1990) ("a trial judge's decision regarding the scope of rebuttal may not be reversed unless there has been a clear abuse of discretion."). "Rebuttal evidence must generally tend to refute the defendant's proof," *Bhaya*, 922 F.2d at 190, and "is not to be used as a continuation of the case-in-chief," *Cates v. Sears Roebuck & Co.*, 928 F.2d 679, 685 (5th Cir. 1991). Moreover, "[o]nce a plaintiff has had a chance to prove a fact, he cannot reopen the matter simply by stating that he wishes to introduce more or better evidence." *Pignons S.A. de Mecanique v. Polaroid Corp.*, 701 F.2d 1, 2 (1st Cir. 1983).

---

[19]     Rule 611(a) provides that: "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." Fed.R.Evid. 611(a).

Considering this authority, the Court correctly excluded the proffered rebuttal evidence because Plaintiff had already presented considerable evidence regarding the condition of his vehicle, a 1986 Nissan 300 ZX, on direct examination. (Docket No. 240 at 32, 36-38). He testified that it was a "two-seater vehicle with a hatch back." (*Id*. at 32). The vehicle also had black "sports louvers" which covered the windows. (*Id*. at 40). The louvers permitted him to see out of the vehicle but restricted others from seeing inside the vehicle. (*Id*.). He testified that before his interaction with the Defendant Officers, there were items in his car, however, after it was searched, "things were thrown around, and nothing was where it was before this happened." (*Id*. at 70). He used numerous photographs of the car taken by his father while describing its condition to the jury. (*Id*.; Plaintiff's Exs. 8, 9, 10, 11, 12, 14). He explained that he had items in a cardboard box in the back of the car, that his leather seats were cut or ripped, and that a speaker was damaged. (Docket No. 240 at 70).

In contrast, during their case-in-chief, the Defendant Officers testified concerning what they saw as the condition of the vehicle. Among them, Woodhall testified that the vehicle was a "disaster." (Docket No. 246 at 27). Goob likewise explained that the vehicle was in "very poor condition" (Docket No. 241 at 196), and Kreger described it as a "pig sty" (Docket No. 246 at 94). From Woodhall's view, the vehicle was a four-seat car but the rear seat was missing. (*Id*.). He explained that there was particle board or a wooden seat in the back where the second row of seats should have been. (*Id*.).

Against this backdrop, at the conclusion of Defendant's case-in-chief, Plaintiff sought to introduce rebuttal evidence about his vehicle. (Docket No. 246 at 171). To this end, Plaintiff's counsel proffered that Plaintiff wished "to speak further to his car, his Nissan, which definitely did not have four seats. It had two. It was a two seater. And he wants to speak further regarding the

particle base." (*Id.*). He also would have testified that the "particle base" in the rear of the vehicle contained stereo speakers. (*Id.*).

In this Court's opinion, the proffered testimony was not proper rebuttal evidence. Rather than rebut new evidence which was presented by Defendants, Plaintiff sought only to introduce more evidence on an issue as to which he had already presented considerable evidence. Defendants merely countered with conflicting evidence, creating a factual dispute. It was within this Court's discretion to exclude the evidence, which had little, if any, relevance as to Plaintiff's liability claims. *See Bhaya*, 922 F.2d at 190. If he believed such evidence was integral to his case in phase I, Plaintiff should have presented this information during his case-in-chief.

The Carfax Report was also properly excluded from evidence as it included hearsay statements. The Carfax Report contained certain data regarding a Nissan 300XZ vehicle with VIN # JN1HZ14S2GX166437, matching the VIN number of Plaintiff's car. (Pl. Ex. 20). However, Plaintiff did not prepare the Carfax Report and none of the factual statements contained thereon could be attributed to him; therefore, it contained inadmissible hearsay. *See* Fed.R.Evid. 801(c)[20], 802 ("Hearsay is not admissible except as provided by these rules."). Plaintiff also failed to argue that any hearsay exception permitted the introduction of the Carfax Report and it appears to the Court that no such exceptions would have applied to permit its admission into evidence. *See* Fed.R.Evid. 803, 804, 807.

Despite this ruling, the Court permitted Plaintiff to use the Carfax Report to refresh his recollection regarding the date he purchased the vehicle and the mileage of the vehicle but refused

---

[20] "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c).

to admit it into evidence.[21]   (*See* Docket No. 241 at 23-28).   This decision conforms to Rule 612 of the Federal Rules of Evidence.   *See* Fed.R.Evid. 612.   The United States Court of Appeals for the Third Circuit has recognized that under Rule 612 "unless the adverse party requests their production, the contents of documents used solely to refresh a witness'[s] recollection might never be shown in open court because the law does not permit the jury to see them."   *United States v. Lnu*, 575 F.3d 298, 307 (3d Cir. 2009) (internal citation omitted) (citing *United States v. Booz*, 451 F.2d 719, 725 (3d Cir.1971) ("The rule in cases of refreshed recollection is that the writing may not be admitted into evidence or its contents even seen by the jury.")).   Therefore, because Plaintiff was permitted to use the Carfax Report to refresh his recollection regarding the challenged facts, and the exhibit was plainly inadmissible otherwise, the Court did not err in excluding it from evidence.

Finally, to the extent that Plaintiff argues that the Court erred in its pretrial ruling that the Carfax Report and a Cars.com printout of a number of Nissan 300ZX cars listed for sale were not admissible as evidence of damages, this argument has no merit given the present state of this case because such evidence was only admissible in phase III, i.e., damages, and the case did not proceed beyond the first phase, i.e., the individual liability of the Defendant Officers.   *See Jackson*, 2010 WL 2510137, at *1-2.

To conclude, Plaintiff has not met his burden to show that the Court erred by preventing the proffered rebuttal evidence or by excluding the Carfax Report.   Accordingly, his motion for a new trial relying on these alleged errors is likewise denied.

---

[21]       On cross-examination, Plaintiff was asked whether he purchased the vehicle in 2000.   (Docket No. 240 at 147).   He testified that he did not recall the exact date, but that "we have a Carfax of it, and it has the actual date." (*Id.*).   Plaintiff was also asked whether the vehicle had over 140,000 miles; again, he testified that he did not recall. (*Id.* at 145).

### 3. Expert Testimony – James Baranowski – Use of Force

Plaintiff also argues that the Court unfairly limited the testimony of his expert witness, James Baranowski, in its pretrial Memorandum Opinion and Order resolving the Defendants' *Daubert* motion. (Docket No. 218 at 5, ¶E). Plaintiff complains that "[b]y this decision, Baranowski was restricted to a point were [sic] his testimony would have very little relevance to the facts and information that he obtained in his report." (*Id*.). He asks rhetorically, "[w]hy couldn't he [Baranowski] testify to his conclusion of his report, the proper rules and procedures that apply (according to the City of Pittsburgh's Rules and Procedures), and render his expert opinion?" (*Id*.).

The Court first addresses Plaintiff's claim that its handling of Baranowski's testimony was "unfair." This argument is belied by the record. The Court granted Plaintiff every opportunity to qualify Baranowski as an expert, to develop the foundation for his testimony, and to properly formulate his expert testimony. Indeed, after the Court determined that a *Daubert* hearing was required prior to the start of the trial; the Court granted Plaintiff's motion for a continuance of the *Daubert* hearing and trial due to a severe health condition of one of Baranowski's relatives. (Docket Nos. 168, 169). The trial was continued from June 21, 2010 until August, 2010 for this reason. (*Id*.). The *Daubert* hearing was initially set for July 22, 2010, but was rescheduled again upon request of Plaintiff made on the afternoon before the hearing due to another, similar emergency.[22] (Docket Nos. 184, 185). On August 2, 2010, the Court held a full-day *Daubert* hearing during which Plaintiff was given every opportunity to provide appropriate grounds for Baranowski's testimony. (Docket No. 190). As discussed below, the Court permitted him to

---

[22] The Court's first inclination was to hold the *Daubert* hearing prior to jury selection on June 21, 2010. *See Trans of Cont. of Pretrial Conf. 6/17/10* at 7.

testify as an expert, with some limitations. Even at trial, the Court was forced to delay proceedings for some time to await Baranowski's arrival as he was stuck in traffic. (Docket No. 241 at 47-49). Given these circumstances, the Court believes it acted more than fairly toward Plaintiff and his witness.

The Court further disagrees with Plaintiff's position that Baranowski's testimony was so limited that it somehow hindered his case. In this Court's estimation, the rulings at trial appropriately limited the scope of Baranowski's testimony in the manner described in its Memorandum Opinion. *See Jackson v. City of Pittsburgh, et al.*, Civ. A. No. 07-111, 2010 WL 3222137, at *15 (W.D.Pa. Aug. 13, 2010). The Court need not restate its entire holding here, although the Court notes that it only excluded his testimony to the extent that it: consisted of improper legal conclusions; lacked foundation; was speculative or based on improper assumptions; related to matters which were irrelevant to the disputed issues at trial; and, was overly prejudicial to the Defendants. *Id.* On the other hand, the Court specifically found that expert testimony was appropriate in this case and that Baranowski was permitted to testify regarding the following:

> (1) His knowledge, experience and extensive law enforcement background;
>
> (2) The standardized police procedures at issue in this case, including the City of Pittsburgh's Use of Force Policy, the Continuum of Control, [ … ]; and,
>
> (3) Whether the Defendants' use of force was in accord with the standardized police procedures given the facts of this case (properly presented to him by way of a hypothetical question).

*Id.* at *15.[23] The Court also instructed that Plaintiff's counsel use hypothetical questions at trial

---

[23] The Court also specifically permitted Baranowski to testify regarding certain standards developed by the

given the inappropriate manner in which Plaintiff's counsel presented her questions to Baranowski during the *Daubert* hearing, and the number of objections raised by the defense at that time. *Id.* To this end, the Court noted that said hypothetical questions must be based on facts in evidence and be properly phrased so as to avoid specifically questioning Baranowski whether the use of force by the officers was "reasonable" under the law.[24]  *Id.*

At trial, Plaintiff's counsel had considerable difficulty formulating a proper hypothetical question and presenting it to Baranowski.[25]  However, Plaintiff's counsel ultimately was able to question him appropriately in a manner that did not result in any objections from the defense. Specifically,

> Q. Mr. Baranowski, have you come to a conclusion, or an opinion, to a reasonable degree, professional degree of certainty, with regard to whether or not excessive force was used in this case?
>
> A. I have.
>
> Q. Can you state that opinion, for the record?
>
> A. Yes. During the confrontation, if the information received from

---

Commission on Accreditation for Law Enforcement Agencies, Inc. ("CALEA"), if these standards were produced to Defendants prior to trial by Plaintiff. *Jackson,* 2010 WL 3222137, at *15. Plaintiff failed to produce them and conceded at trial that Baranowski was not permitted to testify as to those standards. (*See* Docket No. 241 at 2).

[24]     The Court notes that it inartfully referred to the former restriction as prohibiting questioning regarding the "ultimate legal issue" in this case, perhaps conflating two distinct legal principles applicable to expert testimony: (1) that an expert may give testimony that "embraces an ultimate issue to be decided by the trier of fact" under Rule 704 of the Federal Rules of Evidence; and (2) that an "expert witness is prohibited from rendering a legal opinion." *Berckeley Inv. Group, Ltd. v. Colkitt,* 455 F.3d 195, 217 (3d Cir. 2006). The Court notes that a fair reading of its pretrial decision shows that the Court restricted counsel from eliciting an impermissible legal opinion from Baranowski rather than testimony as to an "ultimate issue" which is permitted under Rule 704. Specifically, the Court restricted him from offering testimony regarding "whether the force used by the [Defendant Officers] was 'reasonable.'" *Jackson*, 2010 WL 3222137, at *15.

[25]     In this Court's opinion, the difficulty in presenting Baranowski's testimony to the jury was exacerbated by the fact that Plaintiff's counsel, Ms. Kift, had no experience trying excessive force cases prior to this trial and, likewise, Plaintiff's expert, James Baranowski, had not previously testified as a use of force expert (Docket No. 241 at 132). Lengthy sidebar conferences were held in order to resolve the Defendants' many objections to counsel's improper questioning.

Mr. Jackson in his complaint and his deposition is to be believed, and he was struck in the face or the neck area during the altercation, the officers [would] have had to justify deadly force. Any force used against a subject from the neck up needs to be justified as deadly force, and that's because of the potential seriousness of the injury involved, attacking the neck, the spinal cord, the brain stem, and the face. So, if the information from Mr. Jackson is to be believed, then, excessive force was used.

THE COURT: Anything further, Miss Kift?

MISS KIFT: Your Honor, no.

(Docket No. 241 at 150-151). On cross-examination, among other testimony, Baranowski admitted that if the Defendant Officers' version of events were accepted, rather than Plaintiff's version, then the use of force by Defendants Goob and Kreger was appropriate.[26] (*Id*. at 151-52).

---

[26]        Specifically,

> Q. Now, you've reviewed the statements made by the officers; is that correct?
> A. That is correct, yes.
> Q. And you know in the case of Mr. Kreger, that Officer Kreger indicated that he was doing an inventory search of the car, and that Mr. Jackson came up on him very quickly, in an assaultive manner, and as a result of that, he turned on him and he gave him a two-hand chuck, or a push away.  Now, if those facts are believed, that force used by Kreger, is that within officer's training, and is that something that an officer is permitted to do?
> A. Yes, it would be acceptable.
> Q. Okay. And is the reason for that the fact that officers are armed, have weapons, and officers have to be very conscious of people around them, and being around them?
> A. That is correct, yes.
> Q. And officers, that's why they always want sort of a clearance, or a certain space, so that, for their own protection and the protection of others?
> A. Yes. We call it reactionary distance or gap.
> Q. What generally is that?
> A. Six foot.
> Q. Okay. And also, if you would assume the facts as related by Detective Goob, he indicated that he gave a verbal command to Mr. Jackson to stop, informed him he was under arrest. He didn't stop, and then, he proceeded to use an arm bar to take him down.under those circumstances, is that force the force that officers are taught in and trained to use?
> A. Yes. If you accept that version of the events, then, it would be acceptable.
> Q. Okay. You were asked a question earlier about use of an arm bar, given the surface. In the training that's given to police officers, you're permitted to use an arm bar, regardless of the surface you're on, whether it's grass, concrete, asphalt, sand, whatever?

Thus, Baranowski's testimony was premised on a classic credibility dispute best suited for resolution by the jury. The jury simply resolved the disputes against Plaintiff. That is the nature of the jury trial system.

In this Court's estimation, Plaintiff has not demonstrated that the Court committed any error of law or fact, during pretrial proceedings or at trial, regarding the limitations placed on the testimony of his expert witness, Baranowski. In fact, the Court believes that it appropriately limited Baranowski's testimony pursuant to *Daubert* and the Federal Rules of Evidence after considerable inquiry into his qualifications, experience and methodology. *See Jackson*, 2010 WL 3222137, at *15. Accordingly, Plaintiff's motion for a new trial is denied to the extent that he argues that the Court erroneously excluded portions of and/or limited Baranowski's testimony.

### 4. Kreger's History of Untruthfulness/Report of Disciplinary History

Plaintiff further asserts that the Court erred in its ruling that evidence of Defendant Kreger's history of untruthfulness and a report of same were inadmissible for impeachment purposes. (Docket No. 218 at 2, ¶B). At trial, Plaintiff's counsel attempted to admit Plaintiff's Exhibit 5 from the Court's *Daubert* hearing during her cross-examination of Defendant Kreger. (Docket No. 246 at 121). That document is titled "DAR Listing Query" and states, among other things, that, for DAR Number 96-081, Kreger received "2 days suspension" as a result of his commission of three disciplinary offenses: court appearances; truthfulness; and neglect of duty. (Docket No. 190-5, *Plaintiff's Ex. 5 from Daubert Hearing*). Contemporaneously with her presentation of the document to Kreger, Plaintiff's counsel questioned him as follows: "Speaking

---

A. That's correct. If you can justify the need for the force, surface you're on is immaterial.
Q. Okay.
(Docket No. 241 at 151-53).

36

of being sustained, has a charge of untruthfulness ever been sustained against you within the City of Pittsburgh police?" (Docket No. 246 at 121). The Defendants objected to the introduction of said exhibit and to the question presented. (*Id*.). These objections were sustained at trial after a lengthy side bar conference. (*Id*. at 127-28).

At this stage, Plaintiff claims that it was "unfair for the jury not to be apprised" that Kreger was disciplined for untruthfulness because the Defendants were permitted to introduce evidence of his prior convictions of a number of *crimen falsi* crimes.[27] (Docket No. 218 at 2-3, ¶ B). Plaintiff cites to no rule of law or precedential decision supporting his position. (*Id*.). Defendants maintain that the objections were properly sustained. (Docket No. 236). The Court agrees with Defendants.

Although Plaintiff does not specifically cite any of the Federal Rules of Evidence in support of his argument, the Court notes that the exhibit and question which were proffered at trial potentially implicate Rules 404(b), 608, and 609. However, none of these Rules authorize the admission of the proffered evidence in the manner attempted at trial and a review of the trial record demonstrates that the evidence was properly excluded.

To this end, Rule 404(b) does not permit the introduction of "evidence of other crimes, wrongs, or acts … to prove the character of a person in order to show conformity therewith." Fed.R.Evid. 404(b). Thus, the proffered exhibit and the stated question were not admissible for the purpose of proving that because Kreger acted untruthfully on one occasion that he again did so while filling out the reports he prepared incident to Plaintiff's arrest or while testifying at trial. *See Savage v. District Attorney of County of Philadelphia*, 116 F. App'x 332 (3d Cir. 2004).

---

[27] The Court resolved pretrial motions in limine regarding the use of Plaintiff's prior convictions as evidence at trial. *See Jackson*, 2010 WL 2511380, at *2-4. Plaintiff has not challenged these rulings in his post-trial motions. (*See* Docket Nos. 214, 218). Therefore, the Court will not address them here.

Rules 608 and 609 govern the use of evidence for the purpose of impeaching a witness. *See* Fed.R.Evid. 608, 609. Rule 609 pertains only to the use of a witness's criminal convictions for impeachment. *See* Fed.R.Evid. 609 ("evidence that a witness … <u>has been convicted of a crime</u>, shall be admitted.") (emphasis added). Plaintiff sought to introduce evidence of Kreger's disciplinary history which did not include any criminal convictions. (Docket No. 190-5, *Plaintiff's Ex. 5 from Daubert Hearing*). Therefore, Rule 609 does not apply. On the other hand, Rule 608 permits cross examination of a witness's character for truthfulness in some fashion, although the strategy employed to introduce the proffered evidence at trial is not authorized by Rule 608. *See* Fed.R.Evid. 608.

"Rule 608(b) permits questioning during cross-examination about specific instances of a witness's prior conduct when that conduct is probative of a witness's truthfulness or untruthfulness." *Bailey v. Diuglielmo*, Civ. A. No. 07-719, 2010 WL 2902532, at *2 (E.D.Pa. Jul. 23, 2010) (citing Fed.R.Evid. 608(b)). "The classic example of a permissible inquiry [under Rule 608(b)] would be an incident in which the witness had lied." *United States v. Bocra*, 623 F.2d 281, 288 (3d Cir. 1980). However, Rule 608(b) expressly states that specific instances of witness's prior conduct for untruthfulness "may not be proved by extrinsic evidence." Fed.R.Evid. 608(b). In the context of this case, "extrinsic evidence" includes, among other things, proof by documentary evidence and of the consequences of the witness's prior conduct, i.e., any discipline received by the witness. *Bailey*, 2010 WL 2902532, at *2; *see also Ashford v. Bartz*, Civ. A. No. 1:04-cv-00642, 2009 WL 2356666 (M.D. Pa. Jul. 30, 2009) (discipline and termination of officer inadmissible extrinsic evidence). Given this authority, Plaintiff's proffer of evidence at trial failed in at least two ways: (1) Exhibit 5, an extrinsic document, was not admissible as proof of the specific incident of Kreger's untruthfulness; and (2) the question posed

to Plaintiff requested inadmissible information regarding the discipline Kreger received as a result of his purportedly untruthful conduct. After the objection was sustained, Plaintiff's counsel did not pursue the matter further and no appropriate questions were presented to Kreger as to the specific incident of untruthfulness – which, based on the document, appears to have occurred in 1996 or five years before the incident at issue in this case and nine years prior to Kreger's testimony at trial. (*See* Docket No. 190-5, *Plaintiff's Ex. 5 from Daubert Hearing*). Therefore, the Court appropriately exercised its discretion and excluded the proffered evidence.[28] Having found no error in the exclusion of evidence, Plaintiff's motion for a new trial on this basis is denied.

### 5. Defendant Officers' Use of Force Histories/OMI Report

Plaintiff also complains that the Court improperly excluded evidence he sought to use to impeach the Defendant Officers, including prior excessive force and unlawful search and seizure complaints submitted against them and the Office of Municipal Investigations Report regarding the instant matter.[29] (Docket No. 218 at 2-3, ¶ B). In this Court's estimation, no such errors were committed.

The trial record does not support Plaintiff's assertion that the prior excessive force and/or unlawful search and seizure complaints were excluded during cross-examination of the Defendant

---

[28] The Court further notes that permitting such evidence potentially could have resulted in a "mini-trial" and required proof of facts and argument of issues that had no direct relevance to the present matter. Conducting such a "mini-trial" was not warranted and flies in the face of Rule 1, which requires the speedy and inexpensive determination of all cases. Fed.R.Civ.P. 1.

[29] Plaintiff's claim that defense counsel "opened the door" to the admission of such evidence is untimely raised in his April 14, 2011 response. (Docket No. 251 at 6, 8, 15, 29-32). In any event, the Court agrees with the defense that the statements made by defense counsel during opening statements did not open the door to permit such improper questioning by Plaintiff's counsel. *See United States v. Asher*, 854 F.2d 1483, 1508 (3d Cir. 1988) (holding that a "defendant's opening statement, standing alone, thus does not, within the meaning of the evidentiary rule, constitute an attack on the credibility of a forthcoming witness").

Officers at trial. In fact, Plaintiff did not even attempt to introduce this information into evidence through their testimony or via any exhibit. (*See* Docket No. 241 at 208 – 220; Docket No. 246 at 1-140). In any event, for largely the same reasons as the exclusion of the evidence of Kreger's prior history for untruthfulness, the prior complaints submitted against the Defendant Officers alleging their use of excessive force and/or incidents of unlawful searches and seizures were not admissible to prove that they violated Plaintiff's constitutional rights on November 2, 2001. This type of propensity evidence is not admissible under Rule 404. *See* Fed.R.Evid. 404. Further, the impeachment Rules discussed above, 608 and 609, simply do not apply to the prior complaints against the Defendant Officers which have no relation to their propensity to be truthful. *See* Fed.R.Evid 608, 609. To the extent that Plaintiff sought to introduce the OMI Report as evidence of the complaints against the Defendant Officers, the same analysis applies.[30] On the other hand, as the Court recognized during pretrial proceedings and at trial, this type of evidence was likely admissible during phase II of the case, i.e., Plaintiff's *Monell* claim against the City of Pittsburgh challenging whether its policies, procedures, practices and customs violated Plaintiff's constitutional rights.[31] (Docket No. 239 at 11-12).

---

[30] Further, to the extent that Plaintiff sought to introduce the specific findings or conclusions of OMI regarding its investigation of the Defendant Officers' arrest of Plaintiff, such evidence would only be admissible after weighing the considerations set forth under Rule 403, much like an EEOC determination in an employment discrimination case, *see Coleman v. Home Depot, Inc.*, 306 F.3d 1333 (3d Cir. 2002).

[31] At trial, the Court ruled as follows:

> THE COURT: Miss Kift, [as to your] objection [,] this case was divided into three phases. The first phase is whether or not there was a constitutional violation; i.e., whether or not there was excessive force. And to that end, that's all we're supposed to be talking about. To the extent that you get into the records on any or all of these officers, you're getting into Phase 2 and what the liability, if any, is of the City, in terms of training, in terms of retention of these officers. Now, his direct was pretty narrow and basically just asked all, that he's currently a Baldwin Borough police officer, that he started in '93, resigned in 2002 with the City, that -- where he all worked, how he got on this impact squad, and this incident, and that's it. So, if this document is going to be used at all, it's going to be used in

Regarding the OMI Report, which contains statements by the Defendant Officers, the Court explicitly held that it could be used to impeach if the Defendant Officers' trial testimony was inconsistent with their prior statements to OMI. (Docket No. 240 at 118 ("Now, he can be cross examined on what he said in the OMI report versus what he said on the stand, but the report itself doesn't come into evidence.")). Plaintiff argues that each of the Defendant Officers, Goob, Woodhall, Joyce and Kreger, testified at trial in a manner which was inconsistent with their prior statements to OMI and those made during their depositions. (Docket No. 218 at 6, ¶2). He contends that his attorney attempted to cross-examine the Defendant Officers with their prior statements, but that the Court erroneously sustained the objections. (*Id*.). Having reviewed the trial record in its entirety, the Court disagrees.

The trial record is clear that Plaintiff's counsel did not attempt to impeach any of the Defendant Officers on the basis that their trial testimony was inconsistent with their prior statements made to OMI or with their deposition testimony.[32] First, Defendants Goob and Joyce were neither questioned regarding their OMI statements nor their deposition testimony during cross-examination. (Docket Nos. 241 at 208-220; 246 at 1-19; *Joyce*, Docket No. 246 at 73-87). Second, Defendant Kreger was questioned regarding the OMI Report, but only to the extent discussed above involving the "untruthfulness" charge. (Docket No. 246 at 128-140). Third,

_____

Phase 2, because you don't have any case law or rule, you don't have any case law or rule that you can put this in front of the jury. And what this particular gentleman may have done in one period of time doesn't mean he would have done it every time and in all time. This isn't like *crimen falsi*, like your client was accused of.

(Docket No. 246 at 125-126).

[32] In contrast, in his response filed on April 14, 2011, Plaintiff now engages in a lengthy comparison of the Defendant Officers' testimony to their prior OMI statements. (Docket No. 251). This type of information should have been used at trial to impeach them via effective cross-examination techniques and Plaintiff cannot rely on these purported inconsistencies to support his post-trial motions. *See Ashford*, 2010 WL 272009, at *4 ("Generally, a party is not entitled to receive a new trial for objections to evidence that he did not make at or prior to the initial trial, even if they may have been successful.").

Defendant Woodhall was questioned regarding his OMI statement during cross-examination, but the questioning was general in nature and did not seek to impeach him based on any alleged inconsistent statements. (Docket No. 246 at 53-60).

Since Plaintiff's claim of error pertains to only the cross-examination of Woodhall, a brief discussion of the relevant evidence is necessary. Woodhall's direct examination was limited. He was questioned regarding his background and experience including his employment in the United States Air Force and as a City of Pittsburgh police officer. (Docket No. 246 at 20-22). He was also probed regarding his role as a detective with the narcotics unit and the policies and procedures for all of the following: traffic stops, vehicle inventories, towing vehicles, and processing an arrestee through intake at the Allegheny County Jail. (*Id*. at 22-32). He further described the events of November 2, 2001 from his perspective, but testified that he saw very little of the exchanges between Plaintiff and the other officers due to his location in the car. (*Id*.). He did, however, see the condition of Plaintiff's vehicle from the outside as he peered in through the window. (*Id*.).

On cross-examination, Woodhall was questioned about his OMI statement. (Docket No. 246 at 53-60). After some preliminary questions were asked about his appearance before OMI and statement, Plaintiff's counsel attempted to display the OMI statement to the jury and question him regarding the VIN number of Plaintiff's car. (*Id*. at 56). The Defendants objected on grounds that the evidence lacked an appropriate foundation because the document had not yet been admitted into evidence. (*Id*. at 56-7). At a sidebar conference, the exhibit was withdrawn by Plaintiff's counsel and never displayed to the jury.[33] (*Id*. at 57). The Defendants also objected to

---

[33]    The following exchange took place at sidebar:

the line of questioning vis-à-vis the VIN number on the basis that the questioning was outside the scope of Woodhall's direct examination.  (*Id*.).  This objection was properly sustained by the Court.

Rule 611(b) governs the scope of cross-examination and provides that:

> Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.

Fed.R.Evid. 611(b); *Reppert v. Marino*, 259 F.App'x. 481, 488 n.6 (3d Cir. 2007) ("Cross-examination is generally limited to the subject matter of the direct examination and matters affecting the credibility of the witness.").  Woodhall provided no testimony regarding the VIN number of Plaintiff's car on direct examination.  (Docket No. 246 at 20-32).  Thus, pursuant to Rule 611(b), the Court appropriately exercised its discretion to limit the scope of cross-examination and prevented Plaintiff from eliciting testimony from Woodhall on this fact.

In sum, Plaintiff has failed to demonstrate any errors by the Court during cross-examination of the Defendant Officers.   Accordingly, his motion for a new trial relying on these arguments is denied.

6. <u>Prior Lawsuit – *Williams v. City of Pittsburgh* / Consent Decree in *United States v. City of Pittsburgh* / Contact with Jim Ginger, Department of Justice</u>

A number of Plaintiff's additional allegations of error relate to the Court's exclusion of evidence regarding matters which took place years before the events underlying the instant

---

THE COURT: Miss Kift, you understand you have not laid the proper foundation --
MISS KIFT: Um-hum.
THE COURT: -- to use the OMI statement. And furthermore, it was not admitted into evidence yet in this case.
MISS KIFT: I know. I realized that after I set it up there. I'm sorry.

(Docket No. 246 at 57).

lawsuit. Before addressing the merits of his arguments, some background information is helpful. To this end, Plaintiff was a party in a prior civil rights lawsuit against the City of Pittsburgh styled *Williams, et al. v. City of Pittsburgh, et al.* filed at Civil Action Number 96-cv-560 in the United States District Court for the Western District of Pennsylvania. This case alleged various civil rights claims against the City of Pittsburgh, its officials and police officers.[34] *Id*. The lawsuit also involved a number of individuals, the American Civil Liberties Union and other organizations as plaintiffs. *Id*. Plaintiff's individual lawsuit against the City was settled. *See Jackson v. Morano, et al.*, Civ. A. No. 02-cv-21, Docket No. 6 (W.D.Pa. Jul. 31, 2002). As a result of the allegations of police misconduct in the *Williams* matter, the United States instituted a separate lawsuit against the City, styled *United States v. City of Pittsburgh, et al.*, Civil Action Number 97-354, alleging that the policies, practices, procedures and customs of the City of Pittsburgh violated the civil rights of certain citizens, including many of the plaintiffs in the *Williams* litigation. This case was resolved by virtue of a negotiated Consent Decree between those parties in 1997. *Id*. James Ginger, Ph.D., was appointed as a compliance auditor to monitor the City's adherence to the terms and conditions of the Consent Decree and report on same to the Court. *Id*. Dr. Ginger served in the auditor's role from 1997 through 2005, when the final auditor's report was filed and a joint motion to terminate the consent decree and dismiss the case was granted by the court. *Id*. at Docket Nos. 75, 76. With this background, the Court now turns to Plaintiff's specific arguments.

Plaintiff's first allegation requires little discussion. He complains that the Court improperly sustained the Defendants' objection to his testimony that he contacted James Ginger

---

[34]     The Court notes that Defendant Kreger was a named defendant in the *Williams* litigation. *See Neidig v. City of Pittsburgh, et al.*, Civil A. No. 02-00007.

from the Department of Justice shortly after the events of November 2, 2001, but no such objection was even raised during trial. (Docket No. 218 at 2, ¶B). In fact, the trial record demonstrates that Plaintiff freely testified regarding Ginger, without any objections lodged by the defense to his testimony. Specifically,

> Q. Well, the question is, were you or were you not thinking about bringing this lawsuit?
>
> A. I wanted to have proof of what happened to me, and I figured later on I would decide if I wanted or not. Another reason is because I was in contact with Jim [G]inger, who is at the Department of Justice, and I wanted him to see what I looked like, to show him. That is why I did it.

(Docket No. 240 at 178-79). Therefore, as the challenged evidence was admitted without objection, no ruling was made by the Court, and no error could have been committed. Accordingly, the same cannot serve as the basis for a new trial.

Plaintiff further maintains that the Court erred by preventing him from testifying as to the nature and circumstances which resulted in his prior lawsuit against the City of Pittsburgh, in the *Williams* matter, particularly, that this case was the "second time" that he was assaulted by City police officers.[35] (Docket No. 218 at 2-3, ¶B). Plaintiff also asserts that it was unfair for the Court to exclude testimony, evidence and argument concerning the 1997 Consent Decree at trial, including the nature and content of the Consent Decree, and the fact that it was in place on

---

[35]       Plaintiff testified as follows:
> Q. And you filed this law[suit] yourself, didn't you, originally?
> A. Yes, sir.
> Q. Because you want money?
> A. No. We're not talking that, you know. What I want, I want justice. I think what happened to me is the second time this has happened to me, because the first time
> --
> MR. CAMPBELL: Objection, Your Honor.
> THE COURT: Sustained.

(Docket No. 240 at 179).

November 2, 2001, the date of the events in question, and remained until 2005. (*Id.*).

As the Court held at trial, the prior lawsuits against the City and Plaintiff's involvement in same bore no relevance to the issues in dispute in the first phase of this case, i.e., Plaintiff's § 1983 claims alleging that he was unlawfully arrested, subjected to excessive force, and that his car was unlawfully searched and seized. Again, such evidence was only relevant and admissible if it was probative of one of the disputed issues at trial. *See* Fed.R.Evid. 401; *Toledo Mack Sales & Service, Inc.,* 386 F.App'x. at 218. The facts that Plaintiff had previously sued the City of Pittsburgh successfully in a civil rights case and that the City of Pittsburgh settled that case and others, including the action brought by the United States which resulted in the Consent Decree, do not have a tendency to make it more or less probable that the Defendants Officers violated Plaintiff's civil rights on November 2, 2001.[36] Moreover, as discussed above,[37] Rule 404 of the Federal Rules of Evidence specifically precludes the admission of this type of evidence for the purpose of proving that because City police officers had previously violated the civil rights of citizens, that the Defendant Officers violated Plaintiff's civil rights on that date. *See* Fed.R.Evid. 404.

### 7. Conclusion – Evidentiary Rulings

For these reasons, Plaintiff has failed to demonstrate that the Court erred in any of the challenged evidentiary rulings. Accordingly, he is not entitled to a new trial and his motion for

---

[36] The Court notes that the evidence as to the prior lawsuits and the Consent Decree may have been relevant in the second phase involving Plaintiff's *Monell* claim against the City, but because of the jury's verdict against Plaintiff in the first phase, the second phase was not tried. *See* § V.D.2., *infra.*

Likewise, the fact that Plaintiff filed a similar civil rights lawsuit against a state police officer from events which occurred in 2005 and settled such litigation in 2011 would not have been relevant or admissible in the instant case. *See Jackson v. Nassan, et al.*, Civ. A. No. 08-1054 (W.D. Pa.).

[37] *See* § V.B.5, *supra.*

a new trial is denied.

C. *Motion for New Trial - Weight of the Evidence*

In addition to the alleged errors in the Court's evidentiary rulings, Plaintiff also argues that he is entitled to a new trial because the jury's verdict is contrary to the evidence presented at trial. (Docket No. 214 at ¶3; Docket No. 218 at ¶3). He maintains that the evidence conclusively demonstrated that the Defendant Officers used excessive force against him. (*Id*.). Plaintiff seeks a new trial on his claims because he also believes that this evidence compels a verdict in his favor on his unlawful arrest and excessive force claims. (*Id*.).

Plaintiff alleges that he presented evidence that he "was punched in his throat area of his neck at trial," causing him injuries. (Docket No. 218 at 6-7, ¶3). He states that the fact that he sustained these injuries was supported by the testimony of Dr. Ung. (*Id*.). He further asserts that both Baranowski and defense witness David Wright[38] testified that a blow to the throat or head of an individual constituted the use of deadly force by a police officer but that the evidence at trial did not suggest that the officers were in danger necessitating the use of deadly force against him. (*Id*.). He cites Third Circuit precedent and this Court's Memorandum Opinion resolving the Defendants' motion for summary judgment for support. (*Id*.). Taken together, Plaintiff argues that the evidence at trial conclusively proves that excessive force was used against him by the Defendant Officers and that a new trial is warranted. (*Id*.).

---

[38] David Wright has been employed as a City of Pittsburgh police officer for 17 years. (Docket No. 246 at 141). At the time of trial, he had been assigned as a certified trainer and teacher at the City of Pittsburgh Police Academy focusing on use of force, self-defense and physical fitness for ten years. (*Id*. at 141-142). He testified regarding the standards for training of City police officers and the type of training each officer receives. (*Id*. at 142-157). He also explained the "continuum of control" which he stated was "the logical progression through the stages of control that we have available as an officer to deal with certain situations, whether it's a resisting actor, or a compliant actor." (*Id*. at 147). The stages of the continuum range from "officer presence" wherein the mere presence of a uniformed police officer will help control an actor to "deadly force" which applies in situations when the officer is in danger. (*Id*. at 152). Among other things, Officer Wright stated that a punch to the throat of an individual would constitute the use of deadly force by an officer. (*Id*. at 159).

Plaintiff, however, ignores the evidence presented by the Defendant Officers that he was not assaulted in any manner; much less the manner he described. Instead, the Defendant Officers testified that Plaintiff was irate, pacing back and forth, loudly using profanity, and approached Kreger from behind, on the side where his gun was holstered – necessitating the officers' use of force. (Docket Nos. 241 at 197-198; 241 at 198-204). Plaintiff also fails to acknowledge that his own expert witness, Baranowski, admitted that no excessive force was used against him if the Defendant Officers' version of the events was believed rather than his account. (Docket No. 241 at 151-53). Additionally, Plaintiff ignores the testimony of his treating physician, Dr. Ung, who described Plaintiff's injuries as not serious or life threatening. (Docket No. 240 at 6-24). He also ignores that Dr. Ung did not testify as to the cause of Plaintiff's injuries. *See* n.6, *supra*; *see also Allen*, 230 F.App'x, at 194-195. Therefore, Dr. Ung did not testify that Plaintiff's injuries were caused by a punch to the throat or a kick to the head or other "deadly force", as Plaintiff suggests. (*Id*.). In fact, on cross examination, Dr. Ung opined that the Plaintiff's facial injuries were likely to have been caused by rubbing or scraping of Plaintiff's face. (Docket No. 240 at 19). Moreover, Plaintiff's injuries were such that they did not even require a medical exam by a nurse at the Allegheny County Jail upon his incarceration. (Docket No. 246 at 205; Docket No. 241 at 30-31).

"[T]he jury was required to review any excessive force claims under a totality of the circumstances test, as enunciated in *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989), to determine whether the force used was reasonable." *McKenna v. City of Philadelphia*, 582 F.3d 447, 460 (3d Cir. 2009) (citing *Jones v. Parmley*, 465 F.3d 46, 62 (2d Cir. 2006)). "[T]he jury was not required to accept plaintiffs' evidence." *McKenna*, 582 F.3d at 460. Rather, the jury was tasked with resolving the many factual conflicts in this case,

weighing the evidence and evaluating the credibility of the witnesses.   *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).   The jury here performed its function and returned a verdict against Plaintiff on all of his constitutional claims against each of the Defendant Officers.   (*See* Docket No. 206).

In this Court's estimation, the trial record fully supports the jury's verdict in his case. Thus, it is not "contrary to the great weight of the evidence" and "a miscarriage of justice" will certainly not result if the verdict stands.   *Pryer*, 251 F.3d at 453.   Accordingly, Plaintiff's motion for a new trial is denied.

D.  *Motion for Reconsideration*

Plaintiff's next allegations of error challenge the Court's Orders granting judgment as a matter of law in favor of the Defendant Officers and the subsequent dismissal of the City of Pittsburgh as a Defendant in this case.   (Docket No. 218 at ¶¶ 3, 4, 5).   As is discussed below, neither argument warrants reconsideration of the Court's Orders.

1.   Unlawful Search Claim

At trial, the Court granted the Defendant Officers' motion for judgment as a matter of law as to Plaintiff's claim that their search and seizure of his vehicle violated his constitutional rights. (*See* Docket Nos. 204, 207).   Plaintiff argues that this ruling is based on an erroneous factual finding by the Court, i.e., that he did not testify that he requested that the Defendant Officers permit him to call someone else to retrieve his vehicle rather than order it to be towed.   (Docket No. 218 at 7-8, ¶¶ 4, 5(B), 5(C)).   He maintains that he did testify to this fact while the Defendants did not testify that they offered him the opportunity to call anyone but simply ordered that the car be towed.   (*Id*.).   Plaintiff contends that the City of Pittsburgh Towing

49

Policy #41-1 *requires* that he be permitted to contact another person to retrieve his vehicle. (*Id.*). Thus, in his view, the fact that he requested that his vehicle be towed is dispositive of the issue of whether the Defendant Officers violated his constitutional rights. (*Id.*).

Having reviewed the trial record,[39] the Court admits that it erroneously found that Plaintiff did not make a request to the Defendant Officers that they permit him to call someone else to retrieve his vehicle. On review of the transcript, it appears that Plaintiff did testify that he made this request.[40] (Docket No. 240 at 104). However, this factual error was harmless because it was not central to the Court's legal ruling supporting the grant of the Defendant Officers' motion for judgment as matter of law.[41] Specifically, the Court held that the evidence presented at trial was not sufficient to sustain the claim under the appropriate legal standard, *see e.g., Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) and *Eshelman v. Agere*

---

[39] The Court's factual findings were based on hand written notes taken during trial because live transcription was not ordered for these proceedings. In addition, Plaintiff had a tendency to speak softly, mumble and interrupt both his attorney and defense counsel during their questioning of him, causing the Court to repeatedly advise him to speak up during his testimony and to avoid talking at the same time as the other speakers. (*See* Docket Nos. 240 at 26, 51, 82; 241 at 7).

[40] He testified as follows:

> [PLAINTIFF]:… When the paddy wagon arrived, they pulled me up by my handcuffs. I was pulled up by my handcuffs. Anyway, I had asked them when they were calling for the tow truck, I had asked them, can I call someone to move my vehicle, or pick up my vehicle? And I was told, no.
> Q. I'm sorry, when you say "them", who do you mean?
> A. The officers that were at the scene. Not the paddy wagon police officers, but the four defendants. When we were all, you know, I guess, say, eventually to get out there. They got me up from the ground. I was -- and I realized they were calling for a tow truck, and I asked, can I call, can I call someone to pick up my vehicle? And I was told, no; flat out, no. And that's once -- I mean that is when I knew that they were making arrangements to tow my vehicle.

(Docket No. 240 at 104).

[41] The Court notes that Plaintiff's counsel did not object at trial to the Court's factual finding that Plaintiff failed to testify that he asked the Defendant Officers if he could call anyone to move his car. (*See* Docket No. 245 at 6). Therefore, the Court questions whether Plaintiff waived this issue based on the failure to object at trial. *See Kiewit Eastern Co., Inc.*, 44 F.3d at 1204 ("Courts often take a dim view of issues raised for the first time in post-judgment motions. Generally, this is a decision within the sound discretion of the district court."). In any event, because Plaintiff's substantial rights were not affected by the erroneous factual finding, the potentiality for a waiver need not be resolved.

*Systems, Inc.*, 554 F.3d 426 (3d Cir. 2009), because: (1) the search was conducted after a lawful traffic stop; (2) the testimony presented indicated that the search was limited to an inventory search; (3) the search was completed for the purpose of cataloging the contents of the vehicle; (4) it was conducted pursuant to standardized procedures that were not contradicted; and, (5) the relevant policy of the City of Pittsburgh authorized the towing of vehicles if it presented a traffic hazard and could not be driven away.   (Docket No. 245 at 4-5).

Again, Plaintiff maintains that City of Pittsburgh Towing Policy # 41.1, sections 1.1, 5.1, and 5.3, *require* that the Defendant Officers permit him to call another person to pick up his vehicle before ordering that it be towed.   (Docket No. 218 at 7-8, ¶¶ 4, 5(B), 5(C)).   In support of his argument, Plaintiff quotes directly from the policies which were used throughout the pretrial proceedings in this case.   (*Id*.).   However, these provisions of the Towing Policy were not admitted into evidence at trial.   (*See* Docket No. 205).   Instead of admitting the Towing Policy into evidence, the Defendant Officers offered uncontroverted testimony that the City of Pittsburgh has a policy which authorized them to tow the vehicle because: it was blocking traffic; the officers were prohibited from driving the vehicle; Plaintiff had a suspended Pennsylvania driver's license; and, therefore, he was not permitted to drive the vehicle.   (Docket Nos. 241 at 193-194; 246 at 25-26, 92-93).

When considering a motion for judgment as a matter of law, the Court is required to consider "all of the evidence in the record."   *Reeves*, 530 U.S. at 150.   For Plaintiff to survive such a motion, "there must be enough 'evidence upon which the jury could properly find a verdict'" in his favor.   *Galena v. Leone*, 638 F.3d 186, 206 (3d Cir. 2011).   Here, Plaintiff's argument relies in part on provisions of a Towing Policy which were not admitted into evidence and not made a part of the trial record.   (*See* Docket No. 205).   Thus, these provisions could

not have been used by the jurors during their deliberations and they could not have relied on them in support of their verdict. *See United States v. Rana*, 123 F.2d 123, 126 (3d Cir. 1991) (quoting *United States v. Harris*, 738 F.2d 88, 92 (3d Cir. 1984)) ("a jury is bound to decide a case purely on the law and the evidence, and it is therefore error for a jury to rely on items not admitted into evidence to reach its verdict.").

In sum, Plaintiff's legal arguments, which necessarily flow from the asserted Court-made factual error, are flawed. For this reason, the Court's factual error was harmless; it did not affect Plaintiff's substantial rights and did not cause a manifest injustice. *See* Fed.R.Evid. 61.[42] Accordingly, he has not demonstrated that reconsideration of the Court's Order is warranted and his motion is denied.

2. *Monell* Claim Against the City of Pittsburgh

Plaintiff also seeks reconsideration of the Court's Order dismissing the City of Pittsburgh from this case after judgment had been entered in favor of the Defendant Officers and against Plaintiff on his § 1983 claims. (Docket No. 218 at 8, ¶5(A)). Plaintiff maintains that the evidence showed that the Defendant Officers filed joint subject resistance reports, rather than individually as is required by City of Pittsburgh policy. (*Id.*). He posits that the Defendant Officers' failure to follow said policy demonstrates a constitutional violation by the City of

---

[42]     Rule 61 provides:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Fed.R.Evid. 61.

Pittsburgh sufficient to permit his case to proceed to phase II and III. (*Id.*). The Court disagrees.

It is well-established that Plaintiff's § 1983 claim against the City of Pittsburgh under *Monell* is "derivative" in nature. *Mills v. City of Harrisburg*, 350 F.App'x. 770, 773, n.2 (3d Cir. 2009); *see also Connick v. Thompson*, --- U.S. ---, 131 S.Ct. 1350, 1360 (2011) (holding that "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train" unless the unconstitutional consequences of a municipality's failure to train are "patently obvious"). In order for Plaintiff to prevail under a *Monell* claim, he was required to prove that the Defendant Officers committed a constitutional violation and that the City of Pittsburgh's policy or custom actually caused his constitutional injury. *Grazier ex rel. White v. City of Philadelphia*, 328 F.3d 120, 124 (3d Cir. 2003) (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (observing that a City "may be held liable if its policy *actually causes injury*.") (emphasis added)); *see also Connick*, 131 S.Ct. at 1359 (quoting *Monell*, 436 U.S. at 692) ("Plaintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury."). At this juncture, all of Plaintiffs' claims against the Defendant Officers have been dismissed or have resulted in a verdict entered against him and the Court has also denied his motions for reconsideration and for a new trial. (Docket Nos. 204, 206, 208). Because the Defendant Officers were not found liable, the City of Pittsburgh cannot be held liable under *Monell*. *See Mills*, 350 F.App'x. at 773, n.2 ("Absent an underlying constitutional violation by an agent of the municipality, […] the municipality itself may not be held liable under § 1983."). Thus, the City was appropriately dismissed.

### 3. Conclusion as to Motion for Reconsideration

To conclude, Plaintiff has not identified any appropriate basis warranting reconsideration of the Court's Order dismissing the City from this case. *See Max's Seafood Café by Lou Ann, Inc.*, 176 F.3d at 677 (to warrant reconsideration, a moving party must demonstrate: (1) an intervening change in the controlling law; (2) the availability of new evidence which was not available when the court issued its order; or (3) the need to correct a clear error of law or fact or to prevent a manifest injustice.). Accordingly, Plaintiff's motion for reconsideration of this Order is denied.

E. *Alleged Newly Discovered Evidence*

In his final effort to resuscitate to his case, Plaintiff contends that alleged newly discovered evidence necessitates a new trial and/or the judgment to be reopened in this case. (Docket No. 251). He also lodges a serious accusation that defense counsel committed discovery violations by failing to produce the criminal complaint/affidavit of probable cause prior to trial and posits that this evidence was willfully withheld in an effort to conceal the true facts of this case. (*Id.*). From Plaintiff's view, those facts include that he was arrested by Pittsburgh Police Officer Terry Collings rather than the Named Defendants and that his arrest occurred on November 3, 2001 as opposed to November 2, 2001. (*Id.*).

In support of these arguments, he presents the Court with copies of Allegheny County Jail records related to the instant matter along with affidavits from his former counsel, Bonnie Kift, Esquire and his former expert witness, James Baranowski. (Docket Nos. 251-3, 251-4). In this Court's estimation, the post-trial investigations by Kift and Baranowski are much too late and involve factual matters that should have been thoroughly investigated during discovery.

Specifically, Ms. Kift declares that she was only provided with the offense/incident report and supplemental arrest report during discovery in this case and that she never received a criminal complaint. (Docket No. 251-3). But, she also admits that she was not Plaintiff's counsel for the

entirety of this case and only became lead counsel after Sylvia Denys, Esquire withdrew her appearance.[43] (*Id*.). Therefore, she did not handle all of the discovery matters on Plaintiff's behalf in this case. (*Id*.). In addition, Ms. Kift does not state the specific discovery requests which were made to Defendants, these discovery requests have not been provided to Court at this stage and were not previously filed of record consistent with the Court's Local Rules. *See* W.D.Pa. L.CvR 5.4.A. ("Discovery requests and responses referenced in Fed. R. Civ. P. 5(d) shall not be filed with the office of the Clerk of Court except by order of Court."). So, even if Plaintiff's challenge to Defendants' compliance with his discovery requests were timely, the Court cannot fully evaluate his claim because he has failed to meet his burden to produce such information in conjunction with his motion. W.D.Pa.L.CvR. 5.4.B. ("A party making or responding to a motion or seeking relief under the Federal Rules of Civil Procedure shall file only that portion of discovery requests and responses as needed to decide the motion or determine whether relief should be granted.").

Mr. Baranowski claims that a search for Plaintiff's arrest on November 2, 2011 from a number of sources, which he conducted in April of 2011, was unsuccessful as he was unable to locate any records of an arrest of Plaintiff on that date. (Docket No. 251-4). But, he also concedes that Pennsylvania adopted a new computer system for tracking criminal cases after 2001. (*Id*.). He explains that many of the older cases were closed out and were not entered into the computer database. (*Id*.). Pursuant to this policy, hard copies of cases that did not proceed to the Court of Common Pleas were purged after 7 years. (*Id*.). Finally, Baranowski notes that his request for similar information from the FBI was not yet fulfilled as of the date of his affidavit.

---

[43]     Ms. Denys filed a motion to withdraw as Plaintiff's counsel on March 16, 2010, and her motion was granted by the Court on that date. (Docket Nos. 105, 106).

(*Id*.).

Defendants maintain that Plaintiff has not produced any newly discovered evidence sufficient to support a motion for reconsideration. (Docket No. 257 at 14-15). They also claim that Plaintiff's allegations are inconsistent with and otherwise contradict the evidence presented at trial. (*Id*.).

Yet, Plaintiff contends in his June 27, 2011 response – which was filed without leave of court[44] – that the Defendants failure to deny that the criminal complaint and/or affidavit of probable cause were not produced and their failure to produce them at this stage demonstrate that the documents were fraudulently withheld. (Docket No. 258 at 12-14). He requests that the Court impose sanctions upon Defendants for their alleged failure to produce the documents, and enter an order vacating the judgment and scheduling a new trial. (*Id*.).

As noted above, Plaintiff's arguments are untimely under Rules 59(b) and 59(e). However, they potentially raise timely claims under Rules 60(b)(2) and 60(b)(3). Rule 60(b)(2) provides, in pertinent part, that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order or proceeding" based upon "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Fed.R.Civ.P. 60(b)(2).[45] The United States Court of Appeals for the Third Circuit has held that "Rule 59 and Rule 60(b)(2) share the same standard for granting relief based on newly discovered evidence." *Compass Technology, Inc. v. Tseng Laboratories, Inc.*, 72 F.3d 1125, 1130 (3d Cir. 1995). To this end, "Rule 60(b)(2) 'requires that the new evidence (1)

---

[44]     *See* n. 12, *supra*.
[45]     A motion under Rule 60(b)(2) must be brought within one year of the entry of judgment. *See* Fed.R.Civ.P. 60(b)(1) ("A motion under Rule 60(b) must be made within a reasonable time – and for reasons (1), (2), and (3), no more than a year after the entry of the judgment or order or the date of the proceeding.").

be material and not merely cumulative, (2) could not have been discovered before trial through the exercise of reasonable diligence, and (3) would probably have changed the outcome of the trial.'" *Floorgraphics, Inc. v. News America Marketing In-Store Services, Inc.*, 2011 WL 1486558, at *2 (3d Cir. Apr. 20, 2011) (quoting *Compass Technology*, 72 F.3d at 1130). Claims of "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party" are evaluated under Rule 60(b)(3). Fed.R.Civ.P. 60(b)(3). "To prevail [under Rule 60(b)(3)], the movant must establish that the adverse party engaged in fraud or other misconduct, and that this conduct prevented the moving party from fully and fairly presenting his case ... Failure to disclose or produce evidence requested in discovery can constitute Rule 60(b)(3) misconduct."46 *LG Electronics U.S.A., Inc. v. Whirlpool Corp.*, C.A. No. 08-234-GMS, 2011 WL 2610177, at *20 (D.Del. Jul. 1, 2011) (quoting *Stridiron v. Stridiron*, 698 F.2d 204, 207 (3d Cir. 1983)). But, not every discovery violation rises to the level of misconduct actionable under Rule 60(b)(3). *Id.* at *22 (quoting *Floorgraphics Inc*, 2011 WL 1486558, at *2). Indeed, consideration of:

> [w]hether there has been discovery misconduct warranting relief under Rule 60(b)(3) requires not only consideration of the request propounded, but also the response by one's adversary, and whether the moving party resorted to a motion to compel or a request for sanctions as permitted by the federal rules.

*Id.* Claims under Rule 60(b)(3) must be proven by clear and convincing evidence. *Id.* Finally, the party seeking relief under Rule 60(b) bears a "heavy burden." *Compass Technology*, 72 F.3d

---

46    "Rule 60(b)(3) concerns litigation-related fraud perpetrated in the course of litigation that interferes with the process of adjudication." *Smith v. Farnan*, Civ. No. 10-830-LPS, 2011 WL 2119340, at *3 (D.Del. May 27, 2011) (citing *Roger Edwards, LLC v. Fiddes & Son Ltd.*, 427 F.3d 129, 134 (1st Cir.2005)). This type of fraud includes, *inter alia*, "perjury of a witness or the introduction of a false document into evidence." *Roger Edwards, LLC*, 427 F.3d at 134.

at 1130.

Before addressing the merits of Plaintiff's arguments, the Court first resolves Plaintiff's claim that the Defendants have in effect admitted that they violated certain discovery rules by virtue of their response to his claim of newly discovered evidence. (Docket No. 258 at 12-14). Specifically, he argues that the Defendants failed to deny that they did not produce the criminal complaint and affidavit of probable cause and thus have conceded or admitted that they have engaged in discovery misconduct. (*Id.*). "It is clear that a party's admission in a pleading, such as an answer, can constitute a binding judicial admission, however, '[t]o be binding, admissions must be unequivocal.' Further, admissions 'must be statements of fact that require evidentiary proof, not statements of legal theories.'" *TDY Industries, Inc. v. National Freight Transp., Inc.*, Civ. A. No. 07-984, 2009 WL 691947, at *15 (W.D.Pa. Mar. 12, 2009) (quoting *In re Teleglobe Comm. Corp.*, 493 F.3d 345, 377 (3d Cir. 2007) (citing *Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3d Cir. 1972)). Despite Plaintiff's claim to the contrary, Defendants clearly deny any such discovery misconduct in their response. (*See* Docket No. 257 at 14). Defendants state that Plaintiff's claims consist of: "litigious lies of ethical violations and government misconduct"; bald/false accusations; inconsistent statements both with the evidence presented at trial and within his arguments; and do not contain any new evidence. (*Id.* at 14-15). In this Court's estimation, Defendants' response does not and cannot constitute a judicial admission under Third Circuit precedent as it is not unequivocal.

Turning to Plaintiff's arguments and supposed newly discovered evidence, the Court finds that he cannot meet his "heavy burden" under Rule 60(b)(2). Plaintiff's entire argument, along with the declaration by his former counsel, are undermined by assertions made in his Final Witness List and Offer of Proof, filed prior to trial on May 21, 2010. (Docket No. 116 at ¶ 8). In this

proffer, filed through his former counsel, Plaintiff states that "Officer Terry Collings of [the] Pittsburgh Police Department also may be called, he having executed the original police report of charges against Plaintiff and dated 11.02.01." (*Id.*). Therefore, the fact that Officer Collings was involved in this case was not "newly discovered" by Plaintiff after trial because Plaintiff and his then-counsel were clearly aware of the role that Collings purportedly played in his arrest prior to trial and Plaintiff asserted that he intended to call Collings as a witness to testify as to his role. (*See Id.*). Plaintiff also admits in his response that he had possession of the criminal complaint/affidavit of probable cause at one time. (*See* Docket No. 251 at 46 ("The Criminal Complaint/Affidavit of Probable Cause is precisely the documents that was [sic] given to me (Plaintiff) at Allegheny County Jail the next day when I was charged with the crimes, and had a bail set for those charges."). However, for reasons unknown to the Court, Plaintiff and his trial counsel did not call Collings to testify and thereby did not elicit from him the type of information Plaintiff now complains was wrongfully withheld. Nor did Plaintiff's counsel question any of the other witnesses at trial about the role Collings played – including Plaintiff himself. They also did not present the copy of the criminal complaint/affidavit of probable cause that Plaintiff once had in his possession at trial or question any of the witnesses about the criminal complaint/affidavit of probable cause. Plaintiff clearly had the opportunity to probe this theory in discovery and at trial but chose not to do so. Finally, even if the criminal complaint/affidavit of probable cause was not produced by the defense, there is nothing to suggest that the result of the trial would have changed if Plaintiff had presented those documents at trial.[47] For these reasons, relief from the judgment under Rule 60(b)(2) is not warranted.

---

[47] The Court also questions whether these documents would have been admissible given the Court's ruling on Plaintiff's Exhibit 15. *See* § V.B.1, *supra.*

Plaintiff also claims that the date of his arrest was actually November 3, 2001 as opposed to November 2, 2001. With respect to this claim, the Allegheny County Jail records, upon which Plaintiff now relies, were admitted under Joint Exhibit 3 during trial, except for a document titled "Allegheny County & Police ID Section." (*See Jt. Ex.* 3; Docket No. 205). This new exhibit contains virtually the same information as the others; thus, it is merely cumulative and does not contain new evidence. *See Floorgraphics, Inc.*, 2011 WL 1486558, at *2 ("Rule 60(b)(2) 'requires that the new evidence (1) be material and not merely cumulative"). As Plaintiff suggests, these documents all state that the date of the offense at issue in this case was November 3, 2001. *Jt. Ex. 3*. However, other documents admitted at trial, including the arrest report, offense/incident report and supplemental offense/incident report, all state that the incident occurred on November 2, 2001. *Jt. Ex. 4*. The apparent discrepancy in the dates between the documents was not brought up by Plaintiff or his former counsel in any fashion during the trial or pretrial proceedings. As with Officer Collings' purported involvement, such information could have been elicited during the testimony of Plaintiff himself, any of the Defendant Officers or Officer Collings, if he had been called. Aside from the Allegheny County Jail records now cited by Plaintiff, however, virtually every other document filed by Plaintiff in this case, either *pro se*, or through his former counsel, states that the incident occurred on November 2, 2001, including, Plaintiff's *pro se* Amended Complaint, his counseled Third and Fourth Amended Complaints, the parties' pretrial stipulations, and the aforementioned Witness List and Proffers. (*See* Docket Nos. 42, 45, 56, 116, 140). Consistent with the parties' pretrial stipulation, the Court instructed the jurors during the preliminary instructions that the parties had stipulated that "on November 2[nd], 2001, the defendant police officers initiated a stop, within the time frame of 9:15 p.m. and 10:00 p.m. of a vehicle then being operated by plaintiff, Charles Jackson." (Docket No. 239 at 40). In

addition, all of the witnesses, including Plaintiff himself, testified at trial that Plaintiff was arrested on November 2, 2001. (Docket No. 240 at 29). Hence, Plaintiff's claim to the contrary has no merit. In any event, the discrepancy in the dates on the documents has no bearing on this case, which involved whether or not the Defendant Officers unlawfully arrested Plaintiff, searched his vehicle and/or subjected him to excessive force during said arrest.[48]

Lastly, Baranowksi's affidavit, wherein he states that he was unable to locate any evidence of Plaintiff's arrest on November 2, 2001 in his post-trial investigation[49] of this case, proves nothing,[50] much less fraud or discovery misconduct by the defense.[51] (*See* Docket No. 251-4). As discussed above, and in the Court's pretrial Memorandum Opinion regarding his proffered expert testimony, Baranowski prepared an expert report in this case and stated that he reviewed much of the evidence in this case, including the arrest report and incident report – both of which show that the incident in question occurred on November 2, 2001. *See Jackson*, 2010 WL 3222137, at *2; (Docket No. 76). As such, it is plainly disingenuous for him to now state that he has found no record which states that Plaintiff's arrest occurred on November 2, 2001 and the

---

[48]    The date discrepancy is also easily explained. Plaintiff was pulled over in the Homewood section of Pittsburgh at 9:30 p.m. on November 2, 2001. Time obviously elapsed given the ensuing confrontation between Plaintiff and the Defendant Officers. The Defendant Officers then called for a paddy wagon to pick Plaintiff up, which arrived after some time. Plaintiff was next transported across town to the Allegheny County Jail, where he was processed, etc. It is not outside the realm of possibility that this process was not completed until after midnight on November 3, 2001. Of course, the reason for the error is only speculation by the Court because Plaintiff's counsel did not ask any of the witnesses about the discrepancy in the dates on the documents or the reason for same.

[49]    Neither Plaintiff nor Baranowski present the Court with any reason why the date of the arrest was not investigated prior to trial. Plaintiff has not acted with diligence in pursuing this claim because it is much too late and should have been investigated earlier. To this end, Baranowski's expert report is dated June 19, 2009, (Docket No. 76 at 2), and he had been involved in this case for more than a year prior to trial, which commenced on August 23, 2010. As the Court recognized in its *Daubert* Opinion, *see Jackson*, 2010 WL 3222137, at *1-2, Baranowski has significant law enforcement experience; therefore, he easily could have conducted this type of investigation prior to trial.

[50]    The date of the arrest is of no moment. Defendants did not raise a statute of limitations defense or assert any other defense at trial which would have relied on proof of the date.

[51]    The burden to prove fraud or other misconduct is very high. *See Compass Technology*, 72 F.3d at 1130 (noting the heavy burden on a movant to prove fraud or other misconduct).

Court questions his credibility for doing so now. In addition, Baranowski sets forth a plausible explanation about why his post-trial investigation for records of the arrest came up empty, i.e., Pennsylvania has not maintained the type of records for which he searched and the FBI has not answered his request for their records. (*See* Docket No. 251-4). Hence, Baranowski's affidavit demonstrates that his post-trial investigation did not uncover any newly discovered evidence, precluding any possible relief under Rule 60(b)(2).

In sum, Plaintiff has failed to meet his heavy burden to show that he should be relieved from the judgment entered against him under Rule 60(b)(2) based on the alleged newly discovered evidence he has presented. *See* Fed.R.Civ.P. 60(b)(3); *see also Compass Technology*, 72 F.3d at 1130.

For largely the same reasons, Plaintiff's claim that defense counsel fraudulently withheld the criminal complaint and/or affidavit of probable cause, possibly entitling him to relief under Rule 60(b)(3), carries little weight. Plaintiff's pretrial offer of proof of Officer Collings' testimony demonstrates that he had possession of the information underlying this alleged newly discovered evidence prior to trial. (*See* Docket No. 116 at ¶ 8). So, even if the documents were wrongfully withheld, which Defendants dispute, Plaintiff had a full and fair opportunity to present this theory during pretrial proceedings and trial without the actual documents if indeed he did not have them. Yet, he and his counsel chose not to do so. Moreover, Plaintiff never challenged the Defendants' discovery production claiming that these documents were wrongly withheld. (*See* Docket Report, Civ. A. No. 07-111). He did not bring a motion to compel such production during discovery,[52] did not bring a motion in limine during pretrial proceedings on this issue[53] and never

---

[52]        The only motion to compel filed in this case was brought by Defendants. (*See* Docket No. 64).

informed the Court of any such discovery problems – except for the brief argument highlighted by Plaintiff during trial.  (*See* Docket No. 240 at 112-116).   Even then, Plaintiff's counsel did not pursue the matter further by calling Collings as a witness, seeking leave to depose him during trial, cross-examining the Defendant Officers, attempting to enter rebuttal evidence as to such facts, or moving for a mistrial.   Because Plaintiff failed to enforce his rights during the pendency of this case, including during discovery and trial, this Court does not find that Defendants engaged in the type of fraud (or any fraud) entitling Plaintiff to relief under Rule 60(b)(3).  *See Floorgraphics Inc*, 2011 WL 1486558, at *2.   Claims of fraud should not be made lightly and, when they are made, must be supported by clear and convincing evidence.  *Id*.   Plaintiff has presented no evidence of fraud or misconduct and has failed to meet his burden under Rule 60(b)(3). Accordingly, to the extent Plaintiff's arguments are construed as requesting relief under Rule 60(b)(3), said request is denied.

VI.    CONCLUSION

Based on the foregoing, Plaintiff's motion for a new trial and his motion for reconsideration, (Docket Nos. 214, 218), are denied.   Likewise, to the extent Plaintiff seeks relief from judgment under Rule 60, the same is also denied.   An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date:   August 8, 2011

cc/ecf:  All counsel of record.

---

[53]    Plaintiff brought two pretrial motions in limine; the first sought preclusion of Plaintiff's criminal record, while the second sought to preclude or limit the testimony of defense witness, Officer David Wright.   (Docket Nos. 133, 135).

Charles Jackson, *pro se*
HH8901
SCI Camp Hill
P.O. Box 200
Camp Hill, PA 17001-0200